**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

DOMENICA NOMINEES PTY. LTD., FRANK
WILSON, and LUCERNE AUSTRALIA PTY.
LTD.,

                    Plaintiffs,

      -against-

EMERGING MARKETS INTRINSIC CAYMAN
LTD., SRT CAPITAL SEGREGATED
PORTFOLIO COMPANY TFC, CGO V, LLC,
SRT CAPITAL SPC, LTD., ERIC MAASS and
BULENT TOROS,

                 Defendants.

Case No. 16-cv-09016

**<u>COMPLAINT</u>**

Plaintiffs Domenica Nominees Pty. Ltd. ("Domenica"), Frank Wilson ("Mr. Wilson" or "Wilson") and Lucerne Australia Pty. Ltd. ("Lucerne Australia") file this Complaint against Defendants Emerging Markets Intrinsic Cayman Ltd ("EMI"); SRT Capital Segregated Portfolio Company TFC ("SRT"); CGO V, LLC ("CGO V"); SRT Capital SPC, Ltd. ("SRT Capital"); Eric Maass ("Maass"); and Bulent Toros ("Toros").

## I. <u>PARTIES</u>

1.    Plaintiff Domenica Nominees Pty. Ltd. ("Domenica") is an Australian entity with its principal place of business in Australia.

2.    Plaintiff Frank Wilson ("Mr. Wilson") is an individual residing in Australia.

3.    Plaintiff Lucerne Australia Pty. Ltd. ("Lucerne Australia") is an Australian entity with its principal place of business in Australia.

4.      Defendant Emerging Markets Intrinsic Cayman Ltd ("EMI") is a Cayman Islands company with its principal place of business at 388 East Main St., Suite 2111, Branford, Connecticut, 06405.  EMI has appeared in this suit through counsel.

5.       Defendant SRT Capital Segregated Portfolio Company TFC ("SRT") is a segregated portfolio of Defendant SRT Capital SPC, Ltd. with its principal place of business at 31 The Strand, 46 Canal Point Drive, Grand Cayman KY1-1105, Cayman Islands.   Upon information and belief, at some point in time SRT changed its name to Domenica Nominees SPC.

6.      Defendant CGO V, LLC ("CGO V") is a Delaware company with its principal place of business at 31 Thimble Farms Road, Suite 200, Branford, Connecticut, 06405.  CGO V has appeared in this suit through counsel.

7.      Defendant SRT Capital SPC, Ltd. ("SRT Capital") is a segregated portfolio company organized under the laws of the Cayman Islands with its principal place of business at 31 The Strand, 46 Canal Point Drive, Grand Cayman KY1-1105, Cayman Islands.

8.      Defendant Eric Maass ("Maass"), upon information and belief, is an individual residing at 31 Thimble Farms Road, Branford, Connecticut, 06405.  Maass is a managing partner and/or director of defendants EMI and a director of defendant CGO V.  Maass directly or indirectly controls defendants SRT and SRT Capital.

9.      Defendant Bulent Toros ("Toros"), upon information and belief, is an individual residing in New York City.  Toros is the Managing Director of defendant CGO V and Chairman & CEO of defendant EMI.

## II.   JURISDICTION AND VENUE

10.     Plaintiffs file the Complaint in accordance with Fed. R. Civ. P. 3 and Fed. R. Civ. P. 81(c).

11.     The Court has subject matter jurisdiction over this lawsuit under 28 U.S.C. § 1331 because it presents claims arising under federal laws.   Specifically, Plaintiffs assert claims against all Defendants for violations of the Racketeer Influenced and Corrupt Organizations Act under 18 U.S.C. §§ 1961 *et. seq.* ("**Civil RICO**").   18 U.S.C. § 1964(c) vests jurisdiction over Civil RICO cases in the U.S. District Courts.   Additionally, Plaintiffs assert claims under 42 U.S.C. § 1985 for Defendants' egregious threats and intimidation of parties and witnesses in this official proceeding.

12.     This court also has supplemental jurisdiction over the state-law claims asserted in this lawsuit because they are so related to the federal claims that they form part of the same case or controversy.   28 U.S.C. § 1367(a).

13.     This court has personal jurisdiction and venue is proper in this district under 28 U.S.C. §1391 because Defendants agreed to be sued in this forum and to be subject to the jurisdiction and laws of this state.

## III.   FACTS

### A.     Introduction

14.     Through a series of malicious and pre-meditated actions, Defendants have defrauded Plaintiffs out of millions of shares in publicly traded securities, which Defendants are wrongfully treating as collateral for a sham loan transaction.

15.     Unbeknownst to Plaintiffs, Defendants' intentions were far from entering into a normal lending relationship.   In fact, as explained below, Defendants' motivation was to

wrongfully seize control of Plaintiffs' shares, which they accomplished through a well-orchestrated wire and investment fraud.

16.     Defendants purported to rely upon what they knew to be non-binding facsimile signatures of Mr. Wilson principal to immediately declare a sham "default" on a sham loan for which no funds had ever been lent.   The Defendants' illicit goal was to illegally seize, trade, and profit from the securities which purportedly secured the loan.

17.     When Plaintiffs initially confronted Defendants, Defendants doubled down on their illegal behavior by: (1) refusing to voluntarily stop their foreclosure on the securities purportedly held as collateral; (2) refusing to identify the current location and custodian of the securities; (3) refusing to confirm whether they had already sold, traded, lent, or otherwise encumbered the securities; (4) refusing to vote the securities as required pursuant to Plaintiffs' instructions as they had previously agreed to do; (5) wrongfully converting dividends paid on the Collateral shares worth hundreds of thousands of dollars that were paid on November 8, 2016; and (6) directly threatening the reputations and job security of Plaintiffs' principals should any legal action be taken.

18.     Refusing to be extorted or to allow the securities to be stolen and traded, Domenica sought preliminary injunctive relief from the New York State Supreme Court.

