**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

DOMENICA NOMINEES PTY. LTD., FRANK
WILSON, and LUCERNE AUSTRALIA PTY.
LTD.,

                Plaintiffs,

     -against-

EMERGING MARKETS INTRINSIC CAYMAN
LTD., EMERGING MARKETS INTRINSIC,
LTD., SRT CAPITAL SEGREGATED
PORTFOLIO COMPANY TFC, CGO V, LLC,
SRT CAPITAL SPC, LTD., ERIC MAASS, and
BULENT TOROS,

                Defendants.

Case No. 16-cv-09016 (VEC)

**SECOND AMENDED**
**COMPLAINT**

---

     Plaintiffs Domenica Nominees Pty. Ltd., Frank Wilson, and Lucerne Australia Pty. Ltd.,

pursuant to Fed. R. Civ. P. 15(a)(1)(B), file this Second Amended Complaint against Defendants

Emerging Markets Intrinsic Cayman Ltd., Emerging Markets Intrinsic, Ltd., SRT Capital

Segregated Portfolio Company TFC, CGO V, LLC, SRT Capital SPC, Ltd., Eric Maass, and

Bulent Toros.[1]

## I. PARTIES

     1.    Plaintiff Domenica Nominees Pty. Ltd. ("Domenica") is an Australian entity with

its principal place of business in Australia.

     2.    Plaintiff Frank Wilson ("Mr. Wilson") is an individual residing in Australia.

---

[1]    Pursuant to the local rules, a redlined version of this Second Amended Complaint is attached hereto as
**Exhibit A**.

3.     Plaintiff Lucerne Australia Pty. Ltd. ("Lucerne Australia") is an Australian entity with its principal place of business in Australia.  Anthony Murphy ("Mr. Murphy) is the principal of Lucerne Australia.

4.     Defendant Emerging Markets Intrinsic Cayman Ltd. ("EMI") is a Cayman Islands company with its principal place of business at 388 East Main St., Suite 2111, Branford, Connecticut 06405.  EMI has appeared in this suit through counsel.

5.     Upon information and belief, defendant Emerging Markets Intrinsic, Ltd. ("EMI, Ltd.") is a corporation organized under the laws of the British Virgin Islands with its principal place of business at 388 East Main St., Suite 2111, Branford, Connecticut 06405.  EMI, Ltd. has appeared in this suit through counsel.

6.     Upon information and belief, Defendant SRT Capital Segregated Portfolio Company TFC ("SRT") is an entity organized under Part XIV of the Cayman Companies Law, is a segregated portfolio of Defendant SRT Capital SPC, Ltd., and has its principal place of business at 31 The Strand, 46 Canal Point Drive, Grand Cayman KY1-1105, Cayman Islands.   Upon information and belief, at some point in time SRT changed its name to Domenica Nominees SPC.  SRT has appeared in this suit through counsel.

7.     Defendant CGO V, LLC ("CGO V") is a Delaware company with its principal place of business at 31 Thimble Farms Road, Suite 200, Branford, Connecticut 06405.  CGO V has appeared in this suit through counsel.

8.     Defendant SRT Capital SPC, Ltd. ("SRT Capital") is a segregated portfolio organized under Part XIV of the Cayman Companies Law with its principal place of business at 31 The Strand, 46 Canal Point Drive, Grand Cayman KY1-1105, Cayman Islands.  SRT Capital has appeared in this suit through counsel.

9.     Defendant Eric Maass ("Maass"), upon information and belief, is an individual residing at 31 Thimble Farms Road, Branford, Connecticut 06405.  Maass is a managing partner and/or director of defendants EMI and EMI, Ltd. and is a director of defendant CGO V.  Maass also directly or indirectly controls defendants SRT and SRT Capital.  Maass has appeared in this suit through counsel.

10.     Defendant Bulent Toros ("Toros"), upon information and belief, is an individual residing in Turkey.  Toros is the Managing Director of defendant CGO V and Chairman & CEO of defendant EMI.  Toros has appeared in this suit through counsel.

## II. <u>JURISDICTION AND VENUE</u>

11.     Plaintiffs file this Second Amended Complaint in accordance with Fed. R. Civ. P. 15(a)(1)(B).

12.     The Court has subject matter jurisdiction over this lawsuit under 28 U.S.C. § 1331 because it presents claims arising under federal laws.  Specifically, Plaintiffs assert claims against all Defendants for violations of the Racketeer Influenced and Corrupt Organizations Act under 18 U.S.C. §§ 1961 *et. seq*.  This Court has jurisdiction over civil RICO cases pursuant to 18 U.S.C. § 1964(c).  Additionally, Plaintiffs assert claims under 42 U.S.C. §§ 1985, 1986 for Defendants' egregious threats and intimidation of a party and witness in this official proceeding.

13.     Plaintiffs also assert claims for violations of federal securities laws, including Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), Rule 10b-5, 17 C.F.R. § 240.10b-5, and Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a).  This Court has exclusive jurisdiction over the Section 10(b) and Rule 10b-5 claims under 15 U.S.C. § 78aa(a), and the Court has jurisdiction over the Section 17(a) claims under 15 U.S.C. § 77v(a).

14.     This Court has supplemental jurisdiction over Plaintiffs' state-law claims because they are so related to the federal claims that they form part of the same case or controversy.  28 U.S.C. § 1367(a).

15.     Venue is proper in this district under 28 U.S.C. § 1391, and the Court has personal jurisdiction over Defendants, because Defendants agreed to be sued in this forum and to be subject to the jurisdiction and laws of this state.  Specifically, defendants EMI, EMI, Ltd., and SRT each executed a contract, which is the subject of this suit, that contained a forum-selection clause submitting to the jurisdiction and venue of this Court and waiving any objection as to the same. *See* Ex. 1 ¶7(k), p. 8.  Defendants Maass and Toros also signed the contract—Maass as Managing Partner of EMI, Ltd. and Toros as Chairman and CEO of EMI.  The liability of defendants Maass and Toros, who acted in concert to damage Plaintiffs, arises out of the same misconduct and set of circumstances as the signatory Defendants.  Defendants Maass and Toros were so closely related to the transactions at issue, and they directly benefited therefrom, that it was foreseeable that they would be bound, individually, by the forum-selection clause in the contract that they signed.  Moreover, Defendants Maass and Toros have also appeared voluntarily in New York for EMI-related business and legal matters, including the invocation of the jurisdiction of New York courts on behalf of EMI and its affiliates.

16.     Further, the same contract, which relates to a transaction of not less than $1 million, contains a choice-of-law provision, designating New York law to apply.  *Id.*  ¶7(j).  Therefore, venue and jurisdiction are proper pursuant to New York General Obligations Law §§ 5-1401, 1402.

17.     Alternatively, the Court has personal jurisdiction over all of the Defendants under New York Civil Law & Practices § 302(a).

### III. <u>FACTS</u>

4

A.    **Introduction**

18.    Through a series of intentional, malicious, and pre-meditated actions, Defendants have defrauded Plaintiffs out of millions of shares in publicly-traded securities, which Defendants are wrongfully treating as collateral for a sham loan transaction for their own benefit and to enrich themselves.

19.    While Plaintiffs Mr. Wilson and Domenica believed that they were negotiating an ordinary loan transaction with Defendants, Defendants' intentions were far from entering into a normal lending relationship.   In fact, as explained below, Defendants' motivation was to wrongfully seize control of Plaintiffs' shares, which they accomplished through a well-orchestrated securities, wire, and investment fraud scheme to benefit and enrich themselves.

20.    Defendants purported to rely upon what they knew to be non-binding facsimile signatures of Mr. Wilson provided by an unauthorized third party to immediately concoct a sham "default" on a sham loan for which no funds had ever been lent.  Defendants' illicit goal was to illegally seize, trade, and profit from the securities that purportedly secured the "loan."

21.    When Plaintiffs initially confronted Defendants, Defendants doubled down on their illegal behavior by: (a) refusing to voluntarily stop their foreclosure on the securities purportedly held as collateral; (b) refusing to identify the current location and custodian of the securities; (c) refusing to confirm whether they had already sold, traded, lent, or otherwise encumbered the securities; (d) refusing to vote the securities pursuant to Plaintiffs' instructions as they were required to do; (e) wrongfully converting dividends paid on or about November 8, 2016 on the collateral shares worth over $675,000 A.U.D.; and (f) directly threatening the reputations, job security, and even physical safety of Plaintiffs' principals.

22.     Refusing to be extorted or to allow the securities to be stolen and traded, Domenica sought preliminary injunctive relief from the New York State Supreme Court.

23.     Defendants then removed the case to this Court, under the guise of compelling arbitration premised on the same fraudulent and non-binding documents that they relied upon to convert the securities.  *See* Dkt. No. 1.  However, Defendants never moved to compel arbitration.

24.     Defendants' propensity for illegal conduct was not at all deterred by their removal to this Court.  Instead, similar to the pre-suit extortion and threats, on the very day this case was removed and on several other occasions, Defendants made direct threats to a key witness, Mr. Anthony Murphy—the principal and founder of Plaintiff Lucerne Australia—who had given a truthful declaration in connection with this proceeding confirming the fraudulent and illegal nature of Defendants' actions.  In direct response to Mr. Murphy's testimony, Defendants conspired to deter and intimidate Mr. Murphy from further participating in this case.  Acting through Defendant Maass, Defendants made numerous vicious and reprehensible threats to Mr. Murphy—on several different occasions—specifically intended to affect this proceeding.  A sampling of the illegal threats (many of which were memorialized in text and social media messages while others were held in various phone calls) are:

- Maas was going to "bury" Mr. Murphy;
- Mr. Murphy should "tell [his] wife not to have a 3rd baby because you and your family are finished."
- "Wave goodbye to your Dad today."
- "how on earth could you have done something so stupid?"
- "u try and fry me?"
- "I am one person u don't f**k over"
- "Just spoke to Aaron [EMI's counsel]" / "AG [Aaron's law firm] will put your chairman on notice Monday"
- "I've emailed MNY and JKL" [two corporate clients of Lucerne's]
- "Coming after the market and then Lucerne"
- "I'm going to f***ing end Lucerne and your 20 something employees"
- "You're a p***y f****t c***sucker and I'm going to destroy your sh***y little firm"

- "U don't want your kids to hear this"
- "I'm not mad at you for being truthful, I'm mad at you for being an idiot."
- "We're coming after you across the globe.  Singapore [referring to EMI's counsel there] is going to get your Chairman.  CU [another EMI law firm] is coming after gadens [law firm that represents Lucerne] and your c***sucking sh***y lawyer, jol [sic]," and ominously,
- "Look forward to seeing u in NY."

