UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------

DOMENICA NOMINEES PTY. LTD.;
FRANK WILSON; and LUCERNE
AUSTRALIA PTY. LTD.,

    Plaintiffs,

   -against-

EMERGING MARKETS INTRINSIC
CAYMAN, LTD.; EMERGING MARKETS
INTRINSIC, LTD.; SRT CAPITAL
SEGREGATED PORTFOLIO COMPANY
TFC; CGO V, LLC; SRT CAPITAL SPC,
LTD.; ERIC MAASS; and BULENT
TOROS,

    Defendants.

---------------------------------------------------------------

Case No. 16-cv-09016 (VEC)

**ORAL ARGUMENT REQUESTED**

## **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

## <u>TABLE OF CONTENTS</u>

Table of Contents ................................................................................................................. ii

Table of Authorities ........................................................................................................... iii

Appendix ............................................................................................................................. vi

I.      INTRODUCTION ....................................................................................................1

II.     FACTUAL BACKGROUND ...................................................................................3

   A.   The 2015 Margin Lending Agreement .............................................................3

   B.   The 2016 Proposed Transaction........................................................................4

   C.   Maass' Harassment of, and Efforts to Suborn Perjury from, Murphy ..............12

III.    ARGUMENT & AUTHORITIES ........................................................................13

   A.   Plaintiffs are Likely to Succeed on the Merits of Their Claims or, Alternatively, Have Demonstrated Sufficiently Serious Questions Regarding the Merits ...............................13

     i.   *Fraud (as to the 2016 Proposed Transaction)*...................................................13

    ii.   *Breach of Contract (as to the 2015 MLA)* ........................................................15

   iii.   *Declaratory Judgment* ......................................................................................20

   iv.   *Conclusion* .........................................................................................................21

   B.   Plaintiffs Will Suffer Irreparable Harm if the Injunction is Not Granted..........................21

   C.   The Balance of Hardships Weighs Decidedly in Plaintiffs' Favor....................23

   D.   No Public Interest is Disserved by the Requested Injunction...........................24

   E.   Injunction Requested .......................................................................................25

IV.    CONCLUSION.......................................................................................................25

# <u>TABLE OF AUTHORITIES</u>

*Cases*

*AIU Ins. Co. v. Deajess Med. Imaging, P.C.*,
    882 N.Y.S.2d 812 (N.Y. Sup. Ct. 2009) ...............................................................................20

*Arnold v. Gramercy Co.*,
    218 N.Y.S.2d 23 (N.Y. Sup. Ct. 1961) ..................................................................................19

*Arnold v. Gramercy Co.*,
    224 N.Y.S.2d 613 (1st Dep't 1962) .......................................................................................19

*Benihana, Inc. v. Benihana of Tokyo, LLC*,
    784 F.3d 887 (2d Cir. 2015) ...........................................................................................13, 25

*Casita, LP, v. Maplewood Equity Partners (Offshore) Ltd.*,
    No. 603525/2005, 2007 WL 4294741 (N.Y. Sup. Ct. 2007) .................................................23

*Century Pac., Inc. v. Hilton Hotels Corp.*,
    528 F. Supp.2d 206 (S.D.N.Y. 2007) .....................................................................13, 14, 15

*Coastal Distribution, LLC v. Town of Babylon*,
    216 F. App'x 97 (2d Cir. 2007) .............................................................................................23

*Corning Glass Works v. Jeannette Glass Co.*,
    308 F. Supp. 1321 (S.D.N.Y. 1970) ......................................................................................25

*Danaher Corp. v. Chicago Pneumatic Tool Co.*,
    No. 86 Civ. 3499 (PNL) slip op., 1986 WL 7001 (S.D.N.Y. June 16, 1986) .........................23

*Eberhard v. Marcu*,
    530 F.3d 122 (2d Cir. 2008) ..................................................................................................21

*FXDirectDealer, LLC v. Abadi*,
    No. 12 CIV. 1796 CM, 2012 WL 1155139 (S.D.N.Y. Apr. 5, 2012) .....................................25

*Garten v. Kurth*,
    265 F.3d 136 (2d Cir. 2001) ..................................................................................................20

*Golden Krust Patties, Inc. v. Bullock*,
    957 F. Supp.2d 186 (E.D.N.Y. 2013) ....................................................................................24

*Housekeeper v. Lourie*,
    333 N.Y.S.2d 932 (1st Dep't 1972) .......................................................................................21

*Int'l Banknote Co. v. Muller*,
713 F. Supp. 612 (S.D.N.Y. 1989).........................................................................23

*Int'l Bus. Machines Corp. v. Johnson*,
629 F. Supp.2d 321 (S.D.N.Y. 2009)....................................................................17

*Int'l Paper Co. v. Suwyn*,
966 F. Supp. 246 (S.D.N.Y. 1997)...................................................................18, 19

*Jordan v. Metro. Life Ins. Co.*,
280 F. Supp. 2d 104 (S.D.N.Y. 2003)...................................................................23

*Laduzinski v. Alvarez & Marsal Taxand LLC*,
16 N.Y.S.3d 229 (1st Dep't 2015) .........................................................................14

*LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*,
10 F. Supp.3d 504 (S.D.N.Y. 2014).......................................................................15

*Neckles Builders, Inc. v. Turner*,
986 N.Y.S.2d 494 (2d Dep't 2014)........................................................................14

*Orange Cty. Legislature v. Diana*,
968 N.Y.S.2d 319 (N.Y. Sup. Ct. 2013) ...............................................................20

*Process Am., Inc. v. Cynergy Holdings, LLC*,
839 F.3d 125 (2d Cir. 2016)..................................................................................16

*Quantum Corp. Funding, Ltd. v. Assist You Home Health Care Servs. of VA.*,
144 F. Supp.2d 241 (S.D.N.Y. 2001).....................................................................25

*Register.com, Inc. v. Verio, Inc.*,
356 F.3d 393 (2d Cir. 2004)..................................................................................23

*Sabo v. Delman*,
3 N.Y.2d 155 (N.Y. 1957) ....................................................................................14

*Stewart v. Jackson & Nash*,
976 F.2d 86 (2d Cir. 1992)....................................................................................14

*Street v. Vitti*,
685 F. Supp. 379 (S.D.N.Y. 1988).........................................................................23

*Suchodolski Assocs., Inc. v. Cardell Fin. Corp.*,
No. 03 Civ. 4148(WHP), 2003 WL 22909149 (S.D.N.Y. Dec. 10, 2003) .................22, 23, 24

*Terwilliger v. Terwilliger,*
    206 F.3d 240 (2d Cir. 2000)........................................................................................15

*Westchester Legal Servs., Inc. v. Westchester Cty.,*
    607 F. Supp. 1379 (S.D.N.Y. 1985).........................................................................13

### **Statutes**

N.Y. C.P.L.R. § 3001 (McKinney)...................................................................................20

N.Y. U.C.C. Law § 3-404(1) ...........................................................................................20

## APPENDIX

Pursuant to Local Civil Rule 7.1(a)(3), included with this memorandum of law are the following declarations and exhibits, contained in the attached appendix:

- **Declaration of Frank Wilson**, with the following exhibits:

    - Exhibit 1: Margin Lending Agreement dated July 2, 2015

    - Exhibit 2: E-mail from Frank Wilson to Anthony Murphy dated October 4, 2016, at 11:03 p.m.

    - Exhibit 3: E-mail from Frank Wilson to Anthony Murphy and Jeremy Wade dated October 30, 2016, at 6:07 a.m.

    - Exhibit 4: E-mail from Frank Wilson to Anthony Murphy and Jeremy Wade dated October 30, 2016, at 11:01 a.m.

    - Exhibit 5: E-mail from Jeremy Wade to Frank Wilson and Anthony Murphy dated October 30, 2016, at 9:29 p.m.

    - Exhibit 6: E-mail from Frank Wilson to Anthony Murphy and Jeremy Wade dated October 30, 2016, at 9:52 p.m.

    - Exhibit 7: E-mail from Frank Wilson to Anthony Murphy and Jeremy Wade dated October 31, 2016, at 6:32 p.m.

