UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DOMENICA NOMINEES PTY. LTD.;
FRANK WILSON; and LUCERNE
AUSTRALIA PTY. LTD.,

        Plaintiffs,

    -against-

EMERGING MARKETS INTRINSIC
CAYMAN, LTD.; EMERGING MARKETS
INTRINSIC, LTD.; SRT CAPITAL
SEGREGATED PORTFOLIO COMPANY
TFC; CGO V, LLC; SRT CAPITAL SPC,
LTD.; ERIC MAASS; and BULENT
TOROS,

        Defendants.

---

Case No. 16-cv-09016 (VEC)

**DECLARATION OF FRANK CULLITY WILSON IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

## DECLARATION OF FRANK CULLITY WILSON

I, Frank Cullity Wilson, pursuant to 28 U.S.C. § 1746, do state under penalty of perjury as follows:

1.      My name is Frank Cullity Wilson. I am over twenty-one years old and competent to make this declaration. The facts stated in this declaration are within my personal knowledge and are true and correct

2.      I co-founded and am currently the Chief Executive Officer of TFS Corporation Ltd. ("TFS"). TFS owns and manages sandalwood plantations, processing, and distilling facilities in Australia. TFS and its U.S. subsidiaries employ over five hundred people.

3.      TFS is a publicly traded company on the Australian Securities Exchange (the "ASX"). TFS shares are traded on the ASX under the symbol TFC. As of June 30, 2016, TFS had a market capitalization of approximately $547,207,000 (AUD) based on a closing share price of $1.41.

4.      Domenica Nominees Pty. Ltd. ("Domenica"), an Australian entity, is controlled and owned by my family. Domenica has at all relevant times been the beneficial owner of a substantial number of shares of TFS.

5.      In the summer of 2015, I desired to borrow funds in connection with certain contemplated business and personal transactions. Anthony Murphy, an Australian investment advisor, approached me with the idea of a securities-backed loan and introduced to me Emerging Markets Intrinsic Cayman Ltd. ("EMI"). Before this introduction, I had never met or done business with EMI or its principals, Eric Maass and Bulent Toros.

6.      As my negotiations with EMI progressed, EMI conditioned its participation in the transaction on the formation of a new entity, SRT Capital Segregated Portfolio Company TFC ("SRT"), a company based in the Cayman Islands, to serve as the anonymous borrower. I was

consistently told by EMI, and specifically through Mr. Murphy, Mr. Maass and Mr. Toros, that I would own and control SRT and that my family would remain the beneficial owners of the Collateral Shares.

7.     On or about July 2, 2015, SRT (as borrower) and EMI (as Lender) executed and delivered a Margin Lending Agreement (the "2015 Margin Lending Agreement") that attached a term sheet dated May 20, 2015 (the "2015 Term Sheet").  A true and correct copy of the 2015 Margin Lending Agreement with 2015 Term Sheet is attached hereto as **Exhibit 1**.  I signed the 2015 Margin Lending Agreement and 2015 Term Sheet as borrower.

8.     To secure SRT's payment obligations under the 2015 Margin Lending Agreement, Domenica delivered approximately 22,534,000 TFS shares to EMI (the "Collateral Shares").  The Collateral Shares represent approximately 40% of my direct or indirect stock holdings in TFS.

9.     One of the key and critical terms in the 2015 Margin Lending Agreement that I negotiated for was my retained right to vote the Collateral Shares.  Specifically, EMI was required to vote the Collateral Shares as I instructed them.  As co-founder, CEO, and owner of a significant number of shares of TFS, this term was important to me as it allowed me to retain my substantial role in oversight of and control over board management and composition, and matters requiring shareholder approval.

10.    Other key and critical terms of the 2015 Margin Lending Agreement that I negotiated for included, among others: (a) my retained right to immediate payment of all dividends paid on the Collateral Shares; and (b) that EMI could not trade, sell, mortgage, or encumber the Collateral Shares to any third parties.

11.    SRT, Domenica, and I are, and at all times have been, in compliance with all required obligations under the 2015 Margin Lending Agreement.

12. In 2016, I began exploring a possible additional loan transaction with EMI. At all times during these negotiations, I was insistent that the key and critical terms that I had bargained for in the 2015 Margin Lending Agreement be included in the new proposed transactions, namely: (a) I was to be afforded the exclusive and immediate right to payment of all dividends on the Collateral Shares; (b) I was to be afforded control over voting the Collateral Shares by requiring EMI to vote them as per my instructions; (c) EMI could not trade, sell, mortgage, or encumber the Collateral Shares to third parties; and (d) I required confirmation that EMI would and did vote the Collateral Shares per my instructions at the TFS annual meeting in November 2016 before proceeding with any new deal.