19.     Defendants then removed the case to this Court, in a baseless attempt to compel arbitration premised on the same fraudulent and non-binding documents that they relied upon to convert the securities.   *See* Dkt. No. 1.

20.      Defendants' propensity for illegal conduct was not at all deterred by their removal to this Court.   Instead, similar to the extortion threats made pre-suit, on the very day this case was removed, Defendants made direct threats to a key witness, Mr. Anthony Murphy -- the

principal and founder of Plaintiff Lucerne Australia – who had given a truthful declaration affirming the fraudulent nature of Defendants' actions.   In direct response to Mr. Murphy's testimony, Defendants, through Defendant Eric Maass, made numerous vicious and reprehensible threats specifically intended to affect this proceeding.   A sampling of Mr. Maass' illegal threats (many of which were memorialized in text messages) are:

   a.   Maas was going to "bury" Murphy;

   b.   Murphy should "tell [his] wife not to have a 3rd baby because you and your family are finished."

   c.   "Wave goodbye to your Dad today."

   d.   "how on earth could you have done something so stupid?"

   e.   "u try and fry me?"

   f.   "I am one person u don't fuck over"

   g.   "U don't want your kids to hear this" and ominously,

   h.   "Look forward to seeing u in NY."

21.   Standing alone, Defendants' criminal conduct would be egregious enough.   Yet Defendants' actions are not isolated, but part of a consistent pattern of wrongdoing.   As detailed below, Plaintiffs are but the latest in a line of victims, each of whom Defendants deliberately targeted in a series of nearly identical fraudulent schemes.   Plaintiff Wilson has identified two other cases pending in New York courts against Defendants that involve similar allegations of fraud and "sham defaults."   *See Carbures Europe, S.A. et al. v. Emerging Markets Intrinsic Cayman, Ltd, et al.*, Index No. 653892/2015; Supreme Court of the State of New York, County of New York; and *Soleil Capital Limited et al. v. Emerging Markets Intirnisc, Ltd. and Eric Maass;* Index No. 653451/2015; Supreme Court of the State of New York, County of New York.

22.     The facts of this case, like the facts alleged in the *Carbures* and *Soleil Capital* lawsuits, demonstrate that Defendants' illegal conduct is consistent with a pre-meditated and organized pattern of illegal conduct, undertaken by an illegal enterprise through distinct predicate acts in furtherance of an overarching unlawful objective.

**B.**     **Background**

23.     Mr. Frank Wilson ("Mr. Wilson") co-founded and is the Chief Executive Officer of TFS Corporation Ltd. ("TFS").

24.     TFS is a publicly traded company on the Australian Securities Exchange (the "ASX").  TFS shares are traded on the ASX under the code TFC.  As of June 30, 2016, TFS had a market capitalization of approximately $547,207,000 (AUS) based on a closing share price of $1.41.

25.     TFS owns and manages sandalwood plantations, as well as processing and distilling facilities in Australia. TFS and its U.S. subsidiaries employ over five hundred people.

26.     Plaintiff Domenica, an Australian entity, is owned and controlled by Mr. Wilson and his family.  Domenica has at all relevant times been the beneficial owner of a substantial number of TFS shares.

The 2015 Loan Transaction

27.     In the summer of 2015, Mr. Wilson desired to borrow funds in connection with certain contemplated business transactions.

28.     Mr. Wilson discussed his desire to borrow funds with Anthony Murphy ("Murphy"), an Australian investment advisor.  Murphy introduced Mr. Wilson to EMI as a potential lender.  Murphy later formed Plaintiff Lucerne Australia, which also trades as Lucerne

Investment Partners ("Lucerne"), through which he continued to be involved in negotiations and dealings between Mr. Wilson and the Defendants through 2016.

29.     As discussions with EMI progressed, EMI conditioned its participation in the transaction on the formation of a new entity, SRT Capital Segregated Portfolio Company TFC ("SRT"), a company based in the Cayman Islands, to serve as the borrower.  Mr. Wilson was consistently told by Defendants that SRT would be owned and controlled by him.

30.     On or about July 2, 2015, SRT (as borrower) and Emerging Markets Intrinsic Cayman Ltd ("EMI") (as Lender) executed and delivered a Margin Lending Agreement (the "2015 Margin Lending Agreement").  A true and correct copy of the 2015 Margin Lending Agreement is attached to this Complaint as **Exhibit 1.**

31.     To secure SRT's payment obligations under the 2015 Margin Lending Agreement, Domenica delivered approximately 22,534,000 TFS shares to EMI (the "Collateral Shares").  The Collateral Shares represent approximately 40% of Mr. Wilson's direct or indirect stock holdings in TFS.

32.     SRT is, and at all times has been, in compliance with its obligations under the 2015 Margin Lending Agreement.

33.     Defendant Bulent Toros ("Toros") represented that SRT was and would remain beneficially owned by Mr. Wilson and his wife, and therefore that Mr. Wilson and his wife were and would remain the beneficial owner of the Collateral Shares.  Toros repeated this representation on several occasions both before and after the transaction, including but not limited to in an email dated November 8, 2015 to Mr. Wilson.

7

The 2016 Proposed Transaction

34.     In 2016, Mr. Wilson began exploring a possible additional loan transaction with EMI.

35.     In October of 2016, discussions were ongoing and EMI presented proposed transaction documents.  On most occasions, Murphy served as an intermediary between Mr. Wilson and EMI in connection with these discussions.

36.     Mr. Wilson did not agree to the terms of the proposed transaction set forth in these documents.  Although he discussed the proposed terms with his own advisors, he never consented to them.  Nor did Mr. Wilson ever authorize any other person to consent to them in their then current form.

37.     In late October 2016, Maass stated to Murphy several times that EMI desired to close the transaction as quickly as possible or to not proceed with the transaction.  Maass then fraudulently represented to Murphy that a "good will" gesture required by EMI to agree to keep the deal alive was to provide executed outstanding transaction documents, even though he acknowledged the terms of the deal were not final.