25.     Standing alone, Defendants' criminal conduct would be egregious enough.  Yet Defendants' actions are not isolated, but part of a consistent pattern of criminal activity.  As detailed below, Plaintiffs are but the latest in a line of victims, each of whom Defendants deliberately targeted in a series of similar fraudulent and illegal schemes.  At least two other cases are pending in New York courts against Defendants that involve allegations of fraud and "sham defaults."  *See Carbures Europe, S.A. et al. v. Emerging Markets Intrinsic Cayman, Ltd, et al*., Index No. 653892/2015; Supreme Court of the State of New York, County of New York; and *Soleil Capital Limited et al. v. Emerging Markets Intrinsic, Ltd. and Eric Maass*, Index No. 653451/2015; Supreme Court of the State of New York, County of New York.  Upon information and belief, and based on filings with the United States Securities and Exchange Commission, Defendants' pattern of deceit and use of "sham defaults" has been ongoing since at least 2014.  *See* November 11, 2014 Schedule 13D/A (Amendment No. 4) filed with the SEC by Irvin E. Richter re: Hill International, Inc. (CUSIP No. 431466 10 1).

26.     The facts of this case, like the facts alleged in the *Carbures* and *Soleil* lawsuits, demonstrate that Defendants' actions were pre-meditated and accomplished through an organized pattern of illegal conduct with distinct predicate acts in furtherance of an overarching unlawful objective.

**B.     <u>Background</u>**

27.     Mr. Wilson co-founded, is the Managing Director of and, through Domenica, is the largest shareholder of TFS Corporation Ltd. ("TFS").  Based in Western Australia, TFS is the world's largest owner and manager of commercial Indian sandalwood plantations.

28.     Plaintiff Domenica, an Australian entity, is owned and controlled by Mr. Wilson and his family.  Domenica has at all relevant times been the beneficial owner of a substantial number of TFS shares.

29.     TFS is a publicly traded company on the Australian Securities Exchange (the "ASX").  TFS shares are traded on the ASX under the code TFC.  As of June 30, 2016, TFS had a market capitalization of approximately $547,207,000 A.U.D. based on a closing share price of $1.41.  Although based in Australia, TFS has a significant presence in the United States.  TFS has two U.S.-based subsidiaries, Santalis Healthcare Corporation and Santalis Pharmaceuticals, Inc. (together, "Santalis"), each headquartered in Texas.  Santalis has the exclusive world-wide rights to TFS' sustainable, pharmaceutical grade East Indian sandalwood oil for healthcare uses and currently has products in U.S. FDA-approved Phase 2 trials.  TFS employs over five hundred people, including those at its U.S. subsidiaries.  Mr. Wilson serves as a director of each of the subsidiaries.

30.     TFS also relies on U.S.-based investment banks, as part of its key business strategy. TFS' largest customer is headquartered in Utah.  Three of TFS' top shareholders are based in the U.S. as are two of its largest plantation investors.

31.     To foster, promote, and maintain these U.S. operations and business relationships, which are critical to TFS' success, Mr. Wilson travels to the United States approximately three to six times per year.

32.     Mr. Wilson owns a substantial interest in TFS.  As a significant owner, he has significant influence over who is elected as a member of the board of directors of TFS.  TFS, as the sole owner of each Santalis entity, decides who serves on their boards of directors and approves or disapproves all decisions voted on by the shareholders of each Santalis entity.  These matters are determined by TFS' board of directors.  Therefore, the ability to influence who serves on the TFS board of directors results in having significant influence over the operations of each Santalis entity.  Mr. Wilson's loss of the TFS shares he owns could result in a loss of such influence.

33.     For example, Santalis is contemplating an IPO for a listing on the NASDAQ exchange.

34.     Similarly, because of TFS' growing U.S. operations, a successful U.S. listing of Santalis would give TFS the opportunity to consider a duel-listing on the NASDAQ exchange.

35.     Mr. Wilson, through his direct ownership stake in TFS and indirect ownership stake in Santalis, plays a major role in corporate decision making concerning these and other critical transactions.  Reducing his ownership stake and voice in management would have potentially adverse effects on these and other transactions.

The 2015 Loan Transaction

36.     In the summer of 2015, Mr. Wilson desired to borrow funds for certain contemplated business transactions.

37.     Mr. Murphy, an Australian investment advisor, approached Mr. Wilson and suggested the idea of a securities-backed loan.  Mr. Murphy introduced Mr. Wilson to EMI as a potential lender.  Mr. Murphy later formed Plaintiff Lucerne Australia, which also conducts business as Lucerne Investment Partners, through which he continued to be involved as an

intermediary in negotiations and dealings between Mr. Wilson and Defendants through 2016. Mr. Murphy would receive compensation for these transactions from EMI.

38.     With Mr. Murphy as an intermediary, Mr. Wilson began negotiating with EMI, principally through defendant Maass who at all relevant times was present in the United States and a resident of the state of Connecticut.  Specifically, acting in and from the United States, Defendants, through Maass, negotiated with and offered Mr. Wilson terms for a loan agreement via direct and indirect communications.  These communications included e-mails sent and phone calls made from the United States by Maass to Mr. Wilson and/or Mr. Murphy.  In these communications from the United States, Maass made representations about the proposed transaction, sent information about the proposed transaction, circulated drafts of the proposed agreement, induced Plaintiffs into entering into a transaction, and executed the transaction documents.

39.     As discussions with EMI progressed, EMI conditioned its participation in the transaction on the formation of a new entity, SRT, a company based in the Cayman Islands, to serve as the borrower.  Mr. Wilson was consistently told by Defendants, and specifically through Maass in the United States, that Mr. Wilson would own and control SRT.

40.     On or about July 2, 2015, SRT (as borrower), EMI (as Lender), and EMI, Ltd. (as agent) executed and delivered a Margin Lending Agreement (the "2015 Margin Lending Agreement").  A true and correct copy of the 2015 Margin Lending Agreement is attached to this Second Amended Complaint as **Exhibit 1**.  While present in the United States, Mass executed the 2015 Margin Lending Agreement in his capacity as Managing Partner of EMI, Ltd., thereby irrevocably committing the same to be bound by the 2015 Margin Lending Agreement.

41.     The 2015 Margin Lending Agreement incorporated a Loan Agreement Term Sheet ("2015 Term Sheet") identifying Mr. Wilson as the borrower.

42.     To secure SRT's payment obligations under the 2015 Margin Lending Agreement, Domenica delivered approximately 22,534,000 TFS shares to EMI (the "Collateral Shares"). The Collateral Shares represent approximately 40% of Mr. Wilson's direct or indirect stock holdings in TFS.

43.     In the 2015 Margin Lending Agreement and 2015 Term Sheet, Mr. Wilson and Domenica retained many valuable rights including, but not limited to: (a) the right to vote the Collateral Shares; and (b) the right to receive any dividends and distributions paid on the Collateral Shares. The ongoing right to control and vote the Collateral Shares was critical to Mr. Wilson as such control was necessary for Mr. Wilson to maintain his important voice in management of TFS and Santalis, its U.S. subsidiary.

44.     SRT, Mr. Wilson, and Domenica were, and at all times have been, in compliance with any obligations under the 2015 Margin Lending Agreement and there has never been any notice of default.

45.     Defendant Toros represented that SRT was and would remain beneficially owned by Mr. Wilson and his wife, and therefore that Mr. Wilson and his wife were and would remain the beneficial owners of the Collateral Shares. Toros repeated this representation on several occasions to Plaintiffs and third-parties alike, both before and after the 2015 transaction, including, but not limited to, an August 10, 2015 letter to the TFS company secretary and a November 8, 2015 e-mail to Mr. Wilson.

The 2016 Proposed Transaction

46.     In 2016, Mr. Wilson began exploring another possible loan transaction with EMI. Like with the 2015 Margin Lending Agreement, the negotiations for the new transaction occurred principally with Maass, acting on behalf of all Defendants, and who at all relevant times was present in the United States and a resident of Connecticut.

47.     In October of 2016, discussions were ongoing and EMI, through Mr. Murphy, presented proposed transaction documents.  The various drafts and proposed documents were sent via e-mail from Maass in the United States.  On many occasions, Mr. Murphy served as an intermediary between Mr. Wilson and EMI, via Maass, for these discussions.

48.     Mr. Wilson did not agree to the terms of the proposed transaction set forth in these documents.  Mr. Wilson discussed the proposed terms with his own advisors bu never consented to them.  Nor did Mr. Wilson ever authorize any other person to consent to them in their then current form.  In fact, from the onset of the 2016 proposed transaction, Mr. Wilson made clear to Mr. Murphy and Maass his objections to the proposed terms.  In particular, Mr. Wilson required the terms to be altered to protect the ability of the borrower to use the cash in the trading collateral account to meet margin calls, for the borrower to exit the loan at any time upon paying out the remaining term interest, and for the borrower to apply interest earned on the trading collateral account against interest payable.  Mr. Wilson also made it clear that another absolutely essential term of the purported agreement (as in the 2015 Agreement) would be that Defendants had to vote the Collateral Shares per Mr. Wilson's instructions.