    - Exhibit 8: E-mail from Jeremy Wade to Frank Wilson and Anthony Murphy dated October 31, 2016, at 7:58 p.m.

    - Exhibit 9: E-mail from Jeremy Wade to Frank Wilson and Anthony Murphy dated October 31, 2016, at 9:30 p.m.

    - Exhibit 10: E-mail from Anthony Murphy to Frank Wilson and Jeremy Wade dated October 31, 2016, at 10:02 p.m.

    - Exhibit 11: E-mail from Frank Wilson to Anthony Murphy and Jeremy Wade dated October 31, 2016, at 10:16 p.m.

    - Exhibit 12: E-mail from Anthony Murphy to Frank Wilson and Jeremy Wade dated October 31, 2016, at 10:21 p.m.

    - Exhibit 13: E-mail from Frank Wilson to Anthony Murphy and Jeremy Wade dated October 31, 2016, at 10:27 p.m.

- o  <u>Exhibit 14</u>: E-mail from Jeremy Wade to Frank Wilson and Anthony Murphy dated November 2, 2016, at 12:54 a.m.

- o  <u>Exhibit 15</u>: E-mail from Anthony Murphy to Jeremy Wade and Frank Wilson dated November 2, 2016, at 1:00 a.m.

- o  <u>Exhibit 16</u>: Notice of Default dated November 2, 2016

- o  <u>Exhibit 17</u>: E-mail from Anthony Murphy to Jeremy Wade and Frank Wilson dated November 3, 2016, at 3:38 p.m.

- o  <u>Exhibit 18</u>: E-mail from Frank Wilson to Anthony Murphy and Jeremy Wade dated November 3, 2016, at 4:01 p.m.

- o  <u>Exhibit 19</u>: Assignment and Assumption Agreement dated October 25, 2016

- o  <u>Exhibit 20</u>: Margin Lending Agreement dated October 25, 2016

- o  <u>Exhibit 21</u>: E-mail from Anthony Murphy to Bulent Toros and Eric Maass, among others, dated November 4, 2016, at 11:57 a.m.

- o  <u>Exhibit 22</u>: Notice of Acceleration dated November 4, 2016

- o  <u>Exhibit 23</u>: E-mail from Frank Wilson to Eric Maass dated November 5, 2016, at 9:31 a.m.

- **<u>Declaration of Anthony Murphy</u>**, with the following exhibits:

  - o  <u>Exhibit 1</u>: Margin Lending Agreement dated July 2, 2015

  - o  <u>Exhibit 2</u>: E-mail from Frank Wilson to Anthony Murphy dated October 4, 2016, at 5:02 a.m.

  - o  <u>Exhibit 3</u>: "WhatsApp" communications between Anthony Murphy and Eric Maass on October 5, 2016

  - o  <u>Exhibit 4</u>: E-mail from Eric Maass to Anthony Murphy dated October 26, 2016, at 1:07 p.m.

  - o  <u>Exhibit 5</u>: "WhatsApp" communications between Anthony Murphy and Eric Maass on October 28, 2016

  - o  <u>Exhibit 6</u>: E-mails from Eric Maass to Anthony Murphy dated October 28, 2016, at 1:52 p.m.

  - o  <u>Exhibit 7</u>: E-mail from Frank Wilson to Anthony Murphy dated October 29, 2016,

at 10:35 p.m.

o   <u>Exhibit 8</u>: "WhatsApp" communications between Anthony Murphy and Eric Maass on November 1, 2016

o   <u>Exhibit 9</u>: Text messages between Anthony Murphy and Frank Wilson from November 1, 2016

o   <u>Exhibit 10</u>: Text messages between Anthony Murphy and Frank Wilson from November 1, 2016

o   <u>Exhibit 11</u>: E-mail correspondence between Anthony Murphy and Frank Wilson between October 31, 2016 and November 1, 2016

o   <u>Exhibit 12</u>: E-mail from Anthony Murphy to Eric Maass dated November 1, 2016, at 1:25 a.m.

o   <u>Exhibit 13</u>: E-mail from Anthony Murphy to Eric Maass dated November 1, 2016, at 2:34 a.m.

o   <u>Exhibit 14</u>: "WhatsApp" communications between Anthony Murphy and Eric Maass on November 2, 2016

o   <u>Exhibit 15</u>: Notice of Default dated November 2, 2016

o   <u>Exhibit 16</u>: E-mail from Anthony Murphy to Eric Maass and Bulent Toros dated November 4, 2016, at 11:57 a.m.

o   <u>Exhibit 17</u>: Notice of Acceleration dated November 4, 2016

o   <u>Exhibit 18</u>: Text messages between Anthony Murphy and Eric Maass from November 19, 2016

o   <u>Exhibit 19</u>: "WhatsApp" communications between Anthony Murphy and Eric Maass from November 19-20, 2016

• **<u>Declaration of Jeremy Wade</u>**, with the following exhibits:

o   <u>Exhibit 1</u>: E-mail from Jeremy Wade to Frank Wilson and Anthony Murphy dated October 30, 2016, at 9:29 a.m.

o   <u>Exhibit 2</u>: E-mail from Frank Wilson to Anthony Murphy and Jeremy Wade dated October 31, 2016, at 6:32 p.m.

o   <u>Exhibit 3</u>: E-mail from Jeremy Wade to Frank Wilson and Anthony Murphy dated October 31, 2016, at 7:58 p.m.

o <u>Exhibit 4:</u> E-mail from Jeremy Wade to Frank Wilson and Anthony Murphy dated October 31, 2016, at 9:20 p.m.

o <u>Exhibit 5</u>: E-mail from Anthony Murphy to Frank Wilson and Jeremy Wade dated November 2, 2016, at 1:00 a.m.

## I.  **INTRODUCTION**

Plaintiffs seek to enjoin the sale or loss of over $30,000,000 AUD worth of Plaintiffs' securities in TFS Corporation Ltd. ("TFS"), which were pledged pursuant to a 2015 Margin Lending Agreement (the "Collateral Shares"), and which Defendants have now unlawfully seized by means of an egregious fraud.  Absent injunctive relief, Defendants will sell or otherwise encumber the Collateral Shares, thereby causing irreparable harm by depriving Plaintiff Frank Wilson of the ownership and use of his Collateral Shares and disrupting his management and control of those assets at a critical phase in TFS's operations.

Defendants' extortionate seizure of the Collateral Shares is purportedly based on a fraudulent document—the 2016 Lending Agreement, which Defendants wrongfully assert replaced the 2015 Lending Agreement.  Wilson never agreed to the 2016 Lending Agreement, and the 2015 Agreement was never in default—and this case is not about a borrower trying to avoid payment, as Wilson has never missed a payment and is fully able to meet his obligations.

The following key facts are undisputed:  (1) Wilson did not sign the 2016 Agreement; (2) Defendants never advanced a single dollar under the 2016 Agreement; (3) both Wilson and Lucerne's principal, Anthony Murphy, have sworn that Murphy had no authority—express or implied—to bind Wilson to the 2016 documents nor to affix Wilson's signature to any such binding documents; and (4) despite these facts, Defendants declared a "default" on the 2016 Agreement almost simultaneously (within hours) with their fraudulent solicitation of Murphy to place Wilson's signature on the documents.  Murphy placed Wilson's facsimile signature on certain documents only in reliance on Defendant Eric Maass' representations that Maass' superior—Defendant Bulent Toros—needed it as a non-binding gesture of "good will" to show there was still interest in a proposed transaction.  Murphy had reason to trust Maass, as Murphy

was EMI's broker and the two were in frequent contact and had several substantial unrelated pending business deals together.

In fact, contemporaneous e-mails, messages, and phone conversations prove that no party to this lawsuit ever believed that the 2016 Agreement had become effective.  In particular, the evidence unambiguously demonstrates that: (1) Defendants knew and acknowledged that there was no deal to replace the 2015 Agreement because the proposed terms of the 2016 documents were unacceptable to Wilson and Defendants had not confirmed that they voted the Collateral Shares per Wilson's instructions; (2) Defendants had no intention of performing under the 2016 Agreement; and (3) Defendants' illicit goal was to declare a sham default with 16% interest and then extort millions from Plaintiffs to avoid an unlawful foreclosure of the Collateral Shares. Defendants even resorted to threats and bribery to entice Murphy to lie to this Court.  When Murphy refused, Defendants threatened the safety of his family, his reputation, and his business.