13. In October of 2016, the discussions had evolved to the point that EMI, acting through Mr. Murphy, presented me with proposed documents. Promptly following receipt of the proposed documents, on October 4, 2016, I e-mailed Mr. Murphy expressing my significant concern of the proposed terms, as they did not contain any of the critical points above. A true and correct copy of this October 4, 2016 e-mail is attached hereto as **Exhibit 2**.

14. In the October 4, 2016 e-mail, I made my position clear to Mr. Murphy that, among other things, I could not agree to the proposed deal documents because they did not retain my right to control the voting of the Collateral Shares or my right to receive all dividends. In my e-mail, I likened the proposed provisions to the contrary as "horror clauses."

15. In addition to incorporating these changes, I also made it absolutely clear that I needed confirmation from EMI that it would vote the Collateral Shares per my instructions at the upcoming annual shareholder meeting slated for that November before I would even consider doing another deal with EMI. I made this position known and clear to Mr. Murphy and to EMI (through Mr. Murphy and Mr. Maass) in various phone calls and e-mails. From my original receipt of the proposed deal documents to the present, I have never wavered in my position that there

would be no deal if: (a) the deal documents did not afford me the exclusive and immediate right to payment of all dividends on the Collateral Shares; (b) the deal documents did not afford me control over voting the Collateral Shares by requiring EMI to vote them as per my instructions; (c) the deal documents did not provide that EMI could not trade, sell, mortgage, or encumber the Collateral Shares to third parties; and (d) I did not receive confirmation that EMI would and did vote the Collateral Shares per my instructions at the annual meeting in November 2016.  At all times, I was steadfast in my position.

16. On October 30, 2016, I e-mailed Mr. Murphy and Mr. Wade concerning the negotiations of the proposed 2016 transaction.  Attached hereto as **Exhibit 3** is a true and correct copy of that e-mail.  In my October 30, 2016 e-mail, I instructed Mr. Murphy and Mr. Wade that the term sheet for the new deal should make certain points identified in Mr. Murphy's e-mail "unambiguously clear," including the requirement that I would be entitled to immediate payment of all dividends on the Collateral Shares.

17. On October 30, I was not aware, and no one informed me, that Mr. Murphy and Mr. Maass had already signed a term sheet for the new deal.  In fact, I had not even seen a revised or final term sheet.  I had not authorized, and never did authorize, Mr. Murphy to bind me to any deal documents, much less one I had never seen and did not know existed.

18. Later that same day, I participated in a phone call with Mr. Murphy and Mr. Maass, during which I repeated my conditions and prerequisites for there to be any deal: (a) the deal documents must be amended to afford me the exclusive and immediate right to payment of all dividends on the Collateral Shares; (b) the deal documents must be amended to afford me control over voting the Collateral Shares by requiring EMI to vote them as per my instructions; and (c) I needed to receive confirmation that EMI would and did vote the Collateral Shares per my instructions at the annual meeting in November 2016.  I also indicated that the additional terms

referenced in Mr. Murphy's October 30 e-mail needed to be included, namely that the documents be amended: (a) to protect the ability of the borrower to use the cash in the trading collateral account to meet margin calls; (b) for the borrower to exit the loan at any time upon paying out the remaining term interest; (c) and for the borrower to apply interest earned on the trading collateral account against interest payable.  I made it clear that I had no intention of entering into a new transaction unless or until all of these conditions were met, that my required terms were incorporated into the deal documents, and that my Australian counsel, Mr. Wade, had an opportunity to review, vet, and approve the deal documents.

19.    At no point during the October 30 call did Mr. Maass or Mr. Murphy, or anyone else, inform me that: (a) a term sheet had already been executed; (b) that Mr. Murphy had signed the term sheet; (c) that the executed term sheet had been delivered to EMI; or (d) that the executed term sheet purported to require a transfer of the original Collateral Shares plus an additional 24,943,871 shares of TFS stock the very next day (November 1, 2016).  It was my understanding, from the representations of EMI, through Mr. Murphy and Mr. Maass, that the terms of the deal were still being negotiated.  In fact, during this call, Mr. Maass stated that he agreed to all of my proposed terms and changes, with one exception—the term of the contemplated loan.  Mr. Maass stated that EMI would revise the deal documents to reflect all of my other proposed changes and would confer with his United States counsel, Mr. Wayne Martino, regarding my request for a shorter loan term.  At the end of the call, Mr. Maass indicated that he would circulate revised drafts of the deal documents for review and comment.