38.     On October 27, in reliance on Maass's representations that the document would not be considered binding and that the parties would continue to work to finalize the actual deal documents, Murphy signed a Term Sheet (the "2016 Term Sheet") on behalf of Lucerne Australia outlining a new loan to be made to Lucerne Australia, secured by additional shares of TFS.  Murphy sent the 2016 Term Sheet to EMI at the request of EMI and on the understanding that Murphy was demonstrating a commitment to continue to negotiate all outstanding issues with a view to finalizing the transaction.  A similar process had been undertaken for the 2015

Margin Loan Agreement under which a Term Sheet was signed on May 20, 2015 and further amendments were made to the final Margin Loan Agreement executed on July 2, 2015.

39.     The Term Sheet states that Lucerne Australia was assuming the borrower SRT's rights under the 2015 Margin Loan Agreement and that it was pledging the Collateral Shares as partial security for the new loan.  Wilson did not authorize Murphy to bind Wilson to the Term Sheet in its then existing form, was not aware of any assignment of rights under the 2015 Margin Loan Agreement to Lucerne Australia, and did not consent to pledge the Collateral Shares as security for a new loan.

40.     On October 28, 2016, Murphy had an extensive telephone conversation with Mr. Wilson's Australian counsel, Mr. Jeremy Wade, regarding Mr. Wilson's required changes to the documents' terms.

41.     On October 30, 2016, Murphy participated in a telephone call with Mr. Wilson and Mr. Maass, whereby Mr. Wilson explained certain issues he had with the proposed terms and outlined changes he would require before proceeding with the new transaction.  In particular, Mr. Wilson required the terms to be altered to protect the ability of the borrower to use the cash in the trading collateral account to meet margin calls, for the borrower to exit the loan at any time upon paying out the remaining term interest, and for the borrower to apply interest earned on the trading collateral account against interest payable.  Mr. Wilson had no intention to enter into a new transaction until such terms had been incorporated into the deal documents and vetted by his counsel.

42.     After Mr. Wilson explained his position and required changes to the terms, Mr. Maass agreed in principle to all the changes, with one exception – Mr. Wilson's request for a shorter term for the contemplated loan.  Mr. Maass stated that he would consider that change as

well and let Mr. Wilson know his position after EMI's legal counsel, Mr. Wayne Martino, drafted and circulated the new amendments for review.

43.     Murphy understood that, without the important changes to the deal documents, Mr. Wilson was unwilling to proceed with a binding and unconditional deal with EMI on the terms of the existing documents.  Murphy and Mr. Wilson waited for a draft addendum with those requested changes acceptable to Mr. Wilson.  Murphy suggested Mr. Wade draft an addendum to the Term Sheet to reflect the changes verbally agreed to by the parties on the October 30, 2016 call.

44.     Once again, Maass then fraudulently represented to Murphy that a "good will" gesture required by EMI to agree to keep the deal alive was to provide further executed transaction documents, even though he acknowledged the terms of the deal were not final because the amendments discussed during the October 30, 2016 call had not yet been incorporated into the deal documents.  This was despite the fact that Mr. Wilson and Murphy had repeatedly stated to Maass that any proposed deal would also be conditioned on Mr. Wilson receiving confirmation from TFS's company secretary that EMI had voted Domenica's TFS shares pursuant to Mr. Wilson's instructions for the annual general meeting scheduled in November, as required under the 2015 Margin Lending Agreement.

45.     Murphy conveyed his conversations with Maass to Mr. Wilson.  Mr. Wilson stated that he was willing to move forward to "keep the deal alive" and continue negotiations, but that his final acceptance was conditioned on the amendments agreed to during the October 30, 2016 call and the voting of the shares.  Murphy's communications with Mr. Wilson on these issues are reflected in November 1, 2016 email correspondence between Mr. Wilson and Murphy.

46.     On November 1, 2016, relying on Maass's agreement that the terms were conditional on subsequent amendments, Murphy forwarded to Maass additional transaction documents, including the Assignment and Assumption Agreement (the "Assignment Agreement") for which Lucerne affixed a signature from Mr. Wilson.  In the cover email to Maass enclosing the signed documents, Murphy conveyed – consistent with previous communications – that acceptance of the transaction was conditioned on: (a) the additional terms the parties had agreed to on the October 30, 2016 call and (b) EMI's voting of Domenica's shares pursuant to Mr. Wilson's instructions.

47.     At no time did Mr. Murphy have a power of attorney for Mr. Wilson nor express authorization to bind Mr. Wilson to any transaction documents that did not incorporate the additional terms agreed to by the parties on the October 30 call and confirmation from TFS's company secretary that EMI had voted Domenica's TFS shares pursuant to Mr. Wilson's instructions.

48.     On or about November 1, 2016, EMI's U.S. Counsel, Mr. Wayne Martino, e-mailed Murphy and requested that Murphy obtain a second signature from Mr. Wilson on the Assignment Agreement as a representative of SRT.   Again, relying on Mr. Maass' representations, Lucerne affixed Mr. Wilson's signature a second time on the signing page of the Assignment Agreement and returned the signature page to Mr. Wayne Martino on November 2, 2016.  Murphy would not have placed Mr. Wilson's signature on the Assignment Agreement but for his reliance on the understanding, based on all previous correspondence and discussions with EMI, that such documents were not binding because they did not contain the additional terms agreed to on the October 30 call.

49.     On November 3, 2016, while Mr. Wilson was travelling in the United States, he received an e-mail from Murphy advising that Lucerne had received a Notice of Event of Default from defendant CGO V to plaintiff Lucerne Australia (the Notice of Default"). The Notice of Default alleges that Lucerne Australia was in default under a 2016 Margin Lending Agreement and the 2016 Term Sheet.