49.     In late October 2016, Maass, from the United States, stated to Mr. Murphy several times that EMI desired to close the transaction as quickly as possible or to not proceed with the transaction.  Maass, while present in the United States, then fraudulently represented to Mr. Murphy that EMI required a "good will" gesture to keep the deal alive by executing the draft

transaction documents, even though Maass acknowledged the terms of the deal were not final. The transaction documents had been sent by Maass, via e-mail, from the United States, to Mr. Murphy, and Maass' false representations about the transaction were made while Maass was in the United States.

50.     On October 27, in reliance on Maass's fraudulent representations that the executed document would be a sign of "good will" to continue negotiations and would not be considered binding, and that the parties would continue to work to finalize the actual deal documents, Mr. Murphy signed a Term Sheet (the "2016 Term Sheet") on behalf of Lucerne Australia outlining a new loan to be made to Lucerne Australia, secured by additional shares of TFS.

51.     Mr. Murphy sent the 2016 Term Sheet to EMI at the request of EMI and on the understanding that Mr. Murphy was only demonstrating a commitment to continue to negotiate all outstanding issues with a view to finalizing the transaction.  Specifically, Mr. Murphy sent the 2016 Term Sheet to Maass via e-mail and Maass received the documents while present in the United States.  No one sent the Term Sheet to Mr. Wilson nor informed him that the Term Sheet has been signed.  Maass acknowledged to Mr. Murphy, after receiving the 2016 Term Sheet, that outstanding issues needed to be addressed before the deal would be final.

52.     The 2016 Term Sheet states that Lucerne Australia was assuming the borrower SRT's rights under the 2015 Margin Loan Agreement and that it was pledging the Collateral Shares as partial security for the proposed new loan.  Mr. Wilson did not authorize Mr. Murphy to bind Mr. Wilson to the 2016 Term Sheet in its then existing form, was not aware of any purported assignment of rights under the 2015 Margin Loan Agreement to Lucerne Australia, and did not consent to pledge the Collateral Shares (or any other shares) as security for a new loan.

53.     On October 28, 2016, Mr. Murphy had an extensive telephone conversation with Mr. Wilson's Australian counsel, Mr. Jeremy Wade, regarding Mr. Wilson's required changes to the documents' terms.  No one informed Mr. Wade that the Term Sheet had already been signed.

54.     On October 30, 2016, Mr. Murphy participated in a telephone call with Mr. Wilson and Maass.  Maas was in the United States for this call, and was contacted at a U.S. phone number. In the call, Mr. Wilson explained certain issues he had with the proposed terms and outlined changes he would require be resolved before proceeding with the new transaction.  In particular, Mr. Wilson reiterated he required the terms to be altered to protect the ability of the borrower to use the cash in the trading collateral account to meet margin calls, for the borrower to exit the loan at any time upon paying out the remaining term interest, and for the borrower to apply interest earned on the trading collateral account against interest payable.  Mr. Wilson also made it clear that another absolutely essential term of the proposed agreement (as in the 2015 Agreement) would be that Defendants had to vote the Collateral Shares per Mr. Wilson's instructions.  The right to control and vote the Collateral Shares remained critical for Mr. Wilson to maintain his substantial role in management of TFS and Santalis.  Mr. Wilson stated that he had no intention to enter into a new transaction until such terms had been incorporated into the deal documents and vetted by his counsel.  At no point during this call did Maass disclose that he already had the signed 2016 Term Sheet in hand.  Nor did Maass disclose that the additional collateral had to be delivered the next day.

55.     After Mr. Wilson explained his position and required changes to the terms, Maass agreed in principle to all the changes, with one exception—Mr. Wilson's request for a shorter term for the contemplated loan.  Maass stated that he would consider that change as well and let Mr.

Wilson know his position on that issue after EMI's U.S. legal counsel, Mr. Wayne Martino, drafted and circulated the new amendments for review.

56.     The entire October 30 telephone conversation took place while Maass was present in the United States.

57.     Mr. Murphy understood that, without the important changes to the deal documents, Mr. Wilson was unwilling to proceed with a binding deal with EMI on the terms of the existing documents.  Mr. Murphy and Mr. Wilson waited for a revised Term Sheet with those requested changes acceptable to Mr. Wilson.

58.     Once again, Maass, from the United States and via e-mail and telephone communications, then fraudulently represented to Mr. Murphy that EMI would require another "good will" gesture to keep the deal alive by executing additional transaction documents, even though Maass acknowledged the terms of the deal were not final because the amendments discussed during the October 30, 2016 call had not yet been incorporated into the deal documents. Moreover, Mr. Wilson and Mr. Murphy had repeatedly stated to Maass that any proposed deal would also be conditioned on Mr. Wilson receiving confirmation from TFS' company secretary that EMI had voted the Collateral Shares pursuant to Mr. Wilson's instructions for the annual general meeting scheduled in November, as expressly required under Section 7(g) of the 2015 Margin Lending Agreement.

59.     Mr. Murphy conveyed his conversations with Maass to Mr. Wilson.  Mr. Wilson stated that he was willing to move forward to "keep the deal alive" and continue negotiations, but that his final acceptance was conditioned on the amendments agreed to during the October 30, 2016 call and the voting of the shares.  Mr. Murphy's communications with Mr. Wilson on these

issues are reflected in November 1, 2016 e-mail correspondence between Mr. Wilson and Mr. Murphy.

60.     On November 1, 2016, relying on Maass' agreement that the terms were conditioned on subsequent amendments, and that the new documents were being executed only as a sign of good will, Mr. Murphy forwarded to Maass additional transaction documents, including the Assignment and Assumption Agreement (the "Assignment") for which Lucerne Australia affixed a facsimile signature from Mr. Wilson.  Upon information and belief, Maas received these documents while present in the United States.  In the cover e-mail to Maass enclosing the signed documents, Mr. Murphy conveyed—consistent with previous communications—that acceptance of the transaction was conditioned on: (a) the additional terms the parties had agreed to on the October 30, 2016 call; and (b) EMI's voting of the Collateral Shares pursuant to Mr. Wilson's instructions.

61.     At no time did Mr. Murphy have a power-of-attorney for Mr. Wilson nor authorization to bind Mr. Wilson to any transaction documents that did not incorporate the additional terms agreed to by the parties on the October 30 call and confirmation from TFS' company secretary that EMI had voted the Collateral Shares pursuant to Mr. Wilson's instructions.

62.     On or about November 1, 2016, EMI's U.S. counsel in Connecticut, Martino, e-mailed Mr. Murphy and requested that Mr. Murphy obtain a second signature from Mr. Wilson on the Assignment Agreement (the "good will" document) as a representative of SRT.  This Martino communication sent from the United States was a pivotal part of facilitating the fraud as Martino and his client knew that Defendants had no intention on performing (i.e. disbursing funds) and the effort to procure this signature was for the sole purpose of declaring the sham default.  Neither

Martino nor Mr. Murphy, nor anyone else, discussed with Mr. Wilson using his signature on the Assignment Agreement on behalf of SRT.

63.     Again, relying on Maass' representations that the document was not binding, another Lucerne representative affixed a facsimile of Mr. Wilson's signature on behalf of SRT a second time on the signing page of the Assignment Agreement and returned the signature page to Martino, who was present in and received the documents in Connecticut, on November 2, 2016. Lucerne would not have placed Mr. Wilson's signature on the purported Assignment Agreement but for Lucerne's reliance on the representations in all previous correspondence and discussions with Maass and EMI, that such documents were not binding because they did not contain the additional terms agreed to on the October 30 call.  Mr. Wilson was unaware that his facsimile signature was being used on the purported Assignment Agreement, which he did not consent to or authorize.

64.     Upon information and belief, Maass executed the purported Assignment while present in the United States on behalf of EMI (as initial lender) and CGO V (as new lender).

65.     On November 3, 2016, while Mr. Wilson was traveling in the United States, he received an e-mail from Mr. Murphy advising that Mr. Murphy had received a Notice of Event of Default from defendant CGO V to plaintiff Lucerne Australia (the "Notice of Default").  The Notice of Default, sent by CGO V from Maass' home address in Connecticut, alleges that Lucerne Australia was in default under the purported 2016 Margin Lending Agreement and the 2016 Term Sheet.   As further evidence of the manufactured nature of the default, the Notice of Default was sent **before** any monies were loaned under the agreement.  In fact, there has never been a single penny disbursed under the 2016 agreement.  The Notice of Default copied Maass and his lawyers, all of whom are residents of and received the communications while present in the United States.

66.     After Mr. Wilson immediately questioned Mr. Murphy about the Notice of Default, Mr. Murphy sent Mr. Wilson an e-mail attaching the Assignment.  The Assignment purported to assign all of SRT's and Mr. Wilson's individual rights and obligations related to the 2015 Margin Lending Agreement to Lucerne Australia.  *See* **Exhibit 2**.   The Assignment further purported to assign all of EMI's rights and obligations as Lender to CGO V.  The Assignment has a signature block with Mr. Wilson's name on it and what purports to be his signature; however, Mr. Wilson never signed the Assignment or authorized anyone to bind him to such document.  Mr. Wilson never approved, accepted, or agreed to the terms of the Assignment.  In fact, prior to receiving the Notice of Default, Mr. Wilson had never seen the executed Assignment and, had he read its terms, Mr. Wilson would have never agreed to the Assignment.

67.     Also on November 3, 2016, Mr. Wilson received from Mr. Murphy a purported October 25, 2016 Margin Lending Agreement (the "2016 Margin Lending Agreement") by and among Lucerne Australia (as borrower), CGO V (as lender) and SRT Capital SPC, Ltd (as agent). *See* **Exhibit 3** (attached as Exhibit A to **Exhibit 3** is the "2016 Term Sheet").  This was the first time Mr. Wilson was aware that a signed term sheet existed and that caused him considerable alarm.  Upon information and belief, Maass signed the 2016 Margin Lending Agreement on behalf of CGO V (as lender) while he was present in the United States.