The irreparable harm that would necessarily result from Defendants' fraudulent attempts to enforce the 2016 Agreement prior to a judicial determination of its validity cannot be addressed in monetary damages, because Wilson's voting rights and management role hang in the balance. On the other hand, Defendants will suffer no prejudice by maintaining the *status quo*, as the value of the shares greatly exceeds the amount disbursed under the 2015 Lending Agreement ($30 million vs. $13 million AUD), and any other alleged harm could easily be addressed through a bond.

Plaintiffs therefore respectfully seek a preliminary injunction: (1) compelling Defendants to disclose the current location and custodian of the Collateral Shares;[1] (2) enjoining Defendants

---

[1]        After a March 9, 2017 discovery teleconference pursuant to Local Civil Rule 37.2, the Court ordered Defendants to produce the Custodial Agreement reflecting the current location and custodian of the Collateral Shares. ECF No. 66.  On March 10, 2017, Defendants produced a partially unsigned, undated, and anonymous agreement (no mention of Defendants, Plaintiffs, lending agreements, or Collateral Shares).  Such agreement confirms neither the

from selling, loaning, trading, encumbering, or otherwise conducting any financial transactions with the Collateral Shares; and (3) requiring Defendants to comply with their obligations under the 2015 Lending Agreement and vote the Collateral Shares in accordance with Wilson's instructions.

## II.  FACTUAL BACKGROUND

Wilson is the co-founder and CEO of TFS, a publicly traded company on the Australian Securities Exchange, which owns and manages sandalwood plantations and processing facilities. TFS and its U.S. subsidiaries employ over five hundred people.  (Wilson Decl. ¶¶2-3.)  As of June 30, 2016, TFS had a market capitalization of approximately $547,207,000 AUD.  (*Id*.)  Domenica, an Australian entity owned and controlled by Wilson's family, has at all relevant times been the beneficial owner of a substantial number of shares of TFS.  (*Id*. ¶4.)

### A.  The 2015 Margin Lending Agreement.

In summer 2015, Wilson sought to borrow funds for certain contemplated business and personal transactions.  (*Id*. ¶5.)  Murphy, an Australian investment advisor and co-founder and CEO of Plaintiff Lucerne, a financial services firm with offices in Australia and Singapore, suggested the idea of a securities-backed loan.  (*Id*. ¶5; Murphy Decl. ¶¶1, 5.)

Murphy introduced Wilson to defendant Emerging Markets Intrinsic Cayman Ltd. ("EMI") and its Managing Partners, Maass and Toros.  (Wilson Decl. ¶5; Murphy Decl. ¶5.)  This was Wilson's first interaction with Defendants.  (Wilson Decl. ¶5.)  After negotiations, Wilson and EMI agreed on terms and, as part of the lending transaction proposed by EMI, a new entity, defendant SRT Capital Segregated Portfolio Company TFC ("SRT"), was formed to act as the anonymous borrower.  (Murphy Decl. ¶7; Wilson Decl. ¶6.)  On or about July 2, 2015, SRT (as

current location, custodian, nor even the existence of the Collateral Shares.

borrower) and EMI (as Lender) executed a Margin Lending Agreement (the "2015 MLA"). (Wilson Decl. ¶7, Ex. 1; Murphy Decl. ¶8, Ex. 1.)

To secure SRT's payment obligations, Domenica delivered 22,534,000 TFS shares to EMI (the "Collateral Shares").   (Wilson Decl. ¶8.)   At the time, the Collateral Shares represented approximately 40% of Wilson's direct or indirect stock holdings in TFS.  (*Id*.)  SRT, Wilson, and Domenica have, at all times, complied with the 2015 MLA in all respects and there has never been any notice of default.  (*Id*. ¶¶11, 43, 57.)

**B.  The 2016 Proposed Transaction.**

In 2016, Wilson and EMI began exploring a possible additional loan transaction, whereby the 2015 loan would be rolled over into a new credit facility, to be collateralized by additional TFS stock.  (Murphy Decl. ¶ 11; Wilson Decl. ¶12.)  In October 2016, discussions evolved to the point of EMI, through Murphy, presenting proposed loan documents to Wilson.  (Murphy Decl. ¶13.) Subsequently, as part of a carefully orchestrated fraudulent scheme, described in part below, Defendants unlawfully seized the Collateral Shares:

**TIMELINE**[2]

**October 4, 2016**

After receiving initial drafts of the proposed 2016 transaction, Wilson promptly rejected it: "[T]here are some horror clauses littered throughout these agreements that certainly bear no resemblance to the sort of arrangement we had in mind.  Under these terms we would lose complete control over our current shares . . ."  (Wilson Decl. ¶13, Ex. 2.)  Wilson instructed Murphy:

> Go back to Eric and **ask his lawyers to practice stealing shares on some other clown and reshape this into a transaction where it is absolutely clear they cannot trade, deal, short any of the shares pledges as security just like the current loan.**

---

[2]       Because of the various time zones involved, the events have been placed in the order that they occurred while the underlying e-mails and messages will reflect the time in whatever time zone the sender or recipient was located.

*        *        *

The beneficial ownership of all shares being the original shares, and the new shares acquired always remains with us, and **all dividends and voting rights remains with us**.

(*Id.*, Ex. 2) (emphasis added).  Thus, Wilson unequivocally rejected any deal that would allow Defendants to trade, sell, or encumber the Collateral Shares or impair his voting and dividend rights.

## October 18, 2016

In a teleconference with EMI, Murphy, Wilson and Wilson's Australian Counsel, Jeremy Wade, Wade repeated Wilson's position.  (Wade Decl. ¶7.)  Wilson consistently sought confirmation that the Collateral Shares would be voted at the upcoming November 2016 shareholders' meeting in accordance with Wilson's instructions, as required under the 2015 MLA. Murphy repeatedly told Maass—via e-mail, in texts, in "WhatsApp" communications, and over the phone—that Plaintiffs would not proceed with the 2016 deal without confirmation of these votes.  (Murphy Decl. ¶¶15-17, 22, 24, 27, 29, 30, 33 Exs. 3, 8, 12.)

## October 27, 2016

Maass e-mailed Murphy and acknowledged that the deal was not finalized, and that EMI would need to "refresh terms" as a precondition to the deal moving forward.  (*Id.* ¶18, Ex. 3.)

Maass stated that he was uncertain whether EMI would move forward with the deal, and advised Murphy that, if Murphy provided a signed term sheet as a nonbinding gesture of "good will," Defendants would set aside capital in the event the transaction was ever finally consummated.  (*Id.* ¶17.)  In reliance on Maass' representations, and without consulting with or obtaining authorization from Wilson, Murphy signed a Term Sheet (the "2016 Term Sheet") on behalf of Lucerne Australia.  (*Id.* ¶20.)  At Maass' request, Murphy sent the 2016 Term Sheet to EMI with the understanding that Murphy was demonstrating nothing more than a commitment to

continue to negotiate.  (*Id.*)  Neither Wilson nor his counsel Wade were informed that this term sheet had been executed by Murphy. (Wade Decl. ¶11; Wilson Decl. ¶30; Murphy Decl. ¶20.)

By this time, Murphy was involved in several unrelated transactions with EMI and Maass. (Murphy Decl. ¶¶6, 45.)  In fact, in the twelve months preceding these October discussions about the 2016 transaction, Lucerne had received approximately $1 million AUD in commissions from EMI in unrelated deals and stood to gain a commission from EMI in the event the 2016 transaction closed.  (*Id.* ¶6.)  Based on this track record and as EMI's broker, it is no surprise that Murphy trusted and relied upon Maass' representations that these documents signed by Murphy were non-binding, expressly conditional, and merely a way to keep Maass' superiors (EMI's "investment committee" and funders) interested in the transaction.  (*Id.* ¶¶6, 17, 18, 29.)