20.    Following the October 30 phone call, and on the same evening, I sent an e-mail to Mr. Wade and Mr. Murphy to memorialize the discussion.  Attached hereto as **Exhibit 4** is a true and correct copy of that e-mail.  In this e-mail attached as Exhibit 4, I confirmed my understanding that the "last remaining issue" under the "proposed term sheet" was the term of the loan.  I also

expressed my concern that EMI was not following my instructions for voting the Collateral Shares at the November annual shareholder meeting (in Exhibit 4, I refer to this meeting as the "AGM"). I explicitly stated that "until I see they have been voted I am not willing to enter into another transaction where I would be relying on them even more."

21.     Subsequently, I received an e-mail from Mr. Wade.  Attached hereto as **Exhibit 5** is a true and correct copy of that e-mail.  In Mr. Wade's e-mail to me attached as Exhibit 5, he asks Mr. Murphy, who is copied on the e-mail, to send him Word versions of the deal documents so he can revise and edit them.

22.     Thereafter, I e-mailed Mr. Murphy and Mr. Wade.  Attached hereto as **Exhibit 6** is a true and correct copy of that e-mail.  In my e-mail attached as Exhibit 6, I expressly stated that I was committed to the transaction "on the condition" that: (a) all of the changes discussed in the phone call earlier that day (October 30) were incorporated; and (b) that I receive confirmation that the Collateral Shares would be voted per my instructions at the annual meeting in November.  At this time, I was awaiting receipt of the final proposed deal documents for my review, and for my counsel Mr. Wade's review, and awaiting confirmation that the Collateral Shares had been voted.

23.     The next day, October 31, 2016, I sent an e-mail to Mr. Murphy and Mr. Wade to check in on the status of the proposed transaction.  Attached hereto as **Exhibit 7** is a true and correct copy of that e-mail.  In my October 31 e-mail attached as Exhibit 7, I reiterated that "subject to" confirmation that the Collateral Shares would be voted per my instructions and the deal documents being revised to reflect "what they have agreed verbally," referring to the October 30 call, that I was willing to move forward

24.     In response to my e-mail in Exhibit 7, I received an e-mail from Mr. Wade on October 31, 2016, asking Mr. Murphy once again for the Word versions of the draft documents.  Attached hereto as **Exhibit 8** is a true and correct copy of that e-mail.

25. Also on October 31, I was copied on and received an e-mail from Mr. Wade. Attached hereto as **Exhibit 9** is a true and correct copy of that e-mail. In that e-mail thread, Mr. Murphy had suggested that the deal move forward without a revised term sheet. In response, Mr. Wade correctly stated my position: "Frank has made it clear that he wants to see a revised terms sheet which incorporates what has been discussed."

26. Subsequently, I received an e-mail from Mr. Murphy. Attached hereto as **Exhibit 10** is a true and correct copy of that e-mail. In his e-mail attached as Exhibit 10, Mr. Murphy suggests that Mr. Wade draft an addendum "listing the changes Eric [Maass] agreed to over the phone," which I understood to be referring to the October 30 phone call in which I participated.

27. On October 31, I sent an e-mail in response to the e-mail contained in Exhibit 10. Attached hereto as **Exhibit 11** is a true and correct copy of that e-mail. In that e-mail, I responded to Mr. Murphy that until EMI "confirmed their acceptance of our amendments" and "until they have voted [the Collateral Shares,]" that the deal "won't be happening."

28. In response to the e-mail I sent in Exhibit 11, I received an e-mail from Mr. Murphy. Attached hereto as **Exhibit 12** is a true and correct copy of that e-mail that I received on October 31, 2016. In this e-mail, Mr. Murphy informed me that that he believed "executed documents today will leave the deal alive but zero shares will be transferring until your existing shares are voted"— otherwise, "no deal."

29. In response to the e-mail I received in Exhibit 12, I sent an e-mail to Mr. Murphy and Mr. Wade. Attached hereto as **Exhibit 13** is a true and correct copy of that e-mail. In that e-mail, I reiterated that EMI need to vote the Collateral Shares per my instructions or there would be no deal.