50.     After Mr. Wilson questioned Murphy about the Notice of Default, Murphy sent Mr. Wilson an e-mail attaching an Assignment and Assumption Agreement (the "Assignment"). The Assignment purported to assign all of SRT's and Mr. Wilson's individual rights and obligations related to the 2015 Margin Lending Agreement to Lucerne Australia. *See* **Exhibit 2,** the Assignment. The Assignment further purported to assign all of EMI's rights and obligations as Lender to CGO V. The Assignment has a signature block with Mr. Wilson's name on it and what purports to be his signature; however, he never signed the Assignment. Mr. Wilson never authorized anyone to sign his name on any binding Assignment. Mr. Wilson never approved, accepted, or agreed to the terms of the Assignment. In fact, prior to receiving the Notice of Default, Mr. Wilson had never seen the executed Assignment and having read its terms, Mr. Wilson would have never agreed to the Assignment.

51.     Mr. Wilson then received from Murphy an October 25, 2016 Margin Lending Agreement, (the "2016 Margin Lending Agreement"), by and among Lucerne Australia (as borrower), CGO V (as lender) and SRT Capital SPC, Ltd (as agent). *See* **Exhibit 3,** 2016 Margin Lending Agreement (attached as Exhibit A to Exhibit 3 is the "2016 Term Sheet" that Lucerne Australia signed on October 27). According to the terms of the 2016 Margin Lending Agreement, the Collateral Shares are pledged as security for Lucerne Australia's obligations under the agreement. Mr. Wilson never approved, accepted, or agreed to the terms of the 2016

Margin Lending Agreement or the 2016 Term Sheet.  Mr. Wilson never authorized anyone on his behalf to approve, agree or enter these agreements.  On the contrary, Mr. Wilson made his position clear, as did Murphy, that the terms of these prepared agreements were not acceptable.

52.     On November 3, 2016, upon seeing the non-binding documents that EMI was attempting to enforce, Mr. Wilson immediately informed Murphy that Mr. Wilson did not sign the Assignment and did not intend to give Murphy authority to sign the Assignment for him. Murphy agreed that these documents were never finalized nor intended to be binding.

53.     On or about November 4, 2016, Mr. Wilson received from Murphy a copy of an email from Murphy to Maass and Toros (each of whom hold themselves out to be representatives of EMI) objecting to the Notice of Default ("Murphy's Email").

54.     Despite being placed on notice that the documents were not authorized, on November 4, 2016, CGO V sent a Notice of Acceleration to Lucerne Australia, notifying Lucerne Australia of CGO V's intent to accelerate Lucerne Australia's obligations under the 2016 Margin Lending Agreement and demanding payment of AUD 23,666,426 on or before November 9, 2016 (Australian Eastern Daylight Time) (the "Notice of Acceleration").   In the Notice of Acceleration, CGO V indicates that it may, "sell any of the Share Collateral in public or private sale and without further notice to the maximum extent allowed pursuant to New York UCC Section 9-611(d)."

55.     On or about November 5, 2016, Mr. Wilson sent an email to Eric Maass, notifying Maass that Mr. Wilson did not sign the Assignment and that the 2015 Margin Lending Agreement has not been assigned to Lucerne Australia.

56.     Mr. Wilson was not in default under the 2015 Margin Lending Agreement and has never received a notice of default under that agreement.

57.     Relying on documents that Mr. Wilson never signed nor authorized in their then current form, CGO sought to foreclose on the Collateral Shares – despite the fact that CGO V did not disburse to Mr. Wilson or anyone else a single dollar of funds under the purported 2016 Margin Lending Agreement.

58.     The Collateral Shares have an approximate current value of approximately $33 million (AUD), far exceeding the balance owed on the 2015 Margin Lending Agreement.

59.     Allowing CGO V to sell the Collateral Shares would cause irreparable damages that cannot be remedied by a monetary judgment.

60.     For example, selling that large of a block of TFS shares in the open market in an uncontrolled manner would likely have a dramatic and detrimental effect on the share prices for all shareholders.  The average daily trading volume in TFS shares on the ASX is less than 1 million shares per day.  Selling over 20 million shares (over 20 times the daily average) would likely create a substantial devaluation of share prices.

61.     Second, under the 2015 Margin Lending agreement, Mr. Wilson maintained the voting rights for the Collateral Shares.  Through these voting rights, Mr. Wilson was able to exercise a significant role in board composition and significant corporate transactions that require shareholder approval.  Allowing the sale of the Collateral Shares would disrupt that role.  While Mr. Wilson owns directly or indirectly, other TFS shares, loss of the Collateral Shares would irreparably dilute Mr. Wilson's ownership and related control.  For example, at a typical TFS annual general shareholder meeting, less than 140 million shares are voted.  The Collateral Shares would represent approximately 14% of that total.  Mr. Wilson always voted his shares at each TFS annual general shareholder meeting (or instructed others, such as EMI, to vote his

shares).  A loss of the ability to vote approximately 14% of the shares voted at an annual general meeting of shareholders would irreparably reduce Mr. Wilson's voice in shareholder matters.

62.     Upon information and belief, the Collateral Shares remain in possession of EMI, its agents, or affiliates.  Through counsel, as recently as November 7, 2016, Mr. Wilson requested the current location of the Collateral Shares, but EMI, through its counsel, has refused to disclose that information.

63.     Additionally, despite written demand, EMI has refused to pay Domenica its dividend from the Collateral Shares which is now due and owing.  Domenica is entitled to this dividend under the express terms of the 2015 Margin Lending Agreement.

64.     Additionally, allowing CGO V to sell the Collateral Shares will result in significant and possibly irreparable reputational harm to Mr. Wilson, particularly within the TFS company and among its shareholders, and to Lucerne Australia.  The suggestion that Mr. Wilson and/or Lucerne Australia "defaulted" on a loan secured by the Collateral Shares would have devastating effect on their professional reputations and standing in the business community.