68.     According to the terms of the purported 2016 Margin Lending Agreement, the Collateral Shares were pledged as security for Lucerne Australia's obligations under the agreement.  Mr. Wilson never approved, accepted, or agreed to the terms of the 2016 Margin Lending Agreement or the 2016 Term Sheet.  Mr. Wilson never authorized anyone on his behalf to approve, agree or enter these agreements.  On the contrary, Mr. Wilson made his position clear, as did Mr. Murphy, that the terms of these proposed agreements were not acceptable.

69.     On November 3, 2016, upon seeing the non-binding documents that Defendants were improperly attempting to enforce, Mr. Wilson immediately informed Mr. Murphy that Mr. Wilson did not sign the Assignment and that he had never given Mr. Murphy authority to sign the Assignment for him.  Mr. Murphy agreed that these documents were never finalized nor intended to be binding.

70.     On or about November 4, 2016, Mr. Wilson received from Mr. Murphy a copy of an e-mail from Mr. Murphy to Maass and Toros (each of whom hold themselves out to be representatives of the entity Defendants) objecting to the Notice of Default.

71.     Despite being placed on notice that the documents were not authorized, final, approved, or binding in any way, on November 4, 2016, CGO V sent a Notice of Acceleration to Lucerne Australia, from Maass' home address in Connecticut, notifying Lucerne Australia of CGO V's intent to accelerate Lucerne Australia's obligations under the 2016 Margin Lending Agreement and demanding payment of $23,666,426 A.U.D. on or before November 9, 2016 (Australian Eastern Daylight Time) (the "Notice of Acceleration").  In the Notice of Acceleration, CGO V indicates that it may "sell any of the Share Collateral in public or private sale and without further notice to the maximum extent allowed pursuant to New York UCC Section 9-611(d)."  Like the Notice of Default, the Notice of Acceleration copied Maass and his lawyers, all of whom are residents of and received the communication while present in the United States.

72.     On or about November 5, 2016, Mr. Wilson sent an e-mail to Maass, which Maas received while present in the United States, notifying Maass that Mr. Wilson did not sign the Assignment and that the 2015 Margin Lending Agreement has not been assigned to Lucerne Australia.

73.     Mr. Wilson was never in default under the 2015 Margin Lending Agreement and has never received a notice of default under that agreement.

74.     Relying on documents that Mr. Wilson neither signed nor authorized, CGO V sought to foreclose on the Collateral Shares—despite the fact that CGO V did not disburse to Mr. Wilson or anyone else any funds under the purported 2016 Margin Lending Agreement.

75.     As of February 28, 2017, the Collateral Shares have an approximate current value of approximately $34 million A.U.D., vastly exceeding the balance owed on the 2015 Margin Lending Agreement.

76.     Allowing CGO V to sell the Collateral Shares would cause irreparable damages that cannot be remedied by a monetary judgment.

77.     First, selling that large of a block of TFS shares in the open market in an uncontrolled manner would likely have a dramatic and detrimental effect on the share prices for all shareholders.  The average daily trading volume in TFS shares on the ASX is less than one million shares per day.  Selling over twenty million shares (over twenty times the daily average) would likely create a substantial devaluation of share prices.

78.     The drop in TFS share value would likely impact the potential market value of its U.S. subsidiary Santalis and may derail the contemplated IPO—creating a distinct and direct injury in the United States.

79.     Second, under the 2015 Margin Lending agreement, Mr. Wilson maintained the voting rights for the Collateral Shares.  Through these voting rights, Mr. Wilson is able to exercise significant influence over board composition and significant corporate transactions that require shareholder approval for both TFS and Santalis.  Allowing the sale of the Collateral Shares would disrupt that role.  While Mr. Wilson owns, directly or indirectly, other TFS shares, loss of the

Collateral Shares would irreparably dilute Mr. Wilson's ownership and related control. For example, at a typical TFS annual general shareholder meeting, less than 140 million shares are voted. The Collateral Shares would represent approximately 14% of that total.

80.     Mr. Wilson has voted his shares at each TFS annual general shareholder meeting (or instructed others, such as EMI, to vote his shares). A loss of the ability to vote approximately 14% of the shares voted at an annual general meeting of shareholders would irreparably reduce Mr. Wilson's voice in shareholder matters—including those that impact Santalis, the U.S. subsidiary.

81.     Upon information and belief, the Collateral Shares remain in possession of EMI, its agents, or affiliates. Through counsel, as recently as January 27, 2017, and in formal discovery requests, Mr. Wilson requested the current location of the Collateral Shares, but EMI, through its counsel, has refused and continues to refuse to disclose that information.

82.     Additionally, despite written demand, EMI has refused to pay Domenica its dividends from the Collateral Shares which is now due and owing. Domenica is entitled to the dividends under the express terms of the 2015 Margin Lending Agreement and the 2015 Term Sheet.

83.     Additionally, allowing CGO V to sell the Collateral Shares will result in irreparable reputational harm to Mr. Wilson, particularly with TFS, Santalis, and among its shareholders. The false and ludicrous suggestion that Mr. Wilson "defaulted" on a loan (even a loan for which no funds were disbursed) secured by the Collateral Shares could have devastating effects on his professional reputation, strategic business relationships, employment status, and overall standing in the business community. And the same is true with respect to Lucerne and Mr. Murphy.

84.     Defendants' misconduct has also disrupted, and threatens to derail, Santalis' potential IPO and U.S. listing and TFS' potential opportunity to consider a dual listing.

85.     There has never been a notice of default under the 2015 Margin Lending Agreement.  Indeed, there has never been even the suggestion of any default in payment under the non-binding and unconsummated 2016 Margin Lending Agreement.  CGO V never advanced any funds under that agreement to Mr. Wilson.  Instead, this entire scenario was intentionally designed to improperly seize the Collateral Shares under a manufactured and contrived "default."

86.     CGO V sent its Notice of Default the same day that it received the non-binding documents that it assured Mr. Murphy were merely gestures of "good will" but that it now seeks to enforce.

87.     Creating the false impression based on unauthorized and fraudulent documents that Mr. Wilson "defaulted" on a loan (even one for which no funds were advanced) would severely impact his, TFS', and Santalis' business reputation and possibly incite unjustified concern among TFS shareholders, thereby endangering his position with the company and his ability to significantly influence operations of TFS and Santalis in the United States and elsewhere.  Similarly, creating the false impression that Lucerne "defaulted" on a loan would cause significant damage to Lucerne.

## IV.  CAUSES OF ACTION

### COUNT ONE
**Violations of the Racketeer Influenced and Corrupt Organizations Act
18 U.S.C. §§ 1961 *et seq.* ("Civil RICO")
(All Plaintiffs Against All Defendants)**

88.     Plaintiffs re-allege and fully incorporate the allegations set forth above.

### *The Enterprise*

89.     EMI is an "enterprise" as defined in 18 U.S.C. § 1961(4).

90.     Through its business operations, EMI is engaged in and/or its activities affect interstate commerce and foreign commerce.  EMI utilizes interstate and foreign commerce in the operation and administration of its lending and investment banking business.

91.     Defendants participate in interstate commerce because, *inter alia*, they have operations in several different states including New York and Connecticut.

92.     EMI routinely participates in foreign commerce because, *inter alia*, it conducts businesses and/or holds the accounts of citizens of different countries. For example, EMI represents that, in addition to the United States, it has offices in Turkey and India.  Moreover, EMI participates in joint ventures in foreign countries including Turkey.

93.     EMI's "asset management" business also necessarily involves and requires the use of interstate wires and communications to transmit communications, funds, loan documents, etc.

94.     EMI is a legal entity that is wholly separate and distinct from the other Defendants.

### *The RICO Defendants*

95.      Defendants EMI, Ltd., SRT, CGO V, SRT Capital, Maass, and Toros (collectively, "the RICO Defendants") are each "persons" within the meaning of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1961(3).

### *Predicate Acts of Racketeering*

96.     Among the many predicate acts committed by the Defendants are the following:

97.     First, each of Defendants' use of e-mail and the internet to send communications to Plaintiffs in furtherance of their scheme constitutes a separate and distinct act of wire fraud under 18 U.S.C. § 1343.  Some examples include:

   a.  *October 30, 2016 Telephone Call and Subsequent Communications:* On an

       October 30, 2016 telephone call, Maass, speaking in and from the United

States and on behalf of the corporate defendants, fraudulently misrepresented to Mr. Murphy and Mr. Wilson that he was agreeing to all changes to the loan agreement proposed by Mr. Wilson, with the exception of the term of the loan.  Over the next few days after this call, Maass fraudulently misrepresented to Mr. Murphy over telephone and e-mail that: (a) an executed copy of the Assignment and 2016 Margin Loan Agreement—without the agreed upon amendments—was required as a non-binding "good will" gesture while the final amendments were being drafted; (b) that the new transaction would include the terms agreed upon during the October 30, 2016 telephone call; and (c) that Defendants would vote the Collateral Shares in accordance with Mr. Wilson's instructions as a prerequisite to any  further loan transaction.

b.  *November 2, 2016 E-mail from Toros to Mr. Murphy*.  Defendants sent the fraudulent Notice of Default via e-mail.  The Notice of Default was a material and critical part of the scheme and was used by Defendants as the tool to seize and attempt to sell the Collateral Shares.  The Notice of Default was itself a fraudulent document as it is predicated on documents the Defendants knew to be unauthorized and obtained via deceit and trickery.

c.  *November 4, 2016 E-mail from Toros to Mr. Murphy*.  Defendants sent the fraudulent Notice of Acceleration via e-mail. The Notice of Acceleration was a material and critical part of the scheme and was used by Defendants as the tool to seize and attempt to sell the Collateral Shares.  The Notice of Default was itself a fraudulent document as it is predicated on documents

the Defendants knew to be unauthorized and obtained via deceit and trickery.