### October 28, 2016

Wade and Murphy spoke again by phone regarding important changes Wilson required to the terms of the 2016 Term Sheet.  (Wade Decl. ¶9.)  No one informed Wade that a 2016 Term Sheet had already been signed by Murphy.  (Wade Decl. ¶11; Murphy Decl. ¶20.)

### October 30, 2016

By e-mail, Wilson emphasized to Murphy and Wade that his changes must be included in a manner that was "unambiguously clear" in any term sheet.  (Wilson Decl., Ex. 3.)  No one informed Wilson or Wade that any term sheet had already been signed. (*Id.* ¶17; Wade Decl. ¶11.)

During a teleconference with Wilson, Murphy, and Maass, both Wilson and Murphy repeated the material changes required before Wilson would proceed with the new transaction. (Wilson Decl. ¶¶18-19, Murphy Decl. ¶24.)  An essential term of the proposed agreement (as in the 2015 Agreement) would be that Defendants had to vote the Collateral Shares in accordance with Wilson's instructions.  (Wilson Decl. ¶¶18-20, Murphy Decl. ¶24.)  Wilson stated that he had

no intention to enter into a new transaction until such terms had been incorporated into the deal documents and vetted by Australian counsel.  (Wilson Decl. ¶¶12, 18-20, 22-23, 27, 29, 36; Murphy Decl. ¶24.)

Maass agreed in principle to all the changes required by Wilson, with one exception—Wilson's request for a shorter term for the contemplated loan.  (Wilson Decl. ¶19, Murphy Decl. ¶24.)  Maass stated that he would consider that change as well and let Wilson know his position on that issue after EMI's U.S. legal counsel, Wayne Martino, drafted and circulated the new amendments for review.  (Wilson Decl. ¶19; Murphy Decl. ¶24.)

Later that day, Wilson e-mailed Murphy and Wade and confirmed that, given Maass' agreement to accept Wilson's changes, the sole unresolved issue was the term of the new loan. Wilson again emphasized his concern about whether EMI was complying with its voting obligations under the 2015 MLA:

> It would appear that our voting instructions for this AGM have not yet been followed for the shares held by the nominee under the current loan, and **until I see they have been voted I am not willing to enter into another transaction**.

(Wilson Decl. ¶20, Ex. 4) (emphasis added).

That same evening, Wade e-mailed Wilson and Murphy and advised that Wade would revise the term sheet to reflect the points discussed during the October 30 teleconference.  Wade requested that Murphy forward the documents in Word format.  (Wade Decl., Ex. 1.)

**October 31, 2016**

The next day Wilson e-mailed Murphy and Wade and made his **conditional** acceptance clear:

> Hi Anthony,
>
> This email is to confirm that I am committed to the transaction on the condition that our shares are voted in accordance with our instructions , and that the amendments to be made by Jeremy to the term sheet are accepted , these being the items verbally discussed and agreed on Sunday night .
>
> I am comfortable proceeding forthwith after these matters are confirmed.

(Wilson Decl. ¶22, Ex. 6) (emphasis added).  This e-mail shows that Wilson had rejected the terms in the documents provided by EMI, made a counteroffer in the October 30 call with Maass that was accepted, and was waiting for the amended documents and confirmation that the shares had been voted.  (*Id.*)

Later that night, Wilson confirmed his "conditional acceptance:"

> Murph subject to them agreeing with Jeremy's mark up ( which should be simply confirming what they have agreed verbally ) , and to them voting our shares as per our instructions , we are there . I'm happy for you to convey this conditional acceptance . Time will beat us if they have a hard deadline of today for a signed term sheet but given complexity of deal and size of it , I am not minded to rush . Also need to see amended interest rate for 36month term but providing it is not more than current loan I am happy .

(Wade Decl., Ex. 2; Wilson Decl., Ex. 7) (emphasis added).  Wade continued asking for a Word version so he could revise the documents.  (Wade Decl., Exs. 1, 3.)  Wade advised Murphy: "I think Frank has made it clear that he wants to see a revised terms sheet which incorporates what has been discussed."  (Wade Decl., Ex. 4.)

By e-mail, Murphy suggested to Wilson and Wade that, for convenience, Wade prepare an addendum to reflect the parties' agreement:

> Thanks, Frank.
>
> In the interests of time can I suggest Jeremy provide an Addendum to the term sheet that you execute listing the changes that Eric agreed to over the phone and have this countersigned by EMI?

(Wilson Decl. ¶26, Ex. 10.)  Wilson's reply was unambiguous:

> Murph given you are facing them , probably best if you convey all this , but bearing in mind that we will not transfer shares until they have voted , and confirmed their acceptance of our amendments . We must all accept that if they insist on transfer of shares today , or before the above occurs , it won't be happening .

(Wilson Decl., Ex. 11.)

**November 1, 2016**

In other calls and using the WhatsApp messenger with Maass, Murphy again explained that Plaintiffs' agreement was conditional upon the addition of the new terms and the voting of the shares.  (Murphy Decl. ¶¶27, 29.)  Maass, knowing he had already agreed to the terms in the October 30 call, asked Murphy to execute copies of the Assignment and the 2016 Margin Lending Agreement ("MLA") as a further gesture of "good will" that would indicate that Plaintiffs were still interested in the transaction.  (*Id*. ¶29.)  Maass expressly represented that these documents were, of course, subject to the additional terms that Maass had agreed to during the October 30 call and were only being requested in order to hold the deal open.  (*Id*.)

In reliance on these representations, Murphy forwarded the Assignment on which he had now inserted Wilson's facsimile signature.  (*Id*. ¶33.)  The e-mail attaching the signed agreements specifically references both the additional terms and the requirement to vote the shares:

> I also note the points I sort clarity on during our call on Sunday and would appreciate if these could incorporated into the documents.
>
> I confirm we are committed to this transaction and we're in a position to transfer shares as soon as votes for upcoming AGM have been confirmed by TFS' Company Secretary.

(*Id*. ¶¶33-34, Ex. 10.)

About an hour later, Murphy sent Maass another e-mail specifically laying out the "additional terms" Defendants had agreed to incorporate:

> Hi mate,
>
> These were the point we discussed on Sunday night that you mentioned Wayne could incorporate:
>
> ·      Frank will only be charged net interest on trading collateral loan i.e. Interest owed to EMI *less* Interest received on cash they're holding in Trading Collateral
>
> ·      All cash in Trading Collateral can be used to cure margin call
>
> ·      Facility can be exited at any time provided term interest is paid in full

(*Id*. ¶¶35-36, Ex. 11.)  EMI's U.S. counsel Wayne Martino then asked Murphy to send over a

document with another signature of Wilson on a different signature block.  (*Id*. ¶39.)

**November 2, 2016**

Meanwhile, Wilson's counsel—not knowing **any** documents had been signed—e-mailed

Murphy and Wilson and continued asking for Word versions of the term sheet so that they could

be revised per the parties' agreement.  (Wade Decl., Exs. 3, 4; Wilson Decl., Ex. 14.)  Murphy's

response conveys his clear understanding:

| From: | Anthony Murphy |
|---|---|
| To: | Jeremy Wade |
| Cc: | Frank Wilson |
| Subject: | RE: Loan |
| Date: | Wednesday, November 02, 2016 1:00:26 AM |

Hi Jeremy,

As discussed, I submitted the discussed / agreed changes with other docs and instructed EMI to incorporate them into the final TS.

Basically, we're now waiting for TFS' Company Secretary to confirm votes are in.

(Wade Decl., Ex. 5.)  Instead of EMI confirming that they incorporated the agreed terms into a

final term sheet and voted the shares, EMI declares a default based on the sham documents.

(Murphy Decl. ¶12, Ex. 12.)

**November 3, 2016**

Murphy e-mailed Wilson and Wade the 2016 documents—which they saw in executed

form for the first time.  (Wilson Decl., Ex. 17.)  Upon seeing his "signature," Wilson immediately

informed Murphy:

> Hi Anthony I'm sending this to make it clear that I did not sign this agreement , and I did not intend to give you authority to affix my signature to it . This is a misunderstanding that needs to be corrected immediately .