30. At the time the e-mails were sent and received on October 31, 2016, I was not aware of, and no one had informed me, that a term sheet had been executed—without my knowledge or

authorization—and delivered to EMI.  No one informed me of these facts on November 1, 2016, or on November 2, 2016.  I did not authorize Mr. Murphy to sign deal documents on my behalf, much less one I had never seen, did not know existed, and had not been vetted by my counsel, Mr. Wade.

31. On November 2, 2016, after a series of e-mail exchanges during which Mr. Murphy states that EMI does not expect the deal to go through unless EMI votes the Collateral Shares per my instructions, I received an e-mail from Mr. Wade in response to the exchange between Mr. Murphy and me.  Attached hereto as **Exhibit 14** is a true and correct copy of the e-mail that I received on October 31, 2016.  In this e-mail, Mr. Wade again asks for the Word version of the deal documents so he can make our required changes to them.

32. I received a response from Mr. Murphy to my e-mail contained in Exhibit 14.  Attached hereto as **Exhibit 15** is a true and correct copy of that e-mail, which I received on November 2, 2016.  In the e-mail, Mr. Murphy states that he "submitted the discussed/agreed changes" and "instructed EMI to incorporate them into the final TS [term sheet]."   I was therefore anticipating that we would be receiving a new proposed term sheet reflecting our discussions in the October 30 call that could be reviewed by my counsel, Mr. Wade.

33. Instead, on November 3, 2016, while I was travelling in the United States, I received an e-mail from Mr. Murphy advising that Lucerne had received a Notice of Event of Default from CGO V, LLC ("CGO V") to Lucerne Australia Pty. Ltd., ("Lucerne Australia") (the "Notice of Default").  The Notice of Default alleges that Lucerne Australia was in default under a purported 2016 Margin Lending Agreement and a 2016 Term Sheet.  Attached hereto as **Exhibit 16** is true and correct copy of the Notice of Default.   This was the very first time that I became aware of any purportedly executed 2016 Margin Lending Agreement or 2016 Term Sheet or that they had been delivered to EMI.

34. That same day, after I questioned Mr. Murphy about the Notice of Default, he sent me an e-mail attaching an Assignment and Assumption Agreement (the "Assignment") and a 2016 Margin Lending Agreement. A true and correct copy of this November 3, 2016 e-mail, with attachments, is attached hereto as **Exhibit 17**.

35. On November 3, 2016, upon seeing these unauthorized documents, I immediately e-mailed Mr. Murphy and informed him that I did not sign the Assignment and did not give him authority to sign the Assignment for me. Attached hereto as **Exhibit 18** is a true and correct copy of that e-mail.

36. Subsequently, Mr. Murphy forwarded me a copy of the fully executed Assignment. A true and correct copy of the purported Assignment, as provided to me by Mr. Murphy, is attached hereto as **Exhibit 19**. The Assignment in Exhibit 19 purports to assign all of SRT's and my individual rights and obligations related to the 2015 Margin Lending Agreement to Lucerne Australia. The Assignment further purports to assign all of EMI's rights and obligations as Lender to CGO V. The Assignment has two signature blocks with my name on it and what purports to be my signatures; however, I never signed the Assignment. I never authorized anyone to sign my name on the Assignment. I never approved, accepted, or agreed to the terms of the Assignment. This was the first time I became aware that Mr. Murphy used my facsimile signatures on the Assignment. Mr. Murphy also forwarded me a copy of the fully executed 2016 Margin Lending Agreement, by and among Lucerne Australia (as borrower), CGO V (as lender) and SRT Capital SPC, Ltd. (as agent). Attached hereto as **Exhibit 20** is true and correct copy of the 2016 Margin Lending Agreement. Attached as Exhibit A to the 2016 Margin Lending Agreement is a purported Term Sheet (the "2016 Term Sheet"). According to the terms of the 2016 Margin Lending Agreement, the Collateral Shares are pledged as security for Lucerne Australia's obligations under the agreement. I never approved, accepted, or agreed to the terms of the 2016 Margin Lending

Agreement or the 2016 Term Sheet. I never authorized anyone on my behalf to approve, agree or enter these agreements. On the contrary, at all times I made my position clear to Mr. Murphy, and Mr. Maass, that the terms of these prepared agreements were not acceptable and needed to be revised and vetted by my counsel, Mr. Wade.