65.     There has never been a notice of default under the 2015 Margin Lending Agreement.  Indeed, there has never been even the suggestion of any default in payment even under the non-binding and unconsummated 2016 Margin Lending Agreement.  CGO V never advanced any funds under that agreement to Mr. Wilson, and it appears that this entire scenario was intentionally designed to improperly seize the Collateral Shares under a manufactured and contrived "Default."

66.     CGO V sent its Notice of Default the same day that it received the non-binding the documents it now seeks to enforce.  Those signatures were not Mr. Wilson's and were not placed on those documents with Mr. Wilson's express or implied authority.

67.     Creating the false impression based on unauthorized documents that Mr. Wilson "defaulted" on a loan would severely impact his business reputation and possibly incite unjustified concern among TFS shareholders, thereby endangering his position with the company.

## IV. CAUSES OF ACTION

### COUNT ONE
**Violations of the Racketeer Influenced and Corrupt Organizations Act
18 U.S.C. §§ 1961 *et seq.* ("Civil RICO")
(All Plaintiffs Against All Defendants)**

68.     Plaintiffs re-allege and fully incorporate the allegations set forth above.

### *The Enterprise*

69.     Emerging Markets Intrinsic Cayman Ltd ("EMI") is an "enterprise" as defined in 18 U.S.C. § 1961(4).

70.     Through its business operations, EMI is engaged in and/or its activities affect interstate commerce and foreign commerce.  EMI utilizes interstate and foreign commerce in the operation and administration of its lending and investment banking business.

71.     Plaintiffs participate in interstate commerce because, *inter alia*, they have operations in several different states including New York and Connecticut.

72.     EMI routinely participates in foreign commerce because, *inter alia*, it conducts businesses and/or holds the accounts of citizens of different countries. For example, EMI represents that, in addition to the United States, it has offices in Turkey, and India.  Moreover, EMI participates in joint ventures in foreign countries including Turkey.

73.     EMI's "asset management" business also necessarily involves and requires the use of interstate wires and communications to transmit communications, funds, loan documents, etc.

74.     EMI is a legal entity that is wholly separate and distinct from the other defendants.

### *The RICO Defendants*

75.     Defendants SRT; CGO V; SRT Capital; Maass; and Toros (collectively, "the RICO Defendants") are each "persons" within the meaning of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1961(3).

### *Predicate Acts of Racketeering*

76.     Among the many predicate acts committed by the Defendants are the following:

77.     Each of Defendants' use of the internet to send communications to Plaintiffs in furtherance of their scheme constitutes a separate and distinct act of wire fraud under 18 U.S.C. § 1343.  Some examples include:

     a.     *October 30, 2016 Telephone Call and Subsequent Communications:* On an October 30, 2016 telephone call, Maass, speaking on behalf of the corporate defendants, fraudulently misrepresented to Murphy and Wilson that he was agreeing to all changes to the loan agreement proposed by Mr. Wilson, with the exception of the term of the loan.  Over the next few days after this call, Maass fraudulently misrepresented to Murphy over telephone and email that (a) an executed copy of the Assignment and 2016 Margin Loan Agreement -without the agreed upon amendments - was required as a non-binding "good will" gesture while the final amendments were being drafted; (b) that the new transaction would include the terms agreed upon during the October 30, 2016 telephone call; and (c) that

Defendants would vote the Collateral Shares in accordance with Mr. Wilson's instructions as a prerequisite to any further loan transaction.

b. *November 2, 2016 E-mail from Bulent Toros to Murphy*.  Defendants sent the fraudulent Notice of Default via email.  The Notice of Default was a material and critical part of the scheme and was used by Defendants as the tool to seize and attempt to sell the Collateral Shares.  The Notice of Default was itself a fraudulent document as it is predicated on documents the Defendants knew to be unauthorized and obtained via deceit and trickery.

c. *November 4, 2016 E-mail from Bulent Toros to Murphy*.  Defendants sent the fraudulent Notice of Acceleration via email. The Notice of Acceleration was a material and critical part of the scheme and was used by Defendants as the tool to seize and attempt to sell the Collateral Shares. The Notice of Default was itself a fraudulent document as it is predicated on documents the Defendants knew to be unauthorized and obtained via deceit and trickery.

78.    Defendants' predicate acts further include their threats to witnesses and parties in connection with this action in violation of 18 U.S.C. §§ 1512 and 1513.  These specific threats are listed in paragraphs above.

79.    Defendants have refused to disclose if they have conducted any sales, loan transactions, or otherwise encumbered the Collateral Shares.  If any such transactions have occurred, such transactions would constitute additional predicate acts and acts of money laundering under 18 U.S.C. § 1956 – namely financial transactions with the proceeds of specified

unlawful activity (in this case wire fraud).  The refusal to disclose such transactions is consistent with the requisite *mens rea* to conceal or disguise the true nature and source of the transactions.

80.     Each of these criminal acts constitute "racketeering activities" under 18 U.S.C. § 1961(1).

81.     Moreover, the predicate acts described above and throughout this Complaint constitute a "pattern of racketeering" within the meaning of 18 U.S.C. § 1961(5).

82.     As described above, at times, the Defendants' mail, wire, and internet communications themselves contained fraudulent communications.   When not patently fraudulent, the Defendants' mail, wire, and internet communications were nevertheless material to and in furtherance of the scheme to defraud the plaintiffs.

83.     The predicate acts all occurred well within 10 years of each other, are all related to each other and "continuous" as explained below.

84.     The predicate acts are related in that they have the same or similar participants, all of whom are established business associates.

85.     Defendants' conduct demonstrates an "open-ended" pattern of continuity as they represent the Defendants' ongoing way of conducting their business by and through EMI.  As demonstrated by the Defendants' suspiciously similar conduct in the *Carbures* and *Soleil* cases, both filed last year, the criminal wrongdoing alleged in this Complaint appears to be Defendants' regular way of conducting business.  Defendants' treatment of Plaintiffs is not a discrete and short-lived scheme; it represents the continuing *modus operandi* of Defendants.