98.     Each of these predicate acts involved the use of interstate mail or wires, in furtherance of Defendants' scheme to defraud with money or property, namely the Collateral Shares, as the object.  Plaintiffs reasonably and justifiably relied on Defendants' fraudulent misrepresentations and omissions contained in the wire communications.  Further, some of the misrepresentations, including the misrepresentation that the Collateral Shares would be voted per Mr. Wilson's instructions, were within the exclusive knowledge of Defendants and the nature of the misrepresentation could not have been discovered by any due diligence on Plaintiffs' part prior to the transaction.  In fact, even after this lawsuit was filed and continuing to date, Defendants have continued to conceal the location and status of the Collateral Shares.

99.     Second, Defendants' predicate acts also include their threats to at least one witness, who is also a party representative, in connection with this action in violation of 18 U.S.C. §§ 1512(a)(2), (b).  These specific threats—made on several different occasions—are listed in paragraphs above and in Count Nine below, all of which are fully incorporated herein, and all of which constitute predicate acts under 18 U.S.C. § 1961(1).  Specifically, Defendants used intimidation, threats, and other corrupt practices, including the threat of physical force (e.g., Maass' threat to "bury" Mr. Murphy, among other things), with intent to influence, delay, or prevent Mr. Murphy's testimony in this proceeding, intent to cause Mr. Murphy to withhold or change his testimony, and/or the intent prevent him from participating in any manner in this case altogether.

100.     Third, Defendants have refused to disclose the location and status of the Collateral Shares, including whether they have conducted any sales, loan transactions, or otherwise

improperly encumbered the Collateral Shares.  If any such transactions have occurred, such transactions would constitute additional predicate acts of money laundering under 18 U.S.C. § 1956.  Specifically, Defendants' conducting of such financial transactions involving the Collateral Shares (as proceeds of their unlawful activities as described herein, including wire fraud), knowing that the Collateral Shares constituted proceeds of their illegal activities, would be designed in whole or in part to conceal or disguise the source, ownership, and/or control of the Collateral Shares.  Defendants' unwillingness, even during the pendency of this lawsuit, to disclose the location and nature of the Collateral Shares, and whether any such transactions have occurred, is consistent with, if not *prima facie* evidence of, the requisite *mens rea* for such a money laundering scheme.

101.    Each of these criminal and predicate acts constitute "racketeering activities" under 18 U.S.C. § 1961(1).

### *Pattern of Racketeering*

102.    The predicate acts described above and throughout this Second Amended Complaint constitute a "pattern of racketeering" within the meaning of 18 U.S.C. § 1961(5).

103.    As described above, Defendants' mail, wire, and internet communications themselves often contained fraudulent communications.  When not patently fraudulent, Defendants' mail, wire, and internet communications were nevertheless material to and in furtherance of the scheme to defraud Plaintiffs.

104.    The predicate acts all occurred well within ten years of each other, are all related to each other, and are "continuous" as explained below.

105.    The predicate acts are related in that they have the same or similar participants, all of whom are established business associates.

106.    Defendants' conduct demonstrates an "open-ended" pattern of continuity as they represent the Defendants' ongoing and regular way of conducting their business by and through EMI, and/or that the nature of Defendants' conduct itself implies a threat of continued criminal activity.  As demonstrated by the Defendants' suspiciously similar conduct in the *Carbures* and *Soleil* cases, the criminal wrongdoing alleged in this Second Amended Complaint appears to be Defendants' regular way of conducting business.  Defendants' treatment of Plaintiffs is not a discrete and short-lived scheme; it represents Defendants' continuing *modus operandi*.

107.    In *Soleil Capital Limited et al. v. Emerging Markets Intrinsic, Ltd. and Eric Maass,* Index No. 653451/2015, the plaintiffs brought claims against EMI and Maas.  The Soleil complaint alleges that EMI and Maas misappropriated and converted 21.5 million shares of stock pledged by plaintiffs as collateral for two separate non-recourse loans for which EMI served as agent.  *Soleil* Complaint ¶ 1.[2]  In *Soleil*, as here, financing was originally arranged though EMI pursuant to margin lending agreements with SRT.  *Id.* ¶ 2.  As collateral for a $1 million loan Plaintiff Soleil Capital Limited transferred seven million shares of stock to SRT.  *Id.* ¶ 29.  Soleil Capital then transferred another five million shares of stock as collateral for a second loan and another borrower, plaintiff Grandale Enterprise Limited transferred 16.5 million shares of stock to SRT for a separate loan.  *Id.* ¶ 4.  After the additional 21.5 million shares of stock were transferred to SRT by plaintiffs, EMI failed to loan any new funds to either Soleil Capital or Grandale Enterprise.  *Id.* ¶ 5.  Instead, EMI issued a margin call demanding $2 million in cash to supplement the collateral shares of stock that had been transferred by these entities.  *Id.* ¶ 4.  Although when asked directly, SRT's agent assured plaintiff that will not sell the collateral shares, *id.* ¶ 16, plaintiffs contend that SRT and EMI nevertheless sold the initial seven million shares provided by Soleil

---

[2] A copy of the *Soleil* Complaint is attached hereto as **Exhibit 4**.

Capital as collateral in an effort to depress the share price and trigger a margin call under the agreements, *id*. ¶ 4.  After the margin call, plaintiffs participated in a telephone call with Maas and Toros, also defendants in this case, and demanded their collateral shares be returned.  *Id*. ¶ 42. Their request was refused.  *Id*. ¶ 43.  Then, two days after Maas announced the "cure period" had expired and thus, Grandale Enterprise and Soleil Capital were in default on their obligations because they had refused to pay EMI an additional $2 million in cash, Maas informed the plaintiffs that all of their collateral shares had been "liquidated in a private sale." *Id*. ¶ 43.  Although Grandale Enterprise had never received any funds at all from EMI, EMI nevertheless seized the entire 16.5 million shares of stock that Grandale Enterprise had pledged as collateral. *Id*. ¶¶ 5, 40, 43.  Similarly, although Soleil Capital transferred an additional five million shares of stock as collateral for a second loan EMI seized these shares without providing any additional funds to Soleil Capital.  *Id*.

108.    Thus, in *Soleil*, as here, Defendants, including SRT, made material false misrepresentations under the guise of a "default" as a means to unjustly seize stock that had originally been pledged as loan collateral when in reality the "default" was manufactured by Defendants and was wholly unrelated to any genuine effort to secure any loaned funds.  Further here, just as in *Soleil*, SRT did not even loan Plaintiffs any funds under the 2016 Margin Lending Agreement, yet it nevertheless seeks to seize millions of dollars in collateral, based on loan documentation that was induced under false pretenses and only intended as a means to unlawfully divest Plaintiffs of the collateral shares.

109.    In *Carbures Europe, S.A. et al. v. Emerging Markets Intrinsic Cayman, Ltd, et al*., Index No. 653892/2015; Supreme Court of the State of New York, County of New York, the plaintiff brought claims against, among others, EMI, EMI, Ltd., Toros, and Maass for inter alia,

breach of contract, fraud, and conversion arising out of EMI's conduct in selling collateral shares plaintiff had pledged to secure a loan from EMI.  Carbures Complaint ¶ 1.[3]  Pursuant to the terms of margin lending agreement the two principal shareholders of plaintiff's stock deposited six million shares into SRT and EMI disbursed €3 million in funds to plaintiff.  *Id.* ¶ 4.  The loan was to be executed in two stages, the first, for €3 million secured by six million Carbures shares and the second, for €4 million to be secured by eight million Carbures shares.  *Id.* at ¶ 2.  The plaintiff alleges that immediately after the first six million shares were transferred as collateral EMI began trading the shares even though they had made numerous representations to plaintiff that they would not trade the shares as long as there was no default and would only engage in limited hedging activity.  *Id.* at ¶¶ 22, 25, 27, 28.  Because EMI engaged in selling large quantities of Carbures collateral shares and significantly depressed Carbures stock value and refused to cease such conduct after multiple requests, Carbures refused to transfer an additional eight million shares to SRT until it received assurances from the defendants that they would not sell the collateral shares. *Id.* at ¶ 55.  EMI refused to provide any such assurances and sent plaintiff a Default Notice for plaintiff's refusal to provide Carbures with another eight million shares.  *Id.* at ¶¶ 54, 57.  Within a week after issuing the default notice EMI sold over 670,000 shares of plaintiff's collateral shares and 1.4 million shares in total.  *Id.* at ¶¶ 65-68.

110.    Thus, in *Carbures* and *Soleil*, just as is the case here, Defendants made materially false statements to induce parties to enter sham lending agreements, which the defendants had no intention of abiding by, and which lending agreements were used in merely as ruses designed to divest borrowers of securities that they had pledged in good faith as loan collateral.  Upon information and belief, the fraudulent conduct in both *Carbures* and *Soleil*, also like here, involved

---

[3] The *Carbures* complaint is attached hereto as **Exhibit 5**.

the illegal use of the wires in violation of 18 U.S.C. § 1341, thereby making the conduct described in those cases not only fraudulent, but also illegal.  Further, the schemes described herein and in the *Carbures* and *Soleil* lawsuits are just those that are available in the public record.  Upon information and belief, Defendants have operated their open-ended and continuous pattern of racketeering to defraud other third parties.

111.   Alternatively, Defendants' conduct also demonstrates a "close-ended" pattern of continuity in that the predicate acts against Plaintiffs as described above show a series of related acts occurring over a substantial period of time—particularly when taken in context of Defendants' substantially similar conduct in the two other cases.  Upon information and belief, Defendants' closed-ended pattern of international racketeering occurred over more than a two-year period and has taken victims across the globe from Australia and the British Virgin Islands to Spain.

### *Violation of 18 U.S.C. § 1962(c)*

112.   As described in detail throughout this Second Amended Complaint, all RICO Defendants have each unlawfully, willfully, and knowingly conducted and participated, directly or indirectly, in the conduct of EMI's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

113.   By conducting or participating in the affairs of EMI, each Defendant committed at least two acts of racketeering activity, the last of which occurred within ten years after the commission of a prior act of racketeering activity.