(*Id.* at Ex. 18.)

**November 4, 2016**

Murphy immediately advised Defendant that they are attempting to enforce documents to which there was no agreement:

> Dear Bulent and Eric,
>
> There appears to have been a misunderstanding between us concerning the Term Sheet.
>
> It has always been very clearly communicated between us, both in our emails to date and in several telephone calls (including our call on Sunday night over our time on 30 October 2016), that the transactions contemplated by the Term Sheet were conditional on the Term Sheet reflecting these additional terms and discussions and those terms being satisfactory to both parties.  These included the ability of the borrower to use the cash in the trading collateral account to meet margin calls, for the borrower to exit the loan at any time upon paying out the remaining term interest, for the borrower to apply interest earned on the trading collateral account against interest payable, and for the borrower to be satisfied that the lender's nominee had voted his shares held under the current loan agreement in accordance with his instructions.

(Wilson Decl., Ex. 21.)

**November 5, 2016**

Wilson notified Defendants:

> Eric ,
>
> Anthony Murphy has brought to my attention two default notices issued to Lucerne in relation to my loan with EMI . My US attorneys will shortly be in contact with you but in the meantime I wanted to advise you that my loan has not been assigned to Lucerne , and as such the whole foundation for your default notices is flawed . I have not signed , nor have I given any person a power of attorney to sign , or affix my signature to any purported assignment of my loan . As you know , I remain in total conformity with my obligations under my loan .
>
> On the other hand I note that you have failed to vote the shares which are held as collateral under my loan , despite instructions from me , and despite this being an obligation of yours under my loan . I also put you on notice that a dividend will be paid on the shares on Nov 8 and I expect that dividend to be passed through to me in accordance with your obligations under my loan.
>
> I would also ask that any future notices under , or in relation to my loan be addressed to me here , not Lucerne .  I am travelling at the moment so I would ask that you email me at this email address .
>
> You will be hearing from my US lawyers shortly and I reserve all rights .

(*Id.* at Ex. 23.)  Despite knowing that there were no binding documents and the conditional nature of Murphy's discussions, Defendants stated their intent to wrongfully foreclose on the Collateral Shares.  (Murphy Decl. ¶44, Ex. 14.)

**C.  Maass' Harassment of, and Efforts to Suborn Perjury from, Murphy.**

After sending the Notices of Default and Acceleration to Lucerne, Maass began a campaign of threats and attempted bribery to convince Murphy to perjure himself in support of Defendants. (*Id*. ¶45.)  Specifically, Maass sought false testimony from Murphy that the signed 2016 transaction documents represented a completed deal and that Murphy was authorized to bind Wilson to it.  (*Id*.)  Maass threatened to interfere with Lucerne's business relationships if Murphy did not provide false testimony, and offered to transfer some of "Frank's shares" to Murphy's daughters if Murphy agreed to perjure himself.  (*Id*.)  Murphy declined.

Instead, on November 18, 2016, Murphy signed a sworn declaration detailing the true facts related to the business relationships between Lucerne, EMI, Wilson, and their affiliates.  (*Id*. ¶46.) As soon as Maass received a copy of Murphy's true declaration, Maass began berating and threatening Murphy.  (*Id*. ¶¶47-55, Exs. 15-16.)  These hostile messages included the following statements:  "you fucked yourself," "I am one person u don't fuck over," and "It's over for u."  (*Id*. ¶50, Ex. 16.)

Between November 19, 2016 and November 20, 2016, Maass called Murphy several times—including separate calls at approximately 10:22 a.m., 10:23 a.m., 11:02 a.m., 11:29 a.m., 2:48 p.m. and 3:04 p.m. on November 19, and calls at approximately 8:49 a.m., 9:40 a.m., and 11:41 a.m. on November 20, 2016.  (*Id*. ¶52.) During these calls, Maass was in a fit of rage, threatening financial harm to Murphy, Lucerne, and Lucerne's other clients, as well as threatening physical harm to Murphy and his family. (*Id*. ¶53.)  Maass made the following statements, among others, to Murphy over the phone: "You fat fuckin loser, I'm going to bury you," "You're finished," "I'm going to fucking end you and Lucerne and your 20 something employees," "Your family better get used to sleeping outside," and "Tell your wife not to have a 3d baby because you

and your family are finished."  (*Id.*)

### III.   ARGUMENT & AUTHORITIES

A party seeking a preliminary injunction must demonstrate likelihood of success, irreparable harm, that the balance of hardships tips in plaintiff's favor, and that an injunction would not disserve the public interest.  *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015).  Alternatively, likelihood of success need not be shown where "sufficiently serious [merits] questions" exist and the balance of hardships tips "decidedly" in plaintiff's favor.  *Id.*

#### A.  Plaintiffs are Likely to Succeed on the Merits of Their Claims or, Alternatively, Have Demonstrated Sufficiently Serious Questions Regarding the Merits.

Plaintiffs need only show likelihood of a success for a single claim.  *Westchester Legal Servs., Inc. v. Westchester Cnty.*, 607 F. Supp. 1379, 1382 (S.D.N.Y. 1985).  Thus, for purposes of this motion, Plaintiffs address only the fraud, breach of contract, and declaratory judgment claims, any one of which is sufficient to support injunctive relief.  *Id.*

##### i.      *Fraud (as to the 2016 Proposed Transaction).*

Fraud under New York law requires proof of a material false representation, that defendant intended to defraud the plaintiff thereby, plaintiff's reasonable reliance, and damages, *Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp.2d 206, 218 (S.D.N.Y. 2007), which are all present here.

Acting on behalf of Defendants, Maas made multiple express misrepresentations, including:  (1) the 2016 Term Sheet, MLA, and Assignment were nonbinding gestures of "good will" to serve as placeholders until the terms of the deal and documents were finalized; (2) Defendants had agreed to Wilson's terms discussed in the October 30 phone call and would incorporate the same into the final documents; and (3) Defendants would vote the Collateral Shares as instructed by Wilson and required under the 2015 MLA, as a prerequisite to any further

transaction.  (Murphy Decl. ¶¶15-17, 21, 24-25, 29-30; Wilson ¶¶15, 18-20, 22-23, 27, 29.)  These representations were false because: (1) Defendants immediately attempted to enforce the nonbinding agreement based on a sham "default;" (2) the changes discussed in the October 30 phone call were not made or incorporated; and (3) Defendants have not, to Plaintiffs' knowledge, voted the Collateral Shares.  (Murphy Decl. ¶40; Wilson ¶¶36, 37, 39, 42.)

Maass' material misrepresentations are actionable as fraud under New York law.  In *Sabo v. Delman*, the Court of Appeals held that "a promise . . .  made with a preconceived and undisclosed intention of not performing it . . .  constitutes a misrepresentation."  3 N.Y.2d 155, 160 (N.Y. 1957) (explaining that claim for fraud lies "where a defendant has fraudulently and positively as with personal knowledge stated that something was to be done when he knew all the time it was not to be done and that his representations were false").[3]  The fact that Defendants never intended to perform their promises is evidenced by their immediate declaration of a "default" within hours of soliciting the signed documents.  (Murphy Decl. ¶40; Wilson Dec., Ex. 16.)

Second, and as evidenced by the same conduct, Defendants' representations were made with the intent to deceive Plaintiffs.  Intent to deceive is rarely demonstrated with direct evidence, and may be established with circumstantial evidence of a "guilty knowledge or willful ignorance." *Century Pac., Inc.*, 528 F. Supp.2d at 222.  Maass had, at a minimum, "guilty knowledge" because Plaintiffs had repeatedly put him on notice that there would be no deal unless or until: (1) the terms discussed in the October 30 phone call were incorporated into the deal documents; and (2)

---

[3]       *Accord Stewart v. Jackson & Nash*, 976 F.2d 86, 89 (2d Cir. 1992) (applying New York law) ("[I]t is settled that, if a promise was actually made with a preconceived and undisclosed intention of not performing it, it constitutes a misrepresentation of material existing fact."); *see also Laduzinski v. Alvarez & Marsal Taxand LLC*, 16 N.Y.S.3d 229, 233 (1st Dep't 2015) (reversing dismissal of action where plaintiff state cause of action for fraud based on defendant's oral representations, despite existence of general merger clause); *Neckles Builders, Inc. v. Turner*, 986 N.Y.S.2d 494, 497 (2d Dep't 2014) (affirming denial of motion to dismiss where defendant promises to give plaintiff equity stake in venture if plaintiff did not accept normal fees and compensation, made with undisclosed intention to not perform).