37. On or about November 4, 2016, I received from Mr. Murphy a copy of an e-mail from Mr. Murphy to Mr. Maass and Mr. Toros (each of whom hold themselves out to be representatives of EMI) objecting to the Notice of Default. A true and correct copy of this November 3, 2016 e-mail, with attachments, is attached hereto as **Exhibit 21**. In the e-mail, Mr. Murphy states that "[i]t has always been very clearly communicated between us, both in our emails and in several telephone calls," that the proposed transaction was conditioned on: (a) the deal documents being amended to incorporate my required changes; and (b) confirmation that the Collateral Shares were voted per my instructions.

38. Despite being placed on notice that the documents were not authorized or agreed to, on November 4, 2016, CGO V sent a Notice of Acceleration to Lucerne Australia, notifying Lucerne Australia of CGO V's intent to accelerate Lucerne Australia's obligations under the 2016 Margin Lending Agreement and demanding payment of AUD 23,666,426 on or before November 9, 2016 (Australian Eastern Daylight Time) (the "Notice of Acceleration"). I received a copy of the Notice of Acceleration from Mr. Murphy, a true and correct copy of which is attached hereto as **Exhibit 22**. In the Notice of Acceleration, CGO V indicates that it may, "sell any of the Share Collateral in public or private sale and without further notice to the maximum extent allowed pursuant to New York UCC Section 9-611(d)."

39. On or about November 5, 2016, I sent an e-mail to Mr. Maass. Attached hereto as **Exhibit 23** is a true and correct copy of that e-mail. In that e-mail, I notified him that I did not sign the Assignment and that the 2015 Margin Lending Agreement has therefore not been assigned

10

to Lucerne Australia.  I also informed him that I never gave anyone permission to agree to the proposed deal documents or sign them on my behalf.  Further, I informed Mr. Maass that EMI appeared in default of the 2015 Margin Lending Agreement for failure to vote the Collateral Shares per my instructions.  I also advised Mr. Maass that I anticipated that dividends would be paid on the Collateral Shares on November 8, 2016, and that I expected them to be paid to me promptly in accordance with the 2015 Margin Lending Agreement.

40. The e-mails contained in **Exhibits 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 17, 18, 21, and 23** were either sent by me from my e-mail address (frank@tfsltd.com.au) or received by me at that same e-mail address.  With the exception of Exhibit 23, all of these e-mails were from or to Mr. Murphy (Anthony.Murphy@lucernepartners.com) and/or Mr. Wade (jeremy.wade@ifflawade.com).  I know these to be Mr. Murphy's and Mr. Wade's e-mail addresses because I have had consistent and successful communications with them at these e-mail addresses over the course of six years (for Mr. Wade) and for over a year (for Mr. Murphy).  During that time, I have received e-mails and responses to e-mails from Mr. Murphy and Mr. Wade from these e-mail addresses.  I sent the e-mail in Exhibit 23 from my e-mail address (frank@tfsltd.com.au) to an e-mail address that I know to belongs to Mr. Maass (EMaass@emintrinsic.com).  I know this to be Mr. Maass' e-mail address Mr. Maass responded to my e-mail, and I have seen other e-mails from him in connection with this proposed deal.

41. On or about November 8, 2016, approximately $675,000 AUD in dividends were paid on the Collateral Shares.  To date, I have not received payment of those dividends from EMI or otherwise.

42. The TFS annual meeting of shareholders was held in November of 2016.  Despite my repeated demands, I believe that EMI did not vote my Collateral Shares per my instructions.  In fact, based on information I received from the TFS company secretary, it appears that the shares

11

were not voted at all and, despite multiple requests, EMI has never provided evidence to the contrary.

43. I am not in default under the 2015 Margin Lending Agreement. I have never received a notice of default under that agreement. I, Domenica, and SRT have complied with all obligations in the 2015 Margin Lending Agreement.

44. At no time did Mr. Murphy have a power of attorney for me, express or implied, or authorization to commit or bind me: (a) to any transaction; (b) to any transaction, the documents for which had not been vetted and approved by Mr. Wade, as my counsel; and (c) to any transaction without confirmation from TFS's company secretary that EMI had voted the Collateral Shares pursuant to my instructions. To the contrary, at every turn, I made my position expressly and abundantly clear to Mr. Murphy that there would be no deal absent incorporation of my required changes into the deal documents, absent vetting and approval of such documents by Mr. Wade, and absent proof that EMI voted the shares as I instructed. None of those conditions occurred.