86.     In *Soleil Capital Limited et al. v. Emerging Markets Intrinsic, Ltd. and Eric Maass,* Index No. 653451/2015, the plaintiffs brought claims against Emerging Markets Intrinsic Cayman, Ltd. ("EMI") and Eric Maas.    The Soleil complaint alleges that EMI and Maas

misappropriated and converted 21.5 million shares of stock pledged by plaintiffs as collateral for two separate non-recourse loans for which EMI served as agent. *Soleil* Complaint ¶ 1.[1]  In *Soleil*, as here, financing was originally arranged though EMI pursuant to margin lending agreements with SRT.  *Id.* ¶ 2.  As collateral for a $1 million dollar loan Plaintiff Soleil Capital Limited ("Soleil Capital") transferred 7 million shares of stock to SRT.  *Id.* ¶ 29.  Soleil Capital then transferred another 5 million shares of stock as collateral for a second loan and another borrower, plaintiff Grandale Enterprise Limited ("Grandale Enterprise") transferred 16.5 million shares of stock to SRT for a separate loan.  *Id.* ¶ 4.  After the additional 21.5 million shares of stock were transferred to SRT by plaintiffs, EMI failed to loan any new funds to either Soleil Capital or Grandale Enterprise.  *Id.* ¶ 5.  Instead, EMI issued a margin call demanding $2 Million in cash to supplement the collateral shares of stock that had been transferred by these entities. *Id.* ¶ 4.  Although when asked directly, SRT's agent assured plaintiff that will not sell the collateral shares, *id.* ¶ 16, plaintiffs contend that SRT and EMI nevertheless sold the initial 7 million shares provided by Soleil Capital as collateral in an effort to depress the share price and trigger a margin call under the agreements.  *Id.* ¶ 4.  After the margin call, plaintiffs participated in a telephone call with Maas and Bulent Toro and demanded their collateral shares be returned. *Id.* ¶ 42.  Their request was refused. *Id.* ¶ 43.  Then, two days after Maas announced the "cure period" had expired and thus, Grandale Enterprise and Soleil Capital were in default on their obligations because they had refused to pay EMI an additional $2 million in cash, Maas informed the plaintiffs that all of their collateral shares had been "liquidated in a private sale." *Id.* ¶ 43. Although Grandale Enterprise had never received any funds at all from EMI, EMI nevertheless seized the entire 16.5 million shares of stock that Grandale Enterprise had pledged as collateral. *Id.* ¶¶ 5, 40, 43.  Similarly, although Soleil Capital transferred an additional 5 million shares of

---

[1] A copy of the *Soleil* Complaint is attached hereto as Exhibit 4.

stock as collateral for a second loan EMI seized these shares without providing any additional funds to Soleil Capital.  *Id.*

87.     Thus, in *Soleil*, as here, SRT made material false misrepresentations to induce plaintiff to enter into a margin lending agreement as a means to unjustly seize stock under the guise of a "default" that had originally been pledged as loan collateral when in reality the "default" was manufactured by the defendants and in actually was wholly unrelated to any genuine effort to secure any loaned funds.  Further here, just as in Soleil, SRT did not even loan Plaintiffs any funds under the 2016 Margin Lending Agreement yet it nevertheless seeks to seize millions of dollars in collateral, based on loan documentation that was induced under false pretenses and only intended as a means with which to unlawfully divest Plaintiffs of its collateral shares.

88.     In *Carbures Europe, S.A. et al. v. Emerging Markets Intrinsic Cayman, Ltd, et al*., Index No. 653892/2015; Supreme Court of the State of New York, County of New York, the plaintiff brought claims against, among others, Emerging Markets Intrinsic Cayman Ltd., Emerging Markets Intrinsic Ltd., Bulent Toros and Eric Maas for inter alia, breach of contract, fraud, and conversion arising out of EMI's conduct in selling collateral shares plaintiff had pledged to secure a loan from EMI.  Carbures Complaint ¶ 1.[2]Pursuant to the terms of margin lending agreement the two principal shareholders of plaintiff's stock deposited 6 million shares into SRT and EMI disbursed €3 million in funds to plaintiff. *Id*. ¶ 4.  The loan was to be executed in two stages, the first, for €3 million secured by 6 million Carbures shares and the second, for €4 million to be secured by 8 million Carbures shares.  *Id*. at ¶ 2.  The plaintiff alleges that immediately after the first 6 million shares were transferred as collateral EMI began trading the shares even though they had made numerous representations to plaintiff that they

---

[2] The *Carbures* complaint is attached hereto as Exhibit 5.

would not trade the shares as long as there was no default and would only engage in limited hedging activity. *Id*. at ¶¶ 22, 25, 27, 28. Because EMI engaged in selling large quantities of Carbures collateral shares and significantly depressed Carbures stock value and refused to cease such conduct after multiple requests by plaintiff Carbures refused to transfer an additional 8 million shares to SRT until it received assurances from the defendants that they would not sell the collateral shares. *Id*. at ¶ 55. EMI refused to provide any such assurances and sent plaintiff a Default Notice for plaintiff's refusal to provide Carbures with another 8 million shares. *Id*. at ¶¶ 54, 57. Within a week after issuing the default notice EMI sold over 670,000 shares of plaintiff's collateral shares and 1.4 million shares in total. *Id*. at ¶¶ 65-68.

89.     Thus, in *Carbures* and *Soleil*, just as is the case here, the SRT and EMI entities made materially false statements to induce the parties to enter lending agreements which the defendants had no intention of abiding by, and which lending agreements were used in merely as ruses designed to divest borrowers of securities that they had pledged in good faith as loan collateral.