114.   Defendants' racketeering activities described herein were the substantial and proximate cause of the injuries to Plaintiffs' business and property, thus entitling Plaintiffs to recover three times their actual damages, attorneys' fees, and other exemplary damages pursuant to 18 U.S.C. § 1964(c).

### *Violation of 18 U.S.C. § 1962(d)*

115.    In addition, each and every Defendant willfully and knowingly conspired to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d), as described throughout this Second Amended Complaint.

116.    Plaintiffs were substantially injured in their business and property by reason of and in furtherance of the Defendants' conspiracy to violate 18 U.S.C. § 1962(c), and are therefore entitled to recover three times their actual damages, attorneys' fees, and other exemplary damages pursuant to 18 U.S.C. § 1964(c).

### *Domestic Injury*

117.    As alleged above, Plaintiffs were injured in their business and/or property by reason of Defendants' racketeering conduct.  Those injuries included significant domestic injuries.

118.    Mr. Wilson, through Domenica, is the largest shareholder, founder, and Managing Director of TFS.

119.    Mr. Wilson is also a director of each Santalis entity, TFS' two U.S. subsidiaries, each based in Texas.

120.    More critically, through his ownership of the Collateral Shares that are being threatened with foreclosure by Defendants, Mr. Wilson has a substantial personal property and business interest in Santalis.

121.    Santalis is the pharmaceutical division of TFS, operates from and in the United States, and is currently involved in U.S. FDA trials for some of its products.  As a director of each Santalis entity, Mr. Wilson is involved in coordinating and overseeing all (U.S.) operations of Santalis.  Mr. Wilson's ownership interests in Santalis via his TFS stock are his personal property.

122. Mr. Wilson's property and business interests in the United States have been damaged and continue to be damaged by Defendants' conduct.

123. First, Defendants' conduct has effectively devalued, or threatens to devalue, Mr. Wilson's shares of TFS, and in turn his business and ownership interests in Santalis.

124. Defendants' refusal to vote the Collateral Shares in accordance with Mr. Wilson's instructions also damaged, and threatens to irreparably destroy, his intangible personal property—i.e., his right to significantly influence the management and control of TFS and Santalis via his ownership of the Collateral Shares.

125. For example, Santalis is contemplating launching an IPO on the NASDAQ exchange. Defendants' wrongful misappropriation of Mr. Wilson's voting rights and/or their wrongful selling, trading, encumbering, or otherwise disposing of the Collateral Shares, or portions thereof, would make it difficult, if not impossible, for Mr. Wilson, to maintain the same role in key decisions concerning the IPO. These injuries are uniquely domestic because they are suffered, and have the greatest impact on Santalis and Mr. Wilson's business and property interests, in the United States.

126. Second, as Managing Director of TFS, a director of each Santalis entity, and a substantial TFS shareholder, Mr. Wilson takes great measures to foster good-will and relationships with strategic business partners, shareholders, and customers located in the United States in order to advance the business goals of TFS and Santalis. For example, three of the top ten TFS shareholders are located in the United States, two of largest TFS institutional plantation investors are in the United States, and TFS' largest customer is headquartered in Utah. TFS also has business relations with various investment banks and financiers in the United States, which assist Mr. Wilson in promoting and growing TFS' presence and operations in the United States. To foster

these relationships and promote the business goals of the companies, Mr. Wilson often travels from Australia to the United States, about three to six times a year.  The damage Defendants' conduct has caused, and threatens to continues to cause, to Mr. Wilson's property and business interests has also damaged these U.S. strategic business partnerships and relationships, to the economic detriment of TFS, Santalis, and, in turn, Mr. Wilson.

127.    Third, TFS itself, which is currently listed on the Australian Securities Exchange, is contemplating a dual listing on the U.S. NASDAQ exchange, given its growing U.S. presence and operations, through Santalis, and the significant U.S. investment support.  As with the Santalis IPO, Defendants' conduct threatens to disrupt, if not derail, TFS' efforts to achieve a presence on the NASDAQ exchange.  For example, the devaluation of the TFS shares described above would make it nearly impossible to garner market support for, and continue with, the IPO for TFS and/or either Santalis entity.

128.    Mr. Wilson has a legal entitlement to his property and his business interests to be unhampered by schemes prohibited by RICO.  Defendants' conduct has directly interfered with those rights and caused damaged for which the financial impact was felt in the United States, as described above.  While working, traveling, and doing business in the United States, Mr. Wilson, and his property and business interests in TFS and Santalis, suffered economic injury in the United States as a result of Defendants' RICO enterprise.

129.    Accordingly, Mr. Wilson has suffered a "domestic" injury for purposes of 18 U.S.C. §§ 1962(c), 1962(d).

## COUNT TWO
### Fraud
### (All Plaintiffs Against All Defendants)

130.    Plaintiffs re-allege and fully incorporate the allegations set forth above.

131.   All Defendants are liable for fraud based on their false representations to Plaintiffs. These misrepresentations, detailed above, include statements in October and November 2016 that: (a) the purported Assignment and 2016 Margin Lending Agreement were nonbinding gestures of "good will" to serve as a placeholder until the documents were amended to reflect the changes agreed upon by the parties; (b) Defendants had in fact agreed to the terms proposed by Mr. Wilson on the October 30, 2016 call; (c) Defendants would vote the Collateral Shares in accordance with Mr. Wilson's instructions as a prerequisite to any further loan transaction.

132.   Between October 27 and November 2, 2016, Defendants also fraudulently failed to disclose to Mr. Wilson that Lucerne Australia had already executed the purported 2016 Term Sheet relating to the transaction that the parties were in the process of negotiating.  This glaring omission was a deliberate attempt to deceive Mr. Wilson and deprive him of his rights under the 2015 Margin Lending Agreement and his rights to the Collateral Shares.

133.   When Defendants made these representations or omissions, they knew them to be false, or made the representation recklessly, as a positive assertion and without knowledge of their truth.

134.   Defendants made the representations or omissions with the intent that Plaintiffs rely on them.

135.   Plaintiffs did, in fact, reasonably rely on Defendants' representations and omissions.  Among other things, Plaintiffs were induced to continue negotiating with Defendants and Lucerne Australia was induced to execute the purported 2016 Margin Lending Agreement and to purport to execute the Assignment on Mr. Wilson's behalf.

136.   The false representations resulted in actual injury to Plaintiffs for which they are entitled to recover damages.

137.     Plaintiffs are also entitled to recover exemplary damages.

## COUNT THREE
### Conversion
### (Domenica and Mr. Wilson Against All Defendants)

138.     Plaintiffs re-allege and fully incorporate the allegations set forth above.

139.     Plaintiffs Domenica and Mr. Wilson had rights to own the Collateral Shares, vote the Collateral Shares, and receive any dividends and distributions paid on the Collateral Shares.

140.     Defendants wrongfully exercised dominion and control over the Collateral Shares in connection with the unauthorized Assignment and 2016 Margin Lending Agreement, through which Defendants purport to have assigned the Collateral Shares to CGO V.

141.     The wrongful conversion of the Collateral Shares has caused injury to Plaintiffs Domenica and Mr. Wilson.

142.     Defendants have further intentionally and wrongfully converted dividends paid on the Collateral Shares that rightfully belong to Domenica.

143.     Specifically, on or about November 8, 2016, dividends were paid on the Collateral Shares in an amount of approximately $676,020 A.U.D.   These funds belong to Plaintiffs Domenica and Mr. Wilson and are being wrongfully retained and withheld by Defendants.

144.     Plaintiffs Domenica and Mr. Wilson have demanded that the dividend payments be provided to them but Defendants persist in their refusal to return these sums.

145.     Plaintiff Domenica has suffered injury because of these wrongful conversions.

## COUNT FOUR
### Declaratory Judgment
### (All Plaintiffs Against All Defendants)

146.     Plaintiffs re-allege and fully incorporate the allegations set forth above.

147.    Plaintiffs request declaratory relief pursuant to 28 U.S.C. § 2201 and N.Y. C.P.L.R. § 3001 and seek an order declaring the 2016 Margin Lending Agreement, 2016 Term Sheet, and the Assignment are: (a) null and void as procured by fraud and/or forgery and as a result of Defendants' illegality; and/or (b) null and void for lack of consideration from Defendants in connection with these purported contracts because, among other reasons, there was never a single dollar of funds loaned under these sham agreements; and/or (c) null and void because the parties to these purported contracts never agreed to their terms.

148.    Plaintiffs bring this request for declaratory judgment so that the Court may determine the rights and other legal relations of the parties to a justiciable controversy.

### COUNT FIVE
### Unjust Enrichment and Restitution
### (Domenica and Mr. Wilson Against All Defendants)

149.    Plaintiffs re-allege and fully incorporate the allegations set forth above.

150.    Pleading additionally and in the alternative pursuant to Fed. R. Civ. P. 8(a)(3), if Defendants have sold, loaned or otherwise conducted financial transactions with the Collateral Shares, all Defendants have been unjustly enriched in any amounts received by them as a result of such transactions.  No Defendant was ever entitled to conduct such transactions if they occurred.

151.    Plaintiffs are entitled to damages and/or restitution from each Defendant in the amounts each received.

### COUNT SIX
### Imposition of Constructive Trust (Domenica and Mr. Wilson Against All Defendants)

152.    Plaintiffs re-allege and fully incorporate the allegations set forth above.

153.    As alleged in the preceding count, Defendants have been unjustly enriched to the extent that they have sold, loaned, or otherwise improperly conducted financial transactions with the Collateral Shares.

154.     Plaintiffs seek the imposition of a constructive trust on all of each Defendants' assets that are traceable in any way to such transactions involving the Collateral Shares.  Plaintiffs also seek the imposition of a constructive trust on any assets that Defendants might have conveyed to any other person in connection with such wrongful transactions.