Defendants voted the Collateral Shares consistent with Wilson's instructions. (Murphy Decl. ¶¶15-17, 21, 24-25, 29-30; Wilson Decl., ¶¶15, 18-20, 22-23, 27, 29.)  Further, manufacturing a default on a deal that Maass knew was not agreed to without conditions, within hours of receiving the "good faith" signatures, and **without having lent a single dollar**, is sufficient evidence to find that Defendants had no intention of honoring their promises.

Third, Plaintiffs reasonably relied on Defendants' misrepresentations.  Specifically, Plaintiff Lucerne reasonably relied on Defendants' express representations that the deal documents were not final, that the terms discussed on October 30 would be incorporated, that the votes would be forthcoming, and that a signature was promptly needed only as a showing of "good will" to keep the deal alive.  *Century Pac., Inc*. 528 F. Supp.2d at 228.[4]  As to Plaintiffs Domenica and Wilson, the fraud is even more pronounced.  Defendants knew from Wilson, his counsel, and Murphy that there would be no deal without the additional terms and voting of the Collateral Shares—period.  Attempting to enforce documents they knew did not even contain Wilson's actual signature is even more egregious.

Fourth, and finally, as a result of Defendants' fraud Plaintiffs have suffered damages, including the loss of millions of shares and Wilson's substantial control and management over TFS.[5]  (Wilson Decl. ¶¶41-42, 47-55.)

   ii.  *Breach of Contract (as to the 2015 MLA).*

To prevail on a breach of contract claim under New York law, a plaintiff must prove the existence of a contract, performance by one party, breach, and damages. *Terwilliger v. Terwilliger*,

---

[4] *See also LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*, 10 F. Supp.3d 504, 519 (S.D.N.Y. 2014) (recognizing that courts are more inclined to find justifiable reliance where the allegations suggest foul play, including where the defendant creates a sense of urgency).

[5] Of course, as discussed in more detail below, Defendants' conduct threatens non-monetary and irreparable damage to Wilson if they sell, trade, encumber, or otherwise dispose of the Collateral Shares in anyway, as such would severely disrupt Wilson's control and management over TFS.

206 F.3d 240, 245–46 (2d Cir. 2000).  There is ample proof to support each of these elements.

First, it is undisputed that the 2015 MLA is a valid contract.  (Wilson Decl. ¶7, Ex. 1.)

Second, it is also undisputed—and amply supported—that Wilson performed under the 2015 MLA, and there has never been a notice of any alleged default.  (*Id*. ¶¶11,43.)

Third, there is ample evidence that Defendants breached several provisions in the 2015 MLA including, among others, Section 5(c), which specifies that "Borrower will be entitled to receive all distributions . . . made on or in respect of any . . . pledged . . . securities . . . to the full extent Borrower would be entitled if the securities had not been . . . pledged."  Section 5(c) also requires that "[a]ny cash amounts received as dividends . . . shall, upon receipt, be transferred from the Lender to the Borrower."  On November 8, 2016, approximately $675,000 AUD in dividends were issued on the Collateral Shares and received by Defendants.  These dividends have not been delivered or paid to Domenica.  (*Id*. ¶¶41, 47.)  Defendants also breached Section 7(g), which specifies that "Borrower retains the right . . . to exercise voting rights with respect to securities pledged to Lender."  Despite demands, Defendants failed to vote the Collateral Shares in accordance with Wilson's instructions at the November 2016 annual shareholder meeting.  (*Id*. ¶42.)

Fourth, Wilson has suffered monetary damages as a result of Defendants' breach—namely, the loss of dividends, and interest thereon, and the lost ability to vote the Collateral Shares (which represent approximately 14% of all outstanding issued shares) at the 2016 annual meeting, losing significant control and management over actions requiring shareholder approval.  (*Id*. ¶49); *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 143 (2d Cir. 2016) (applying New York law) ("[D]amages for breach of contract should put the plaintiff in the same economic position he would have occupied had the breaching party performed the contract.").

The 2016 proposed deal documents are unenforceable for two additional and independent reasons: (1) there was no meeting of the minds; and (2) Wilson did not authorize his signatures on the Assignment.

New York law requires that, a party's acceptance "must comply with the terms of the offer and be clear, unambiguous and unequivocal." *Int'l Bus. Machines Corp. v. Johnson*, 629 F. Supp.2d 321, 330 (S.D.N.Y. 2009). Plaintiffs' response to EMI's proposal for the 2016 MLA falls far short of this standard and, in fact, constitutes a rejection and counteroffer. From the beginning, Wilson and his Australian counsel, Jeremy Wade, repeatedly expressed their disagreement with multiple terms in the proposed agreements to Murphy and Maass. (Wilson Decl. ¶¶15, 18-20, 22-23, 27, 29; Wade Decl. ¶¶7, 9.) Plaintiffs repeatedly informed Maass that they would not move forward with the deal unless and until the additional terms were included and Defendants voted the Collateral Shares in accordance with Wilson's instructions, as required by the 2015 MLA. (Murphy Decl. ¶¶15-17, 21, 24-25, 29-30; Wilson Decl. ¶¶ 15, 18-20, 22-23, 27, 29; Wade Decl. ¶¶7-9, 12-13, Exs. 1-4.) None of these conditions occurred. (Wilson Decl. ¶44.)

Murphy only signed the proposed deal documents in reliance on Maass' representations that it was a gesture of "good will" and Murphy's e-mail transmitting the signed documents expressly conditioned his actions.

> I also note the points I [sought] clarity on during our call on Sunday and would appreciate **if these could [be] incorporated into the documents**. I confirm we are committed to this transaction and we're in a position to transfer shares **as soon as votes for upcoming AGM have been confirmed by TFS' Company Secretary**.

(Murphy Decl. ¶33, Ex. 12.) (emphasis added). Murphy's cover e-mail, of course, was consistent with the previous calls, e-mails and messages to Defendants that Wilson was not willing to proceed unless these conditions were met. (*Id.* ¶¶15-17, 21, 24-25, 29-30.) Indeed, hours after this e-mail, Murphy followed up with yet another e-mail to Maass specifically listing "the points" to which

Maass had previously agreed to incorporate into the final term sheet.  (*Id.* ¶35, Ex. 13.)  Consistent with Murphy's understanding, Maass represented and acknowledged that the deal was "off" even **<u>after</u>** he received Murphy's unauthorized signature.  Thus, the evidence plainly shows that Maass never believed that a deal had been reached, and he knew that the 2016 Agreement never became effective.

The conditional language in Murphy's various communications, combined with Plaintiffs' prior statements to Maass indicating their disagreement with the terms of the proposed deal, demonstrate that Lucerne's response, if anything, simply restated a counteroffer, or an acceptance conditioned upon the addition of the new terms and the voting of the Collateral Shares.  New York courts have repeatedly held that such language, even when contained in a separate document from the agreement, constitutes a rejection and counteroffer rather than a "clear, unambiguous and unequivocal" acceptance.

For example, in *International Paper Co. v. Suwyn*, the plaintiff employer sought a non-compete agreement from the defendant vice-president, but the defendant repeatedly objected to the broad scope of the terms and refused to sign.  966 F. Supp. 246, 250 (S.D.N.Y. 1997).  The CEO eventually met with the defendant and assured him that the plaintiff would not enforce the broad language in the agreement and it was only intended to keep him from working for one of three major competitors.  *Id.* at 250–51.  In reliance on this representation, the defendant signed the agreement but attached a "side letter" reiterating their discussion, stating his understanding that the agreement was "aimed at" employment with only a few major competitors, and also stating that "[i]t is with this understanding that I have signed the agreement."  *Id.* at 251.  When the defendant later took a job with a competitor, the plaintiff sued for breach of contract.  This Court held that, despite the defendants' signature on the unmodified agreement, the side letter constituted

a counteroffer, preventing a meeting of the minds on the agreement's initial terms. *Id.* at 254.