45. Although the purported 2016 Margin Lending Agreement purports to loan $53 million AUD, CGO V, as lender, did not disburse a single dollar of funds prior to declaring the default or since.

46. The Collateral Shares have an approximate current value of approximately $32 million AUD, far exceeding the balance owed on the 2015 Margin Lending Agreement.

47. As a result of the conduct by Emerging Markets Intrinsic Cayman, Ltd., Emerging Markets Intrinsic, Ltd., SRT Capital Segregated Portfolio Company TFC, CGO V, LLC, SRT Capital SPC, Ltd., Eric Maass, and Bulent Toros, I have suffered financial and monetary damages. For example, I was not paid the approximately $675,000 AUD from the November 8, 2016 dividends paid on the Collateral Shares. If EMI or their agents have sold the Collateral Shares, or

otherwise encumbered or disposed of them, I will have also lost the monetary value associated with those shares (approximately $32 million AUD).

48. Allowing CGO V to sell the Collateral Shares would cause irreparable damages to me that cannot be remedied by a monetary judgment.

49. For example, under the 2015 Margin Lending agreement, I maintained the voting rights for the Collateral Shares. Through these voting rights I was able to exercise a significant role in board composition and significant corporate transactions that require shareholder approval. Allowing the sale of the Collateral Shares will disrupt that role. While I own directly or indirectly other TFS shares, loss of the Collateral Shares would irreparably dilute my ownership and related control. For example, at a typical TFS annual general shareholder meeting, less than 140 million shares are voted. The Collateral Shares would represent approximately 14% of that total. I have always voted my shares at each TFS annual general shareholder meeting (or instructed others to vote my shares). A loss of the ability to vote approximately 14% of the shares voted at an annual general meeting of shareholders would irreparably reduce my voice in important shareholder matters.

50. As a significant owner of TFS shares, including the Collateral Shares, I have significant influence over who is elected as a member of the board of directors of TFS. TFS also decides who serves on their boards of directors of its subsidiaries and approves or disapproves all decisions voted on by the shareholders of each subsidiary. These matters are determined by TFS' board of directors. Therefore, my ability to influence who serves on the TFS board of directors results in my having significant influence over the operations of TFS and its subsidiaries. A loss of the Collateral Shares would result in a loss of such influence.

51. Through my direct ownership stake in TFS, I play a major role in corporate decision making concerning critical corporate transactions and decisions. Reducing my ownership stake

and voice in management through foreclosure of the Collateral Shares would have potentially adverse effects on my role in this capacity.

52. Additionally, allowing CGO V to sell the Collateral Shares will result in significant and possibly irreparable reputational harm to me particularly within the TFS company and among its shareholders. The suggestion that I "defaulted" on a loan, even a sham loan, secured by the Collateral Shares would have devastating effects on my professional reputation, strategic business relationships, overall standing in the business community, and employment capability.

53. The truth is that there has never been a notice of default under the legitimate 2015 Margin Lending Agreement. There has never been even the suggestion of any payment default—even under the unauthorized 2016 Margin Lending Agreement. CGO V never advanced any funds under that agreement to me, and it appears that this entire scenario was intentionally designed to improperly seize the Collateral Shares under a manufactured and contrived "default."

54. CGO V sent its Notice of Default within hours of receiving my unauthorized facsimile "signatures" on the documents it now seeks to enforce. Those signatures were not mine and were not placed on those documents with my express or implied authority or with my knowledge.

55. Creating the false impression based on unauthorized documents that I "defaulted" on a loan would severely impact my business reputation.

56. Through my counsel, I have attempted to determine the current location and custodian of the Collateral Shares, but have not been provided that information from EMI or otherwise.

57. I am not in default of the 2015 Margin Lending Agreement, and have the means to pay off the same. Having never agreed to any final terms, having always expressed my required conditions to moving forward with such a deal, and having never approved or authorized my

facsimile signature on any deal documents, I was shocked to learn that CGO V was attempting to foreclose my Collateral Shares that I pledged for the 2015 Margin Lending Agreement, particularly when it is undisputed that I am not in breach of the same. I brought this lawsuit, not to avoid any legal obligation, but to expose and void the fraud perpetrated on me and Domenica in connection with the proposed 2016 transaction.

*** *Signature on next page*** *

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 13, 2017.

Frank Cullity Wilson