90.     The blatant and egregious intimidation and retaliation against witnesses in this case (additional RICO predicates under 18 U.S.C. §§ 1512 and 1513) is also indicative of a threat of continuing criminal activity.

91.     Alternatively, the Defendants' conduct also demonstrates a "Close-Ended" pattern of continuity in that the predicate acts against Plaintiffs as described above show a series of related acts occurring over a substantial period of time – particularly when taken in context of Defendants' substantially similar conduct in the two other cases.

_**Violation of 18 U.S.C. § 1962(c)**_

92.     As described in detail throughout this Complaint, all RICO Defendants have each unlawfully, willfully, and knowingly conducted and participated, directly or indirectly, in the conduct of EMI's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

93.     By conducting or participating in the affairs of EMI, each Defendant committed at least two acts of racketeering activity, the last of which occurred within ten years after the commission of a prior act of racketeering activity.

94.     Defendants' racketeering activities described herein were the substantial and proximate cause of the injuries to Plaintiffs' business, thus entitling Plaintiffs to recover three times their actual damages, attorneys' fees, and other exemplary damages pursuant to 18 U.S.C. §1964(c).

_**Violation of 18 U.S.C. § 1962(d)**_

95.     In addition, each and every Defendant willfully and knowingly conspired to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d), as described throughout this Complaint.

96.     Plaintiffs were substantially injured in their business and property by reason of and in furtherance of the Defendants' conspiracy to violate 18 U.S.C. § 1962(c), and is therefore entitled to recover three times their actual damages, attorneys' fees, and other exemplary damages pursuant to 18 U.S.C. §1964(c).

### COUNT TWO
### Fraud
### (All Plaintiffs Against All Defendants)

97.     Plaintiffs re-allege and fully incorporate the allegations set forth above.

98.     All Defendants are liable for fraud based on their false representations to Plaintiffs.  These misrepresentations, detailed above, include statements in October and November 2016 that (a) the Assignment Agreement and 2016 Margin Lending Agreement were to be nonbinding until the documents were amended to reflect the changes agreed upon by the parties; (b) that Defendants had in fact agreed to the terms proposed by Mr. Wilson on the October 30, 2016 call; (c) that Defendants would vote the Collateral Shares in accordance with Mr. Wilson's instructions as a prerequisite to any further loan transaction.

99.     Between October 27 and November 2, 2016, Defendants also fraudulently failed to disclose to Mr. Wilson that Lucerne Australia had already executed a Term Sheet relating to the transaction that the parties were in the process of negotiating.  This glaring omission was a deliberate attempt to deceive Mr. Wilson and deprive him of his rights under the 2015 Margin Lending Agreement and his rights to the Collateral Shares.

100.    When Defendants made these representations or omissions, they knew them to be false, or made the representation recklessly, as a positive assertion and without knowledge of their truth.

101.    Defendants made the representations or omissions with the intent that Plaintiffs rely on them.

102.    Plaintiffs did, in fact, reasonably rely on Defendants' representations and omissions.  Among other things, Plaintiffs were induced to continue negotiating with Defendants and Lucerne Australia was induced to execute the 2016 Margin Lending Agreement and to purport to execute the Assignment on Mr. Wilson's behalf

103.    The false representations resulted in actual injury to Plaintiffs for which they are entitled to recover damages.

104.    Plaintiffs are also entitled to recover exemplary damages.

## COUNT THREE
### Conversion
**(Domenica and Wilson Against All Defendants)**

105.    Plaintiffs re-allege and fully incorporate the allegations set forth above.

106.    Plaintiff Domenica has a right to own the Collateral Shares.

107.    Defendants wrongfully exercised dominion and control over the Collateral Shares in connection with the unauthorized Assignment Agreement and 2016 Margin Lending Agreement, through which Defendants purport to have assigned the Collateral Shares to CGO V.

108.    The wrongful conversion of the Collateral Shares has caused injury to Plaintiff Domenica.

109.    Defendants have further wrongfully converted dividends paid on the Collateral Shares that rightfully belong to Domenica.

110.    Plaintiff Domenica has suffered injury because of these wrongful conversions.

## COUNT FOUR
### Declaratory Judgment
**(Against All Defendants)**

111.    Plaintiffs re-alleges and fully incorporates the allegations set forth above.

112.    Plaintiffs request declaratory relief pursuant to 28 U.S.C. § 2201 and N.Y. C.P.L.R. § 3001 and seek an order declaring the 2016 Margin Lending Agreement, 2016 Term Sheet, and the Assignment and Assumption Agreement (i)  null and void as procured by fraud and/or forgery and as a result of Defendants' illegality; and/or (ii) null and void for lack of consideration from Defendants in connection with these purported contracts; and/or (iii) null and void because the parties to these purported contracts never agreed to their terms.

113.    Plaintiffs bring this request for declaratory judgment so that the court may determine the rights and other legal relations of the parties to a justiciable controversy.

**COUNT FIVE**
**Unjust Enrichment and Restitution**
**(Domenica and Wilson Against All Defendants)**

114.    Plaintiffs re-allege and fully incorporate the allegations set forth above.

115.    Pleading additionally and in the alternative pursuant to Fed. R. Civ. P. 8(a)(3), if Defendants have sold, loaned or otherwise conducted financial transactions with the Collateral Shares, all Defendants have been unjustly enriched in any amounts received by them as a result of such transactions.   No Defendant was ever entitled to conduct such transactions if they occurred.

116.    Plaintiffs are entitled to damages and/or restitution from each Defendant in the amounts each received.

**COUNT SIX**
**Imposition of Constructive Trust (Domenica and Wilson Against All Defendants)**

117.    Plaintiff re-alleges and fully incorporates the allegations set forth above.

118.    As alleged in the preceding count, Defendants have been unjustly enriched to the extent that they have sold, loaned or otherwise conducted financial transactions with the Collateral Shares.