## COUNT SEVEN
## Breach of Contract (Mr. Wilson Against Defendant EMI)

155.     Plaintiff Mr. Wilson re-alleges and fully incorporates the allegations set forth above.

156.     Plaintiff Mr. Wilson entered into the 2015 Margin Lending Agreement which incorporates the 2015 Term Sheet with Defendant EMI.

157.     Under the 2015 Margin Lending Agreement, EMI was required to vote the Collateral Shares in accordance with Mr. Wilson's instructions.

158.     Under the 2015 Margin Lending Agreement, EMI was required to pay dividends from the Collateral Shares to Domenica.

159.     EMI has breached the 2015 Margin Lending Agreement, among other ways, by failing to pay dividends from the Collateral Shares to Domenica and by failing to vote the Collateral Shares in accordance with Mr. Wilson's instructions despite an obligation and demands to do so.

160.     Mr. Wilson has performed his obligations under the 2015 Margin Lending Agreement.

161.     All conditions precedent have been met or have occurred.

162.     Mr. Wilson has suffered damages, in an amount to be determined at trial, as a result of EMI's breaches of the 2015 Margin Lending Agreement.

## COUNT EIGHT
### Breach of Duty of Good Faith and Fair Dealing
### (Mr. Wilson Against Defendant EMI)

163.    Plaintiff Mr. Wilson re-alleges and fully incorporates the allegations set forth above.

164.    Plaintiff Mr. Wilson entered into the 2015 Margin Lending Agreement which incorporates the 2015 Term Sheet with Defendant EMI.

165.    Implicit in these contracts is a covenant of good faith and fair dealing.

166.    As described throughout this Second Amended Complaint, Defendant EMI has breached this covenant in multiple ways that have frustrated Mr. Wilson's ability to realize the benefit of his bargain.

167.    Mr. Wilson has suffered damages, in an amount to be determined at trial, as a result of EMI's breaches of the covenant of good faith and fair dealing.

## COUNT NINE
### 42 U.S.C. § 1985(2) and § 1986 Claim
### (All Plaintiffs Against All Defendants)

168.    Plaintiffs re-allege and fully incorporate the allegations set forth above.

169.    Defendants conspired to deter, by intimidation or threat, Mr. Murphy from providing full, free and truthful testimony in this case that resulted in injury to Plaintiffs.

170.    Mr. Murphy is the Chief Executive Officer of Lucerne Australia.  Lucerne Australia also had other unrelated business relationships with EMI and Maass.  Specifically, Mr. Murphy had referred other Lucerne clients to EMI and Maass.

171.    On November 8, 2016, Domenica initiated this suit in the Supreme Court of the State of New York against Defendants.  After the suit was filed, on several different occasions, Maass, acting individually and in his capacity for EMI, conspired with Defendants and threatened

Mr. Murphy that if he did not provide a declaration in support of Maass and EMI, and their position in this lawsuit, that they would cease all business with Lucerne, Lucerne Australia, and their clients.  In addition to threatening Mr. Murphy, Maass also attempted to entice him to provide an untruthful declaration that would support Defendants' position by offering to give some of Mr. Wilson's TFS shares to Mr. Murphy's daughters.

172.    Defendants removed this case from state court to this Court and Mr. Murphy provided a truthful declaration.  Mr. Murphy's counsel forwarded the declaration to counsel for Defendants, who apparently were outraged by Mr. Murphy's decision to provide truthful testimony, rather than false testimony that would support Defendants' warped view of the story, even at the risk losing a business relationship and suffering financial injury as a result.

173.    Over the next several days, on or about November 19-20, 2016, and in direct response to Mr. Murphy's truthful testimony, Defendants made numerous direct threats, orally and in writing.  Among the illegal threats (many of which were memorialized in text messages and messages on social media while others were made on multiple phone calls) were the following made by Maass:

- Maas was going to "bury" Mr. Murphy;
- Mr. Murphy should "tell [his] wife not to have a 3rd baby because you and your family are finished."
- "Wave goodbye to your Dad today."
- "how on earth could you have done something so stupid?"
- "u try and fry me?"
- "I am one person u don't f**k over"
- "Just spoke to Aaron [EMI's counsel]" / "AG [Aaron's law firm] will put your chairman on notice Monday"
- "I've emailed MNY and JKL" [two corporate clients of Lucerne's]
- "Coming after the market and then Lucerne"
- "I'm going to f***ing end Lucerne and your 20 something employees"
- "You're a p***y f****t c***sucker and I'm going to destroy your sh***y little firm"
- "U don't want your kids to hear this"
- "I'm not mad at you for being truthful, I'm mad at you for being an idiot."

- "We're coming after you across the globe.  Singapore [referring to EMI's counsel there] is going to get your Chairman.  CU [another EMI law firm] is coming after gadens [law firm that represents Lucerne] and your c***sucking sh***y lawyer, jol [sic]," and ominously,
- "Look forward to seeing u in NY."

174.    As evidenced by these communications, following receipt of Mr. Murphy's truthful declaration and indirect response thereto, Defendants, outraged that Mr. Murphy rejected their demand that he provide false testimony, came to a meeting of the minds and entered into an agreement, express or tacit, to achieve the unlawful end of deterring Mr. Murphy from attending or further testifying in these proceedings, or coercing Mr. Murphy to withdraw his truthful testimony.  Upon information and belief, Defendants reached the meeting of the minds, and formed their express or tacit agreement, on or about November 18, 2016, upon receiving Mr. Murphy's truthful declaration or what Defendants call Mr. Murphy's "Betrayal."  The face of Maass' texts and social media messages alone evidence his conspiracy with the other Defendants, and/or their agents such as their lawyers, to deter Mr. Murphy from participating in these proceedings by threatening to damage, if not ruin, Mr. Murphy's career.

175.     Defendants' unlawful conduct as described above violates 42 U.S.C. § 1985(2).

176.    Additionally, Defendants had knowledge that the threats and intimidation tactics to Mr. Murphy were about to be committed, had the power to prevent or aid in preventing the commission of these threats through the exercise of reasonable diligence, neglected or refused to prevent the threats and intimidation, and are therefore liable for neglecting to prevent these threats under 42 U.S.C. § 1986.

177.    Defendants' unlawful conduct and agreement to deter Mr. Murphy from further participating in these proceedings caused injury to Plaintiffs and/or their property as a result.  For example, Defendants' conduct has soured and damaged the business relationship Mr. Murphy, and

Lucerne by association, had with certain customers who, upon information and belief, have been contacted by Defendants in furtherance of their attempt to intimidate Mr. Murphy and illegally influencing this proceeding.  For example, after Mr. Murphy provided his truthful declaration, Maass followed up on his threats by reaching out to at least four clients of Lucerne.  Lucerne had introduced these clients to EMI in connection with potential financing transaction.  As retribution for Mr. Murphy's declaration, Maass, on behalf of EMI, refused to move forward on potential financing transactions, began making unreasonable demands of these clients as to potential and/or existing facilities (including threatening acceleration without basis), and/or otherwise disparaged Lucerne and/or Mr. Murphy.  As a result, business relationships and opportunities of Lucerne and Mr. Murphy have been lost or significantly damaged.

178.    Similarly, Plaintiffs Domenica's and Mr. Wilson's business relationships have been damaged by virtue of their association with Lucerne and Mr. Murphy.  Finally, Defendants' threats and intimidation tactics have injured all Plaintiffs by compromising their ability to freely and fairly litigate their claims on the merits before this Court, and causing unnecessary delays in the same.

**COUNT TEN**
**Violation of Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q;**
**Violation of Section 10(b) od the Securities and Exchange Act of 1934, 15 U.S.C. § 78j;**
**Violation of Rule 10b-5, 17 C.F.R. § 240.10b-5**
**(All Plaintiffs Against All Defendants)**

179.    Plaintiffs re-allege and fully incorporate the allegations set forth above.

180.    Defendants, in connection with the offer, purchase, or sale of securities and by the use of the means or instruments of communication in interstate commerce or e-mails, directly or indirectly, knowingly and/or recklessly: (a) employed a device, scheme, or artifice to defraud Plaintiffs; (b) obtained money or property by means of an untrue statement of a material facts and/or an omission to state a material fact necessary in order to make the statements made, in light

of the circumstances under which they were made, not misleading; and/or (c) engaged in a transaction, practice, or course of business which operated as a fraud or deceit upon Plaintiffs.

181.    The Collateral Shares constitute a "security" for purposes of 15 U.S.C. §§ 77q, 78j.

182.    The pledging of the Collateral Shares in the purported 2016 Margin Lending Agreement constitutes a disposition of an interest in a security for value, within the definition of "sale" and "offer" for purposes of 15 U.S.C. § 77b(1), (3), 15 U.S.C. § 77q, 15 U.S.C. §78c(10), 15 U.S.C. §78j.

183.    The purported 2016 Margin Lending Agreement was a "domestic transaction in securities" because irrevocable liability was incurred in the United States.  Specifically, at all times relevant to the purported 2016 Margin Lending Agreement, Maas, on behalf of EMI, EMI, Ltd., and CGO V, was located in the United States and was a resident of Connecticut.  Upon information and belief, Maas, the principal liaison for all Defendants regarding the purported 2016 Margin Lending Agreement, negotiated the terms of the purported 2016 Margin Lending Agreement from the United States, prepared the transaction documents from the United States (along with his counsel, who was also present in the United States), sent drafts of the transaction documents from his office in the United States, held the critical October 30, 2016 telephone call (among others) from his offices in the United States, and executed the purported 2016 Margin Lending Agreement on behalf of CGO (as lender) while he was present in the United States.

184.    On or about October 30, 2016, and at the other times referenced herein, Defendants knowingly and/or recklessly misrepresented to Plaintiffs that Mr. Wilson they would provide Mr. Wilson with all dividends generated by the Collateral Shares and abide by Mr. Wilson's instructions on voting the Collateral Shares.  Having chosen to make these misrepresentations, Defendants were under a duty to be both truthful and accurate.  However, despite this duty,

Defendants failed to inform Plaintiffs that these material facts were not true, an omission which made Defendants' other representations regarding the purported 2016 Margin Lending Agreement misleading.  These representations and omissions were made knowingly and/or recklessly on or about October 30, 2016, and the preceding and subsequent days via telephone and e-mail communications.  These representations and omissions were misleading because Defendants never intended for these terms to be part of the purported 2016 Margin Lending Agreement and instead designed the entire transaction to manufacture the sham "default."  Plaintiffs reasonably relied on Defendants' misrepresentation and omissions.

185.    Defendants' misrepresentations and omissions were in connection with the offer or sale of the Collateral Shares and were reasonably calculated to influence Plaintiffs regarding the purported 2016 Margin Lending Agreement.  The misrepresentations and omissions were related to the fundamental nature of the Collateral Shares (the security)—i.e., that Mr. Wilson would retain the right to vote the shares and received dividends—thereby inducing Plaintiffs into the pledge or "sale" of the security as part of the 2016 Margin Lending Agreement.

186.    Further, as detailed in other paragraphs above, Defendants knowingly and/or recklessly employed a scheme to defraud Plaintiffs related to the purported 2016 Margin Lending Agreement by manufacturing, and aggressively pursuing, a sham "default" even before any monies had been loaned under the purported agreement.  This transaction was part of Defendants' practice and course of business which they knowingly and/or recklessly operated to defraud Plaintiffs.

187.    Defendants knew their representations were false.

188.    Defendants at all times had a duty to speak, and their silence as to the omissions described above is therefore intrinsically misleading.

189.     Defendants further had the motive and opportunity to commit their wrongful conduct in connection with the 2016 proposed transaction, specifically because of their prior business relations with Plaintiffs and because they were already in custody of the Collateral Shares pursuant to the 2015 Margin Lending Agreement.  Their motive was financial—manufacturing a sham "default" to seize control of over 22 million shares of TFS stock and thereby attempting to enrich themselves to Plaintiffs' detriment.  As reflected by Defendants' pattern of similar conduct in the *Soleil* and *Cabrures* matters, Defendants' conduct constitutes, at a minimum, conscious misbehavior or recklessness, if not deliberate illegal conduct.

190.     Based on the foregoing, Defendants, singly or in concert, directly or indirectly, violated Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

191.     As a direct and proximate cause of Defendants' conduct as alleged herein caused Plaintiffs to incur damages in an amount to be determined at trial.

### COUNT ELEVEN
**Aiding and Abetting Violations of Section 10(b)**
**of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j in violation of**
**Section 20(e) of the Securities and Exchange Act, 15 U.S.C. § 78t**
**(All Plaintiffs Against All Defendants)**

192.     Plaintiffs re-allege and fully incorporate the allegations set forth above.

193.     Defendants each aided and abetted each other's violations of Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5 described above.

194.     Each Defendant, directly or indirectly, controlled the other Defendants liable under Count Ten for violations of Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C.

§ 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, by engaging in the conduct described in Paragraphs 1-174 above.

195.    Defendants, in connection with the offer, purchase, or sale of securities and by the use of the means or instruments of communication in interstate commerce or e-mails, directly or indirectly, knowingly and/or recklessly: (a) employed a device, scheme, or artifice to defraud Plaintiffs; (b) obtained money or property by means of an untrue statement of a material facts and/or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in a transaction, practice, or course of business which operated as a fraud or deceit upon Plaintiffs.

196.    Each Defendant knew that each other Defendant was engaged in a scheme to defraud Plaintiffs, made material misrepresentations or omissions to Plaintiffs, and /or engaged in a transaction, practice, or course of business that defrauded and deceived Plaintiffs.   Each Defendant, acting singly or in concert, directly or indirectly, aided and abetted each other Defendant and substantially assisted each of the other Defendants in the securities violations described above.

197.    Based on the forgoing, pursuant to Section 20(e) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78t(a), each Defendant is jointly and severally liable with the other Defendants for their federal securities violations described in Count Ten.

#### COUNT TWELVE
**Interference with Contractual and Prospective Business Relations
(All Plaintiffs Against All Defendants)**

198.    Plaintiffs re-allege and fully incorporate the allegations set forth above.

199.    As set forth herein, Plaintiffs had valid contracts and/or prospective business relationships with third parties, Defendants were aware of such contracts and/or relationships, and Defendants intentionally and wrongfully interfered with such contracts and/or relationships.

200.    Plaintiffs have suffered damages as a result of Defendants' intentional and wrongful interference.

## V.  <u>VICARIOUS LIABILITY</u>
### (All Plaintiffs Against All Defendants)

201.    Plaintiffs re-allege and fully incorporate the allegations set forth above.

202.    Defendants are liable for the actions of each other and EMI, an entity in which they have a financial interest and exercised complete dominion or control.

203.    The corporate form of the entity Defendants should be disregarded because the individual Defendants used their dominion and control over corporate forms, which were: (a) abused and/or perverted for the purpose of causing harm to Plaintiffs; (b) used as a sham to perpetuate a fraud; (c) operated as a mere conduit of the individual Defendants; and (d) used to protect against the discovery of a crime or to justify a wrong.  For example, both Maass and Toros interchangeably executed documents on behalf of CGO V, but that entity appears to be nothing more than a shell entity that shares an address with Maass' Connecticut home.  CGO V and the other entities appear to have been created for the sole purpose of Defendants' illegal and fraudulent schemes that damaged not only Plaintiffs, but others as well as evidenced by the *Soleil* and *Cabrures* complaints.

204.    Because the individual Defendants abused the privilege of the corporate form of the entity Defendants, holding only the entities liable without imposing liability on the individual Defendants would result in grave injustice.

46

205.    Therefore, these individual defendants are liable for the actions of these corporate entities.

## VI.  PUNITIVE DAMAGES
### (All Plaintiffs Against All Defendants)

206.    Plaintiffs re-allege and fully incorporate the allegations set forth above.

207.    Plaintiffs are entitled to recover, in addition to other damages, punitive damages from all Defendants based on their intentional, willful, wanton, and fraudulent misconduct.

## VII.  REQUEST FOR INJUNCTION

208.    Plaintiffs re-allege and fully incorporate the allegations set forth above.

209.    Plaintiffs will suffer irreparable injury if all Defendants are not enjoined from selling, loaning, trading, encumbering, or otherwise conducting any financial transactions with the Collateral Shares in connection with the sham "default" on the fraudulent 2016 Margin Lending Agreement and 2016 Term Sheet.

210.    Plaintiffs have no adequate remedy at law.

211.    The balance of equities favors Plaintiffs.

212.    A preliminary and permanent injunction should be issued enjoining Defendants from selling, loaning, trading, encumbering, or otherwise conducting any financial transactions with the Collateral Shares in connection with the sham "default" on the fraudulent 2016 Margin Lending Agreement and the 2016 Term Sheet.

213.    Furthermore, a preliminary and permanent injunction should be issued requiring Defendants to vote the Collateral Shares in accordance with Mr. Wilson's instructions as per the 2015 Margin Lending Agreement and to pay to Domenica any accrued and future dividends from the Collateral Shares.

214.    Plaintiffs will file a separate application for preliminary injunction.

47

## VIII.  <u>PRAYER</u>

WHEREFORE, Plaintiffs Domenica Nominees Pty. Ltd., Frank Wilson, and Lucerne

Australia Pty. Ltd., respectfully ask that the Court do the following:

a.  Grant a preliminary and permanent injunction awarding the relief requested above;

b.  Enter a money judgment against all Defendants jointly and severally awarding Plaintiffs all damages incurred as a proximate result of Defendants' conduct;

c.  Enter a declaratory judgment ordering that the 2016 Margin Lending Agreement, 2016 Term Sheet, and the Assignment and Assumption Agreement are null and void;

d.  Award punitive damages against Defendants;

e.  Award treble damages against Defendants as permitted by 18 U.S.C. § 1964(c);

f.  Award attorneys' fees to Plaintiffs as permitted by 18 U.S.C. § 1964(c) and or under any other applicable law;

g.  Award court costs to Plaintiffs; and

h.  Award all other relief to which Plaintiffs are entitled.

Dated:  New York, New York
    March 1, 2017

**DAVIS SANTOS, P.C.**

By: /s/ Jason Davis
      Jason Davis
719 S. Flores Street
San Antonio, TX 78204
Tel: 210.853.5882
E-mail: jdavis@dslawpc.com
*Attorneys for Plaintiffs Domenica Nominees Pty. Ltd.*
*and Frank Wilson*
*(Admitted Pro Hac Vice)*

**SHER TREMONTE LLP**

By: /s/ Michael M. Tremonte
   Michael Tremonte
   Mark Cuccaro
80 Broad Street, 13th Floor
New York, New York 10004
Tel: 212.202.2600
E-mail: mtremonte@shertremonte.com
*Attorneys for Plaintiffs Domenica Nominees Pty. Ltd.*
*and Frank Wilson*


**STOEL RIVES LLP**

By: /s/ B. John Casey
   B. John Casey
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
Tel: 503.294.9170
E-mail: john.casey@stoel.com
*Attorneys for Plaintiff Lucerne Australia Pty. Ltd.*
*(Admitted Pro Hac Vice)*


**K&L GATES LLP**

By: /s/ Joanna Diakos
   Joanna Diakos
599 Lexington Avenue
New York, NY 10022
Tel: 212.536.4807
E-mail: john.casey@klgates.com
SDNY Bar No. JD/7269
*Attorneys for Plaintiff Lucerne Australia Pty. Ltd.*

## CERTIFICATE OF SERVICE

Pursuant to S.D.N.Y. LR 5, service of this document has been accomplished via notice of electronic filing generated by the Court's electronic filing system.