Courts have reached similar results even where the additional terms are not expressly stated in conditional terms, as they were here.  In *Arnold v. Gramercy Co.*, the plaintiff was negotiating to purchase an apartment in which she had been living.  218 N.Y.S.2d 23 (N.Y. Sup. Ct. 1961).  Plaintiff insisted that she be allowed to install a kitchen, but the defendant had repeatedly refused. *Id.* at 853.  The defendant made an offer of sale for the apartment "as-is," expressly refusing to commit to installation of a kitchen.  *Id.*  The plaintiff's attorney responded, "Ms. Arnold accepts the owner's offer . . . ."  *Id.*  The acceptance letter then referenced additional terms related to a kitchen, stating, "The following paragraph *should* also be inserted as a rider . . . ."  *Id.*

The Court held that the "plaintiff's attorney, while stating that the plaintiff accepted defendant's offer, was clearly qualifying the acceptance with conditions and reservations."  *Id.* at 854.  The Court held that "the use of the word 'should' cannot conceal the obvious fact that by seeking to have included in the lease provisions having to do with the installation or alteration, the plaintiff was not accepting an offer to purchase the apartment on an as-is basis."  *Id.*  It therefore found that no binding contract existed, and the Appellate Division affirmed, holding that the plaintiff's letter "was not a clear and unqualified acceptance of the prior written offer made to her." *Arnold v. Gramercy Co.*, 224 N.Y.S.2d 613, 614 (1st Dep't 1962).

As in *International Paper* and *Arnold*, Plaintiffs' response to the proposed Assignment and 2016 MLA was anything but a clear and unqualified acceptance.  Defendants assured Murphy that the proposed deal documents would not be enforced as written.  Because there was no meeting of the minds, the proposed 2016 deal documents are not binding agreements and certainly not binding against Wilson, who was shocked even to see his signature after the default was declared.

The Assignment is unenforceable against Plaintiffs Wilson and Domenica for the

additional and independent reason that Wilson never signed it or authorized anyone to sign it on his behalf.  (Wilson Decl. ¶¶34-36; Murphy Decl. ¶¶37, 42.)  Instead, Murphy placed Wilson's signature on the Assignment without express or implied authority to do so.[6]  (Wilson Decl. ¶¶34-36; Murphy Decl. ¶¶37, 42.)  Importantly, Defendants were well aware of this fact, as Murphy had explained to Defendants several times that he did not have authority to bind Wilson.  (*E.g.*, Murphy Decl. ¶27.)

Plaintiffs have shown a substantial likelihood on the merits for the breach of contract claim, or at least very serious questions as to the merits such that this claim can support entry of a preliminary injunction.

iii.     <em>Declaratory Judgment</em>.

To obtain a declaratory judgment, the plaintiff must establish: (1) the existence of an actual, justiciable controversy; and (2) that a legally protectable interest is present and directly in issue. N.Y. C.P.L.R. § 3001 (McKinney); *Orange Cty. Legislature v. Diana*, 968 N.Y.S.2d 319, 332 (N.Y. Sup. Ct. 2013).  A declaratory judgment action is appropriate to settle disputes over contract rights and obligations.  *AIU Ins. Co. v. Deajess Med. Imaging, P.C.*, 882 N.Y.S.2d 812, 816 (N.Y. Sup. Ct. 2009).

First, it is undisputed that an actual controversy exists:  Defendants have declared a default under the 2016 proposed deal documents and attempted to accelerate the same, and Plaintiffs contend the documents are invalid, unauthorized, nonbinding, and the product of fraud.  (Wilson Decl. ¶¶34-36, 39, 44; Murphy Decl. ¶¶40-41); *see also Garten v. Kurth*, 265 F.3d 136, 143 (2d Cir. 2001) ("[F]raud in the procurement of any contract, makes it void and unenforceable.");

---

[6]     This is consistent with the U.C.C.'s treatment of unauthorized signatures on negotiable instruments: "Any unauthorized signature is wholly inoperative as that of the person whose name is signed unless he ratifies it or is precluded from denying it . . . ."  N.Y. U.C.C. Law § 3-404(1).

*Housekeeper v. Lourie*, 333 N.Y.S.2d 932, 938 (1st Dep't 1972).  Second, Plaintiffs' legally protected interests, *i.e.*, their ownership and control over the Collateral Shares, are directly at issue. (Wilson Decl. ¶¶34-36; 41-42, 46-52); *see also Eberhard v. Marcu*, 530 F.3d 122, 136 (2d Cir. 2008) ("New York follows the majority American rule, which treats shares of stock as the personal property of the shareholders.").

As to the substantive declaration sought, Plaintiffs have shown a substantial likelihood that the 2016 proposed deal documents are invalid and void, for all of the reasons discussed above, because they were, among other things, procured by fraud and by forgery, and were not the result of any meeting of the minds.

Accordingly, Plaintiffs' declaratory judgment claim also supports granting the preliminary injunction.

> iv.     *Conclusion*.

Plaintiffs have demonstrated a substantial likelihood of success on the merits of their claims for fraud, breach of contract, and declaratory judgment or, alternatively, have raised serious questions as to the merits.  Therefore, the first element for granting injunctive relief is satisfied.

### B.  Plaintiffs Will Suffer Irreparable Harm if the Injunction is Not Granted.

Absent the injunctive relief requested, Wilson will suffer irreparable harm because Defendants will immediately be free to liquidate more than twenty million shares of TFS (if they have not already).  This harm is not speculative, as evidenced by: (1) the Notice of Default stating Defendants' intent to sell the Collateral Shares without further notice to Plaintiffs; (2) Defendants' refusal to continue a stand-still agreement pending trial; and (3) Defendants' persistent refusal to identify the current location or custodian of the Collateral Shares.  (Wilson Decl. ¶¶33, 56, Ex. 16.)

While any monetary value of the shares may be compensable through money damages,

there is imminent threat of substantial irreparable damage that cannot be compensated by money alone.  Wilson has the right to vote the Collateral Shares, and through the substantial number of such shares he is able to exercise a significant role in board composition and significant corporate transactions that require shareholder approval.  (*Id.* ¶¶49-51; Wade Decl. ¶5.)  At a typical TFS annual general shareholder meeting, less than 140 million shares are voted.  (Wilson Decl. ¶49.)  The Collateral Shares would represent approximately 14% of that total.  Wilson has always voted his shares at each TFS annual general shareholder meeting (or instructed others to do so).  (*Id.*)  A loss of the ability to vote approximately 14% of the shares voted at the annual general meeting of shareholders would irreparably reduce his voice in shareholder matters slated for that meeting.  Further, allowing Defendants to sell all or some of the Collateral Shares will disrupt Wilson's role in the company by irreparably diluting his ownership and related control, or losing it altogether.

In a case with similar facts, *Suchodolski Assocs., Inc. v. Cardell Financial Corp.*, the plaintiffs pledged shares of Deltec stock as collateral for a multi-million-dollar loan.  No. 03 Civ. 4148(WHP), 2003 WL 22909149, at *4 (S.D.N.Y. Dec. 10, 2003).  The stock represented about a 25% interest in Deltec.  *Id.* at *1.  The plaintiffs alleged that the defendants intentionally caused plaintiffs to default on the loan with the purpose of "engineer[ing] a 'corporate coup d'etat' whereby [the defendants], through the exercise of its security under the [loan], would acquire a majority ownership in, and control of, Deltec and its assets."  *Id*. at *2.  The Court granted Plaintiffs' application for a preliminary injunction to preserve the status quo pending a full trial on the merits.  *Id*. at *5.  As to irreparable harm, the Court held:

> Upon exercise of the pledges and warrants by Cardell, plaintiffs will lose both their shares and their ability to participate in the business of Deltec. **The dilution of a party's stake in, or a party's loss of control of, a business constitutes irreparable harm**.

*Id*. at *4 (emphasis added) (collecting cases).  Similarly, without injunction relief, Wilson will lose

his voting rights, and his substantial control and management over TFS.  *See id.*[7]

Additionally, the false suggestion that Wilson "defaulted" on even a sham loan secured by the Collateral Shares would severely impact Wilson's business reputation.  (Wilson Decl. ¶52.) This type of non-compensable reputational damage is further evidence of irreparable harm.  *See Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) (finding "irreparable harm through loss of reputation, good will, and business opportunities").[8]

### C.  The Balance of Hardships Weighs Decidedly in Plaintiffs' Favor.

Plaintiffs face significant, irreparable harm if the injunction is not granted: (1) Wilson would lose his voting power within the company, diluting or removing his ability to participate in important decisions and actions; and (2) Wilson will suffer the reputational harm associated with the appearance of a "default" on a secured loan that could lead to a loss of support for Wilson by the officers and shareholders, despite the fact that all parties agree he was never in default of the 2015 MLA and there has not been a single dollar loaned under the sham 2016 transaction.  (Wilson Decl. ¶42.)  Because Defendants would be free to sell the Collateral Shares before resolution of this action, all of these effects would occur before Plaintiffs have an opportunity to present their case at trial.

---

[7]     *See also Int'l Banknote Co. v. Muller*, 713 F. Supp. 612, 623 (S.D.N.Y. 1989) ("Courts have consistently found that corporate management subjects shareholders to irreparable harm by denying them the right to vote their shares or unnecessarily frustrating them in their attempt to obtain representation on the board of directors."); *Street v. Vitti*, 685 F. Supp. 379, 384 (S.D.N.Y. 1988) (finding irreparable harm sufficient to support a preliminary injunction where plaintiffs would lose their rights to inspect corporate books, plaintiffs' shareholdings would be diluted, and plaintiffs' voices in corporate management would be destroyed); *Danaher Corp. v. Chicago Pneumatic Tool Co.*, No. 86 Civ. 3499 (PNL) slip op., 1986 WL 7001 (S.D.N.Y. June 16, 1986)) (finding irreparable harm where defendants refused "to implement the controlling shareholders actions by written consent, bar[ring] the controlling shareholders from exercising he control that is rightfully theirs"); *Casita, LP, v. Maplewood Equity Partners (Offshore) Ltd.*, No. 603525/2005, 2007 WL 4294741, at *8 (N.Y. Sup. Ct. 2007) ("[Plaintiff's] loss of some or all of its investment . . . by reason of a forced sale of its Class A Shares, and/or its loss of the voting and decision-making rights appurtenant to those shares, would constitute irreparable injury.").

[8]     *See also Coastal Distribution, LLC v. Town of Babylon*, 216 F. App'x 97, 100 (2d Cir. 2007) (injury to perception of ongoing business constitutes irreparable harm); *Jordan v. Metro. Life Ins. Co.*, 280 F. Supp.2d 104, 109 (S.D.N.Y. 2003) (finding irreparable harm where Defendant painted plaintiffs "unethical" which threatened to endanger plaintiff's ability to attract employers and new clients and maintain his current client base).

By contrast, the hardship to Defendants resulting from the requested injunctive relief is minimal, and is **purely monetary**.  The value of the Collateral Shares is more than three times the amount lent, and therefore Defendants would remain fully secured for the 2015 MLA.

As to the proposed 2016 deal, because Defendants disbursed no funds they can hardly be at risk of hardship.  To the extent that Defendants claim they are entitled to any principal and/or interest payments under the proposed 2016 deal, a bond could sufficiently address that concern. *See Suchodolski*, 2003 WL 22909149, at *5 (finding that "[a]bsent an injunction, plaintiffs will lose their shares in Deltec and their right to participate in the business," and finding no hardship on the defendants where plaintiffs advanced certain costs and security to protect the defendants' interests); *see also Golden Krust Patties, Inc. v. Bullock*, 957 F. Supp.2d 186, 202–03 (E.D.N.Y. 2013) (requiring a $20,000 bond representing three monthly payments under a disputed lease).

The balance of equities also tip decidedly in Plaintiffs' favor.  It is undisputed that Plaintiffs have complied with their obligations under the 2015 MLA.  In return, Defendants misled Plaintiffs as to their agreement to material terms of the proposed 2016 MLA, pressured Murphy to execute documents that had not yet been finalized and that they knew were conditional, declared default within hours after receiving the signed agreements, and then misappropriated the Collateral Shares, all without disbursing a dime in connection with the new loan.  Finally, after Murphy submitted a truthful declaration in support of his claims, Maass threatened his livelihood, well-being, and personal safety.  The Court should make clear that bad faith conduct of this sort will not be tolerated and enjoin Defendants from causing further harm before the case can be fully resolved on the merits.

### D.  No Public Interest is Disserved by the Requested Injunction.

The final requirement for a preliminary injunctive relief is "that the public interest would

not be disserved by the issuance of an injunction." *Benihana*, 784 F.3d at 895.  As a dispute between two private parties, this action implicates few, if any, public interests.  Nevertheless, the public may have a general interest in exposing and deterring fraud, particularly where Defendants likely have, and will continue to, victimize other innocent third parties.[9]  At a minimum, granting the injunction would not disserve any public interest and therefore this element for injunction relief is satisfied.

### E.  Injunction Requested.

For all of the foregoing reasons, Plaintiffs request that the Court issue a narrowly-tailored injunction, in order to preserve the status quo pending a trial on the merits, that: (1) compels Defendants to disclose the current location of, custodian for, and custodial agreement for the Collateral Shares; (2) prevents Defendants from trading, encumbering, selling, pledging, hypothecating, or otherwise disposing of the Collateral Shares in any way; and (3) compels Defendants to vote the Collateral Shares per Wilson's instructions.

### IV.   CONCLUSION

For the reasons above, Plaintiffs respectfully request that this Court grant their Motion for Preliminary Injunction.

DATED: March 13, 2017

**DAVIS SANTOS, P.C.**
By:  /s/ Jason Davis
         Jason Davis
719 S. Flores Street
San Antonio, TX 78204

---

[9]      *See FXDirectDealer, LLC v. Abadi*, No. 12 CIV. 1796 CM, 2012 WL 1155139, at *8 (S.D.N.Y. Apr. 5, 2012) (finding that the public has an interest in curbing cyber-fraud); *Quantum Corp. Funding, Ltd. v. Assist You Home Health Care Servs. of VA.*, 144 F. Supp.2d 241, 249 (S.D.N.Y. 2001) (finding "continuing pattern of bad-faith by [the defendant] in evading creditor claims" relevant to public's interest); *Corning Glass Works v. Jeannette Glass Co.*, 308 F. Supp. 1321, 1328 (S.D.N.Y. 1970) (finding defendants' deceiving consumers as relevant to public interest).

Tel: 210.853.5882
E-mail: jdavis@dslawpc.com
*Attorneys for Plaintiffs Domenica Nominees Pty. Ltd.*
*and Frank Wilson*
*(Admitted Pro Hac Vice)*


**SHER TREMONTE LLP**
By: /s/ Michael M. Tremonte
          Michael Tremonte
          Mark Cuccaro
80 Broad Street, 13th Floor
New York, New York 10004
Tel: 212.202.2600
E-mail: mtremonte@shertremonte.com
*Attorneys for Plaintiffs Domenica Nominees Pty. Ltd.*
*and Frank Wilson*


**STOEL RIVES LLP**
By: /s/ B. John Casey
          B. John Casey
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
Tel: 503.294.9170
E-mail: john.casey@stoel.com
*Attorneys for Plaintiff Lucerne Australia Pty. Ltd.*
*(Admitted Pro Hac Vice)*


**K&L GATES LLP**
By: /s/ Joanna Diakos
          Joanna Diakos
599 Lexington Avenue
New York, NY 10022
Tel: 212.536.4807
E-mail: Joanna.DiakosKordalis@klgates.com
SDNY Bar No. JD/7269
*Attorneys for Plaintiff Lucerne Australia Pty. Ltd.*

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to S.D.N.Y. LR 5, service of this document has been accomplished via notice of electronic filing generated by the Court's electronic filing system.