119.    Plaintiff seeks the imposition of a constructive trust on all of each Defendants' assets that are traceable in any way to such transactions involving the Collateral Shares.  Plaintiff also seeks the imposition of a constructive trust on any assets that Defendants might have conveyed to any other person in connection with such wrongful transactions.

## COUNT SEVEN
### Breach of Contract (Wilson Against Defendant EMI)

120.     Plaintiffs re-allege and fully incorporate the allegations set forth above.

121.     Plaintiff Wilson entered into the 2015 Margin Lending Agreement with Defendant EMI.

122.     Under the 2015 Margin Lending Agreement, EMI was required to vote the Collateral Shares in accordance with Mr. Wilson's instructions.

123.     Under the 2015 Margin Lending Agreement, EMI was required to pay dividends from the Collateral Shares to Domenica.

124.     EMI has breached the 2015 Margin Lending Agreement by failing to pay dividends from the Collateral Shares to Domenica and by failing to vote the Collateral Shares in accordance with Mr. Wilson's instructions.

125.     Mr. Wilson has performed his obligations under the 2015 Margin Lending Agreement.

126.     Mr. Wilson has suffered damages, in an amount to be determined at trial, as a result of EMI's breaches of the 2015 Margin Lending Agreement.

## V.      VICARIOUS LIABILITY
### (Against All Defendants)

127.     Plaintiff re-alleges and fully incorporates the allegations set forth above.

128.     Defendants are liable for the actions of EMI, an entity in which they have a financial interest, ownership or control.

129.     The corporate form of the corporate defendants should be disregarded because the forms were: (a) used as a sham to perpetuate a fraud; (b) operated as a mere conduit of the

individual defendants; and (c) used to protect against the discovery of a crime or to justify a wrong.

130.    Holding the corporations liable without imposing liability on the individual defendants would result in grave injustice.

131.    Therefore, these individual defendants are liable for the actions of these corporate entities.

## VI.    PUNITIVE DAMAGES
### (Against All Defendants)

132.    Plaintiffs re-alleges and fully incorporates the allegations set forth above.

133.    Plaintiffs are entitled to recover, in addition to other damages, punitive damages from all Defendants based on their intentional, willful, wanton, and fraudulent misconduct.

## VII.    REQUEST FOR INJUNCTION

134.    Plaintiffs re-allege and fully incorporate the allegations set forth above.

135.    Plaintiffs will suffer irreparable injury if all Defendants are not enjoined from selling, loaning, trading, encumbering, or otherwise conducting any financial transactions with the Collateral Shares in connection with the sham "default" on the fraudulent 2016 Margin Lending Agreement and 2016 Term Sheet.

136.    Plaintiffs have no adequate remedy at law.

137.    The balance of equities favors Plaintiff.

138.    Accordingly, a preliminary and permanent injunction should be issued enjoining Defendants from selling, loaning, trading, encumbering, or otherwise conducting any financial transactions with the Collateral Shares in connection with the sham "default" on the fraudulent 2016 Margin Lending Agreement and the 2016 Term Sheet.

139.     Furthermore, a preliminary and permanent injunction should be issued requiring Defendants to vote the Collateral Shares in accordance with Mr. Wilson's instructions as per the 2015 Margin Lending Agreement.

## VIII.   <u>PRAYER</u>

WHEREFORE, Plaintiffs Domenica Nominees Pty. Ltd., Frank Wilson, and Lucerne Australia Pty. Ltd., respectfully ask that the Court do the following:

a.     Grant a preliminary and permanent injunction awarding the relief requested above;

b.     Enter a money judgment against all Defendants jointly and severally awarding Plaintiffs all damages incurred as a proximate result of Defendants' conduct;

c.     Enter a declaratory judgment ordering that the 2016 Margin Lending Agreement, 2016 Term Sheet, and the Assignment and Assumption Agreement are null and void;

d.     Award punitive damages against Defendants;

e.     Award treble damages against Defendants as permitted by 18 U.S.C. § 1964(c);

f.     Award attorneys' fees to Plaintiffs as permitted by 18 U.S.C. § 1964(c) and or under any other applicable law;

g.     Award court costs to Plaintiffs; and

h.     Award all other relief to which Plaintiffs area entitled.

Dated:  New York, New York
           November 30, 2016

DAVIS SANTOS, P.C.

By:  /s/ Jason Davis
           Jason Davis
719 S. Flores Street
San Antonio, TX 78204
Tel: 210.853.5882
E-mail: jdavis@dslawpc.com

*Attorneys for Plaintiffs Domenica Nominees Pty. Ltd.*
*and Frank Wilson*
*(Pro Hac Vice Application to be Submitted)*


SHER TREMONTE LLP

By: /s/ Michael Tremonte
       Michael Tremonte
       Mark Cuccaro
80 Broad Street, 13th Floor
New York, New York 10004
Tel: 212.202.2600
E-mail: mtremonte@shertremonte.com
*Attorneys for Plaintiffs Domenica Nominees Pty. Ltd.*
*and Frank Wilson*


K&L GATES LLP

By: /s/ B. John Casey
       B. John Casey
One SW Columbia Street, Suite 1900
Portland, OR 97258
Tel: 503.226.5716
E-mail: john.casey@klgates.com
*Attorneys for Plaintiff Lucerne Australia Pty. Ltd.*
*(Pro Hac Vice Application to be Submitted)*


K&L GATES LLP

By: /s/ Joanna Diakos
       Joanna Diakos
599 Lexington Avenue
New York, NY 10022
Tel: 212.536.4807
E-mail: john.casey@klgates.com
SDNY Bar No. JD/7269
*Attorneys for Plaintiff Lucerne Australia Pty. Ltd.*

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to S.D. N.Y. LR 5, service of this document has been accomplished via notice of electronic filing generated by the Court's electronic filing system.  In addition, I certify that a true and correct copy of this document will be sent to Defendants' counsel of record, at the following addresses: