UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------

DOMENICA NOMINEES PTY. LTD.;
FRANK WILSON; and LUCERNE
AUSTRALIA PTY. LTD.,

                Plaintiffs,

           -against-

EMERGING MARKETS INTRINSIC
CAYMAN, LTD.; EMERGING MARKETS
INTRINSIC, LTD.; SRT CAPITAL
SEGREGATED PORTFOLIO COMPANY
TFC; CGO V, LLC; SRT CAPITAL SPC,
LTD.; ERIC MAASS; and BULENT
TOROS,

                Defendants.

------------------------------------------------

Case No. 16-cv-09016 (VEC)

**DECLARATION OF ANTHONY MURPHY IN
SUPPORT OF PLAINTIFFS' MOTION FOR
<u>PRELIMINARY INJUNCTION</u>**

Anthony Murphy declares under penalty of perjury under the laws of the United States of America that the following is true and correct:

1.      In around October 2015, I co-founded a business trading as Lucerne Investment Partners ("Lucerne").  I currently serve as Lucerne's Chief Executive Officer and I am a director of Lucerne Australia Pty Ltd.  Lucerne is a financial services firm with offices in Melbourne, Australia and Singapore.

2.      Prior to forming Lucerne, I founded and led the Australian Wealth Management business at Canaccord Genuity ("Canaccord"), a global investment bank.

3.      As part of its investment banking services, Lucerne works with individuals and public and private enterprises in locating and obtaining capital to achieve the client's growth objectives.  I performed many of the same services during my tenure at Canaccord.

1

I.      **The 2015 Margin Lending Agreement**

4.      In 2014, while still at Canaccord, I met Frank Wilson ("Mr. Wilson").  I understand that Mr. Wilson was a co-founder and remains the CEO of TFS Corporation Ltd. ("TFS"), a publicly traded Australian sandalwood processing company.  I further understand that Mr. Wilson, through Domenica Nominees Pty. Ltd. ("Domenica"), owns or controls a significant number of TFS shares.

5.      Mr. Wilson approached me and expressed an interest in borrowing funds for various purposes, and I introduced him to Emerging Markets Intrinsic Cayman Ltd ("EMI"). EMI provides financing solutions for both institutions and high-net-worth individuals.  Among EMI's Managing Partners at that time were Eric Maass ("Mr. Maass") and Bulent Toros ("Mr. Toros").

6.      I served as a broker for EMI.  EMI would pay me a fee for loans I helped broker. I earned approximately $1 million AUD in origination fees from EMI for other clients I brought to EMI.

7.      After some negotiations, Mr. Wilson and EMI agreed upon lending terms and, as part of the lending transaction that was proposed by EMI, a new entity, SRT Capital Segregated Portfolio Company TFC ("SRT"), was formed to act as the borrower in the transaction.

8.      On or about July 2, 2015, SRT (as Borrower) and EMI (as Lender) executed and delivered a Margin Lending Agreement annexing a Term Sheet dated May 20, 2015 (the "2015 Margin Lending Agreement").  A true and correct copy of the 2015 Margin Lending Agreement is attached to this Declaration as Exhibit 1.

9.      I understand that SRT's payment obligations under the 2015 Margin Lending Agreement were secured by the delivery by Domenica of 22,534,000 TFS shares to EMI (the "Collateral Shares").

10.     I earned approximately $400,000 AUD from EMI for the 2015 Margin Lending Agreement.

## II.     The Proposed 2016 Margin Lending Agreement

### A.     Initial Negotiations

11.     In 2016, I had discussions with Mr. Wilson regarding his related entities entering into an additional loan transaction with EMI.  Over the course of several months, I had several similar discussions with Maass, including some with Mr. Wilson, about a proposed new loan transaction with Mr. Wilson's related entities that would be collateralized by additional TFS stock (approximately 25 million shares) from Mr. Wilson and his related entities.

12.     On September 16, 2016, I had a meeting with Mr. Wilson and Maass in Westchester, Connecticut.  At this meeting, Mr. Wilson and Maass stated that neither needed to complete this deal.  Mr. Wilson also stated that, if the parties did agree to a deal, it should take place after the upcoming TFS annual general meeting, to be held on November 11, 2016.  This would ensure that votes relating to the 22,534,000 shares pledged under the 2015 Margin Lending Agreement could be lodged and recorded correctly.  This did not occur in connection with TFS's 2015 annual meeting, which was of concern to Mr. Wilson.  Maass agreed with this timing.

13.     Later in September, I received from EMI proposed loan documents, as I was acting as EMI's broker and expecting a commission from EMI should the transaction close.  Mr. Wilson did not agree to the initial terms of the new loan documents proposed by EMI and asked me to present to EMI various points on those loan documents, as several of the terms were unacceptable to Mr. Wilson.  For example, on October 4, 2016, Mr. Wilson sent me an email pointing out several material terms that he viewed as unacceptable.  A true and correct copy of the October 4, 2016 email is attached as Exhibit 2.

3

14.     Mr. Wilson stated that "there are some horror clauses littered throughout these agreements that certainly bear no resemblance to the sort of arrangement we had in mind."  Mr. Wilson, I believe, was referring to the discussions between the parties at the September 16 meeting.  Mr. Wilson detailed multiple problems with the agreements as drafted and suggested that EMI needed to "reshape this into a transaction where it is absolutely clear they cannot trade, deal, short any of the shares pledged as security just like the current loan."

15.     There were ongoing discussions during October 2016 which resulted in changes to the Term Sheet and supporting documents for the proposed new facility.  In addition to specific terms of the 2016 transaction documents that needed to be revised, a principal sticking point with Mr. Wilson moving forward with the deal was getting confirmation from Defendants that the Collateral Shares, *i.e.*, the stock pledged under the 2015 transaction, would be voted at the November 2016 annual meeting consistent with Mr. Wilson's instructions.  During this time period, both Mr. Wilson and I repeatedly explained to EMI – via email, in texts, in written communications via an application called WhatsApp, and over the phone – that Mr. Wilson would not proceed on the 2016 deal unless and until EMI provided confirmation of these votes. Just as one example, on October 5, 2016, Mr. Maass and I had the following discussion over WhatsApp:

>     10/5/2016, 11:13 PM - Eric Maass: When does Frank want to be funded
>
>     10/5/2016, 11:14 PM - Anthony Murphy: Ideally asap but he wants to be 100% comfortable on structure and process
>
>     10/5/2016, 11:14 PM - Eric Maass: Roger that

 A true and correct copy of an excerpt of an export of WhatsApp communications containing this correspondence is attached as <u>Exhibit 3</u> hereto.

**B.      October 26 - October 31, 2016**

16.      On Wednesday, October 26, 2016, I spoke to Mr. Maass at approximately 8:12 a.m. (AEST)[1] for approximately 12 minutes.  Mr. Maass inquired about the status of the transaction.  I explained to him that Mr. Wilson was not in a position to finalize the deal or send the additional 25 million in collateral shares by November 1 because of two outstanding issues: (i) the loan documents required further revisions, and (ii) EMI needed to provide confirmation of the votes of the Collateral Shares.  I confirmed that Mr. Wilson; Mr. Wilson's Australian Counsel, Jeremy Wade; and I would be corresponding with each other in the coming days to address amending the terms.

17.      At 10:50 p.m. (AEST) that evening, I had another conversation with Mr. Maass in which he stated that it was important to have a signed term sheet by the following day.  Although Masss stated that he was uncertain about whether EMI would even move forward with the deal, he also stated that a signed term sheet would be a nonbinding gesture of "good faith" that there was still interest in moving forward and would allow EMI to at least keep the capital aside in case the transaction was ever finally consummated.  On this call, I pointed out to Mr. Maass that the draft term sheet provided for a November 1 delivery date – only a few days away – for the new share collateral, and again explained that Mr. Wilson would not be moving forward, and would not be transferring the shares, until the votes for the Share Collateral (under the 2015 agreement) were confirmed.  Mr. Maass stated that he did not care if the new share collateral was delivered after November 1 and that he just needed something to show EMI's Investment Committee that Mr. Wilson was still interested in a possible deal.

18.      On Thursday October 27, 2016, Mr. Maass emailed me and stated:

---

[1]      Most of these communications took place while I was in Australia.  "AEST" stands for Australian Eastern Standard Time, which is 15 hours <u>ahead</u> of U.S. Eastern Standard Time.

As discussed a number of times and mentioned within the attachment, [t]he Term Sheet for this transaction states that the Trade Date is October 25, 2016. It also states that if all the Collateral Shares are not delivered by November 1, 2016 to Lender, Lender has no obligation to honor terms set forth in the term sheet or otherwise complete the transaction and advance the loan. As we are now beyond close of business today in New York, and we are well past close of a Business Day in Sydney, we hereby reserve all of our rights including our obligation to, or not to, transact by the terms and conditions contained in the transaction documents.

Bulent and I will be forced to have an uncomfortable discussion internally (especially after my repeated assurances this was on track and scheduled) whether this transaction remains something we are interested in financing. The 15mios that have been side pocketed for this transaction will now be redeployed as there has been ample time for a decision to be taken.

We respectfully ask that you pay the USD 25,000 for your portion of the legal fees for this transaction. As you well know, have spoken several times with Wayne Martino and his team, an awful lot of time and effort has been spent on this transaction, documents, etc.

If we are interested in carrying forward, we will consult with our analysts and investment committee and refresh terms for this transaction.

19.     A true and correct copy of this email is attached as <u>Exhibit 4</u> hereto.

20.     On Thursday, October 27, 2016, I sent to EMI a Term Sheet and Options Agreement signed by me on behalf of Lucerne Australia Pty Ltd., which was listed as the Borrower in the transaction. Consistent with Mr. Maass's representations, I sent the signed Term Sheet and Options Agreement to EMI at the request of EMI and on the understanding that I was demonstrating a commitment to continue to negotiate. Because this was nothing more than my confirming as EMI's broker that there was an interest in continuing negotiations, I did not inform Mr. Wilson or his counsel, Mr. Wade, that there was a signed, nonbinding term sheet.

21.     On Friday, October 28, 2016, I had an extensive telephone conversation with Mr. Wilson's Australian counsel, Mr. Wade, regarding Mr. Wilson's required changes and additions to the terms of the documents. Those changes included the following, among others: the borrower had to be able to (a) use the cash in the trading collateral account to meet margin

calls, (b) exit the loan at any time by paying out the remaining term interest, and (c) apply interest earned on the trading collateral account against interest payable.

22.     Later on October 28, at 8:40 p.m. (AEST), I spoke with Mr. Maass about Mr. Wade's revisions.  I asked Mr. Maass to send me the Term Sheet in Word format so that Mr. Wade could mark up the agreement, but Mr. Maass declined, stating that EMI's lawyer, Wayne Martino, would make Mr. Wilson's changes on their end.  In a WhatsApp communication that Mr. Maass apparently intended to send to his EMI colleague, Mr. Toros, but mistakenly sent to me, Mr. Maass acknowledged that, before closing the deal, I (Murphy) had a "few points to go over but they are straight forward."  Attached hereto as Exhibit 5 is a true and correct copy of an excerpt of an export of WhatsApp communications containing this message.

23.     On Saturday, October 28, Mr. Maass sent me an email, stating that "since the shares are due Nov 1 to keep terms and obligations, the latest we can possibly process the docs for final execution is Monday (preferably this weekend)."  A true and correct copy of this email from Mr. Maass is attached as Exhibit 6 hereto.  I forwarded this communication to Mr. Wilson, and Mr. Wilson, consistent with previous instructions, responded that he was "**definitely not proceeding with this transaction until they have proved they can vote my shares held under the current arrangement**."  A true and correct copy of Mr. Wilson's email is attached as Exhibit 7 hereto (emphasis above supplied).

24.     On Sunday, October 30, 2016,[2] I participated in a telephone call with Mr. Wilson and Mr. Maass (the "October 30 Call").  Mr. Maass, threatening to pull the deal, noted that EMI had kept aside $15 million for this deal for quite some time and that EMI had "more deserving" deals to consider.  Mr. Wilson responded by stating that he did not need to move forward with

---

[2]     The call was at approximately 1:46 a.m. on October 31 (AEST), but it was October 30 for the other participants.

the deal and that he understood if EMI was not prepared to budge on the November 1 collateral delivery date.  Mr. Wilson also explained certain issues he had with the proposed terms and outlined changes he would require before proceeding with the new transaction.  Once again, these changes were that the borrower had to be able to (a) use the cash in the trading collateral account to meet margin calls, (b) exit the loan at any time by paying out the remaining term interest, and (c) apply interest earned on the trading collateral account against interest payable.  Mr. Wilson further explained – yet again – that he would not move forward with the agreements unless and until EMI had voted the Collateral Shares as required by the 2015 Margin Lending Agreement.  After Mr. Wilson explained his position and required changes to the terms, Mr. Maass agreed to all the changes with one exception, which was Mr. Wilson's request for a shorter term for the contemplated loan.  Mr. Maass stated that he would consider that change as well and let Mr. Wilson know his position after EMI's legal counsel, Mr. Martino, drafted and circulated the new Term Sheet for review.

25.     I was thus awaiting from EMI's counsel, Mr. Martino, a draft addendum to the Term Sheet with those changes acceptable to Mr. Wilson.  I also understood, and repeatedly conveyed to Mr. Maass, that without (a) important changes to the transaction documents and (b) confirmation from EMI that the stock pledged under the 2015 transaction would be voted at the November 2016 shareholders' meeting consistent with Mr. Wilson's instructions, Mr. Wilson was unwilling to proceed.

### C.     November 1, 2016

26.     On November 1, 2016, I had several communications with Mr. Wilson, Mr. Toros (of EMI) and Mr. Maass.  The new collateral shares at that point had not been delivered, and Mr. Maass stated several times that the deal was "dead."

27.     Several of these communications took place over WhatsApp.  At 7:51 a.m. (AEST), I stated to Mr. Maass that "[Frank]'s[3] unlikely to move until it's been confirmed stock is voted.  Too much risk for him and I can't push him on that."  At 9:04 a.m. (AEST), I messaged Mr. Toros that "Frank wants to proceed he just can't without knowing 100% the stock is voted." At 8:09 a.m., I wrote to Mr. Maass that "I can't control TFS nor Frank. I can't force him to transfer his stock."   In response to these communications about Mr. Wilson's consent still being conditional, Mr. Maass not only called the deal "off" and "dead," but began threatening not to move forward on other deals I was working on with EMI.  True and correct copies of excerpts of an export of WhatsApp communications containing these messages  are attached as Exhibit 8 hereto.

28.     At 8:12 a.m., in response to these WhatsApp communications with Mr. Maass, I messaged Mr. Wilson and stated: "Hi mate, fyi EMI will be withdrawing the deal today."  Mr. Wilson responded as follows:  "K happy to sit and see if something comes around again with EMI, not fussed, as this deal is way too big to take any risks on voting. … EMI have not impressed on this voting issue two yrs in a row."  True and correct copies of screenshots of these communications are attached as Exhibit 9 hereto.

29.     I continued to dialogue with Mr. Maass in WhatsApp.  During the course of this dialogue, I also had a call with Mr. Maass at 12:17 p.m. (AEST).  During the call, Mr. Maass backed away from the "deal is dead" stance he was taking on our previous WhatsApp correspondence.  Acknowledging that there were deal points that still needed to be incorporated into the final term sheet, Mr. Maass stated that if the Assignment Agreement and the Margin Lending Agreement were received by close of business November 1, 2016, this would be a gesture of "goodwill" to EMI's Investment Committee that would demonstrate that Mr. Wilson

---

[3]     References to "Frank" are to Mr. Wilson.

was still interested in the proposed transaction.  Mr. Maass, however, also stated that there was

no guarantee that EMI would proceed with the proposed transaction, even with the "goodwill"

documents, as he was aware that TFS shares would not be delivered as collateral by November 1,

2016 under the Term Sheet.  On this call, I told Mr. Maass that I would convey all of this to Mr.

Wilson, but that final acceptance would <u>still</u> be subject to (a) the additional terms in the

transaction documents per the October 30 Call and (b) voting confirmation.

30.     At 12:37 p.m. (AEST), I spoke with Mr. Wilson.  Mr. Wilson stated that he was

willing to continue negotiating to "keep the deal alive," but that his final acceptance was

conditioned on the amendments agreed to during the October 30 Call and on the votes coming in

as he requested.  At 1 p.m. (AEST), I again spoke with Mr. Maass.  I again confirmed with Mr.

Maass that sending the balance of the documents would keep the deal alive but that the deal was

not final until the terms had been revised and the Collateral Shares had been voted in accordance

with Mr. Wilson's instructions.  Mr. Maass continued to be negative about the deal moving

forward but told me "just send [the signed documents] and we'll see how we go."

31.     At 1:37 p.m. (AEST), I messaged Mr. Wilson with the following:  "Producing

executed docs today may not seal the deal but Eric said it'll definitely help. I'll let you discuss

with Jeremy but I can [have] everything executed and ready by 5pm – we've got ppl in the office

today."  A true and correct copy of this message is included as <u>Exhibit 10</u> hereto.

32.     In October 31-November 1 email correspondence between Mr. Wilson and me, a

true and correct copy of which is attached as <u>Exhibit 11</u>, Mr. Wilson confirmed that he was ready

to move forward only if the conditions were met: "I am committed to the transaction on the

condition that our shares are voted in accordance with our instructions, and that the amendments

to be made . . . to the term sheet are accepted, these being the items verbally discussed and

agreed on Sunday night."  Consistent with my conversation and other communications with Mr.

Maass, I informed Wilson that I believed "executed documents today will leave the deal alive but zero shares will be transferring until your existing shares are voted"—otherwise, "no deal." Wilson responded "Cool…. But I don't want you or Lucerne facing flak if ... their lawyer tries to wriggle out of what they verbally agreed to."

33.    At 7:25 p.m. (AEST) on November 1, 2016, in reliance on Mr. Maass's representations, Lucerne forwarded to Mr. Maass signed documents, including the Assignment and Assumption Agreement (the "Assignment Agreement") for which Lucerne affixed a signature from Mr. Wilson.  In my cover email to Mr. Maass enclosing the signed documents, I conveyed – consistent with previous communications – that acceptance of the transaction was conditioned on (a) the additional terms the parties had agreed to on the October 30 Call, and (b) EMI's voting of Domenica's shares pursuant to Mr. Wilson's instructions.   I specifically stated in this email:

> I also note the points I [sought] clarity on during our call on Sunday and would appreciate if these could [be] incorporated into the documents.  I confirm we are committed to this transaction and we're in a position to transfer shares as soon as votes for upcoming AGM have been confirmed by TFS' Company Secretary.

A true and correct copy of this email is attached as <u>Exhibit 12</u> hereto.

34.    About an hour later on November 1, I sent Mr. Maass another email specifically laying out the additional "points" Defendants had agreed to incorporate:

> Hi mate, these were the point[s] we discussed on Sunday night [October 31] that you mentioned Wayne [EMI's counsel] could incorporate:
>
> - Frank will only be charged net interest on trading collateral loan i.e., Interest owed to EMI *less* Interest received on cash they're holding in Trading Collateral.
>
> - All cash in Trading Collateral can be used to cure margin call.

- Facility can be exited at any time provided interest term is
  paid in full.

A true and correct copy of this email is attached as <u>Exhibit 13</u> hereto.

35.     In short, Mr. Wilson confirmed with me that he was interested and willing to continue negotiating a transaction conditioned upon and subject to documenting the additional terms from the October 30 Call and receiving confirmation of the votes.  At no time did I have a power of attorney for Mr. Wilson nor authorization to bind Mr. Wilson to any transaction documents.  Mr. Wilson made it very clear that he would not approve any final deal without vetting and approval by his counsel, Mr. Wade.

**D.     The Notice of Default and Acceleration**

36.     On November 2, 2016, at 1:34 a.m. (AEST), I received a countersigned Assignment Agreement and MLA from EMI.  I messaged Mr. Mass at 2:10 a.m. on WhatsApp stating: "Anyway, you countersigned docs so what does that mean?"  He offered no substantive response, and simply stated "Talk later."  Attached hereto as <u>Exhibit 14</u> is a true and correct copy of an excerpt of an export of WhatsApp communications containing these messages.

37.     Approximately 45 minutes later,  EMI's U.S. Counsel, Mr. Martino, emailed me and requested that I obtain a second signature of Mr. Wilson on the Assignment Agreement. Again, relying on Mr. Maass's representations, Lucerne affixed Mr. Wilson's signature a second time on the signing page of the Assignment Agreement and returned this signature page to Mr. Wayne Martino on November 2, 2016.

38.     On November 3, 2016, at 8:59 a.m. (AEST) -- within hours after Lucerne sent the Assignment Agreement -- I received an email containing a Notice of Event of Default from CGO V, LLC ("CGO V") to Lucerne Australia Pty. Ltd., ("Lucerne Australia") dated November 2, 2016 (the "Notice of Default").  The Notice of Default alleges that Lucerne Australia was in

default under a Margin Lending Agreement and a Term Sheet dated October 25, 2016 ("2016 Margin Lending Agreement").  Attached hereto as <u>Exhibit 15</u> is true and correct copy of the Notice of Default.  The email also referenced the Assignment Agreement on which I had previously placed Mr. Wilson's signature.  It became clear that contrary to his express statements to me, CGO V, as the stated new lender under the Assignment Agreement, was now trying to enforce the documents that Mr. Maass had specifically represented, and that I had always understood, were conditional.

39.     I would never have placed Mr. Wilson's signature on the Assignment Agreement but for my reliance on the understanding, based on all previous correspondence and specific representations made by Mr. Maass, that such documents were not binding because (a) they did not contain the additional terms agreed to on the October 30 Call and (b) EMI never provided confirmation of the votes.  EMI also provided no indication that they would even be proceeding with the deal, but needed signed documents merely as a "goodwill" gesture that Mr. Wilson was still interested in moving forward.

40.     Mr. Wilson never signed the Assignment Agreement.  Mr. Wilson never authorized me on his behalf to agree to be bound by the terms of the Assignment Agreement.  At all times, I believed and represented that there were no binding documents unless and until the material amendments were drafted and executed and votes confirmed for the upcoming annual general meeting of TFS as noted above.

41.     On or about November 4, 2016, I sent an email to Mr. Maass and Mr. Toros objecting to the Notice of Default.  Attached hereto as <u>Exhibit 16</u> is a true and correct copy of my email.

42.     Despite being placed on notice that there was no binding commitment to proceed with the proposed transaction on the terms presented at that time, on November 4, 2016, CGO V

13

sent a Notice of Acceleration to Lucerne Australia, notifying Lucerne Australia of CGO V's intent to accelerate Lucerne Australia's obligations under the 2016 Margin Lending Agreement and demanding payment of $23,666,426 AUD on or before November 9, 2016 (Australian Eastern Daylight Time) (the "Notice of Acceleration").  Attached hereto as <u>Exhibit 17</u> is a true and correct copy of the Notice of Acceleration.  In the Notice of Acceleration, CGO V indicates that it may, "sell any of the Share Collateral in public or private sale and without further notice to the maximum extent allowed pursuant to New York UCC Section 9-611(d)."

III.    **My First Affidavit and Mr. Maass's Bribes, Threats and Harassment**

43.    After sending the Default and Acceleration Notices to Lucerne, Mr. Maass began a campaign -- of both threats and bribes -- to convince me to submit a sworn declaration that supported EMI's false position that: (a) I had authority to sign binding documents on behalf of Mr. Wilson, and (b) there were <u>not</u> additional conditions to the 2016 transaction that needed to be met before Mr. Wilson was willing to proceed.  Mr. Maass specifically threatened that EMI would cease all other business with Lucerne and its clients unless and until I provided such testimony.  Mr. Maass made these threats even though EMI's transactions with Lucerne's other clients had nothing to do with the dispute between EMI and Mr. Wilson.  Mr. Maass acted on this threat by continuing to delay prearranged important phone calls and meetings with these other clients and in doing so damaged their relationship with Lucerne and the likelihood of the agreed transactions proceeding.  Mr. Maass also tried to bribe me for this testimony by offering to give some of "Frank's shares" to my two daughters if I went along with Mr. Maass's demands.

44.    On November 18, 2016, I signed a sworn declaration detailing the facts related to the business relationships between Lucerne, EMI, Wilson, and their affiliates (the "November 18

14

Declaration"). That same day my attorney forwarded my declaration to Scott Reynolds,

counsel for EMI.

45. After sending this declaration to Mr. Reynolds, I received several phone calls,

text messages, and WhatsApp messages from Mr. Maass. In these communications, Mr.

Maass repeatedly berated me and threatened me, Lucerne and my family for providing

truthful testimony in the November 18 Declaration.

46. Attached as <u>Exhibit 18</u> hereto are true and correct copies of screen shots of my

text conversations with Mr. Maas between November 19, 2016 and November 20, 2016. As set

forth in Exhibit 18, Mr. Maass made the following statements, among others, to me over text:

> "I always liked u, far more than others but this has to end"
> "I've always liked u. We're friends. But if it means this vs my firm, it is what it is. U
> never listened to me and I've given you gold"
> "Best of luck"
> "Ben and Jeremy are no in play"
> "Philip — love that guy, he's jumped ship on Lucerne alreDy"
> "Ag will put your chairman on notice Monday"
> "Just spoken to Aaron"
> "Side with frank mate, u need him now"
> "Take care brother"

47. I understand the names and/or initials used by Mr. Maass in his text messages

refer to the following:

- "Ben" refers to Ben Wilson, an Analyst for Lucerne, and Mr. Wilson's son.

- "Jeremy" refers to Jeremy Zehnwirth, Chief Operating Officer of Lucerne.

- "Philip" refers to Philip Kapp of Just Kapital, a corporate client of Lucerne.

- "Ag" refers to Allen & Gledhill, a law firm Singapore, and "Aaron" refers
  to Aaron Lee, an attorney at the firm.

- "frank" refers to Mr. Wilson.

48.     Attached as Exhibit 19 hereto are true and correct copies of screen shots of my conversations with Maas over WhatsApp between November 19, 2016 and November 20, 2016. As set forth in Exhibit 19, Mr. Maass made the following statements, among others, to me via WhatsApp:

> "you fucked yourself"
> "how on earth could you have done something so stupid'?"
> "u try and fry me?"
> "I am one person u don't fuck over"
> "U and your heart on your sleeve has destroyed u"
> "Look forward to seeing both of u in NY and Australia"
> "CU will be to Gadens shortly"
> "Scott saying u are franks bitch"
> "It's over for u"
> "I'm on with Scott now"
> "I've emailed MNY and JKL"
> "Look forward to seeing u in NY"
> "What's your firmwide email?"
> "Lucerne@xxx?"
> "I wish things were different but u have chosen your course"
> "I'm actually shocked at how dumb u actually are but that will come out in time"
> "Take care, Anthony"

49.     I understand the names and/or initials used by Mr. Maass in his WhatsApp messages refer to the following:

- "CU" refers to Clayton Utz, an Australian law firm that represents EMI.

- "Scott" refers to Scott Reynolds, EMI's counsel.

- "frank" refers to Frank Wilson.

- "MNY" refers to Money3, another Lucerne client.

- "JKL" refers to Just Kapital.

- "Gadens" refers to the Gadens law firm, which represents Lucerne.

50.     Between November 19, 2016 and November 20, 2016, Mr. Maass also called me several times – including separate calls at approximately 10:22 a.m., 10:23 a.m., 11:02

a.m., 11:29 a.m., 2:48 p.m. and 3:04 p.m. on November 19, and calls at approximately 8:49 a.m., 9:40 a.m., and 11:41 a.m. on November 20, 2016.

51.      Other witnesses, including my wife, Trace Murphy, were witness to a number of these conversations. During these calls, Mr. Maass appeared to be in a fit of rage, and he was screaming and cursing.  He threatened not only financial harm to me, Lucerne and Lucerne's other clients, but physical harm to me and my family.  Mr. Maass made the following statements, among others, to me over the phone:

> "When you're calling me boss from a jail cell"
> "You are a fucking loser"
> "Coming after the market and then Lucerne"
> "Exercising option"
> "You fat fuckin loser, I'm going to bury you"
> Murphy was going to "blow [his own] head off"
> "You're finished"
> "I could've been your best friend in this and now I'm your worst enemy"
> "Frank and EMI both coming after me"
> "Tell your wife not to have a 3rd baby because you and your family are finished"
> "I'm going to fucking end you and Lucerne and your 20 something employees"
> "How could you be so fucking stupid you fucking moron"
> "You're a pussy, faggot cocksucker and I'm going to destroy your shitty little firm"
> "Wave goodbye to your Dad today (referring to my father's 60th birthday)"
> "We're coming after you across the globe. Singapore is going to get your Chairman"
> "CU is coming after gadens and your cocksucking shitty lawyer, Jol"
> "I bet you don't have $17.5m in the bank for when I exercise this warrant on Monday?"
> "You're fucking finished"
> "Do you think others at Lucerne are going to stick by you when I'm done with you? Go find a shitty job in a Private Bank in shitty Asia now whilst you can"
> "Scott's going to put you on the stand and get you on perjury. I can prove that in points 9 and 13, you're fucking finished"
> "Your firm won't survive this, your family won't survive this. You don't fuck me, I'm going to destroy you and your shitty little firm"
> "You better side pocket $3 to $5m just in legal costs alone because I'm charging you $2,500 an hour, motherfucker"
> "I'm going to destroy you in the US and then in Australia"
> "You're ruined and so is your career. This is the end of you"
> "We're coming after you and so is Frank"
> "Please beg your wife not to have another baby. You're going to be Skyping your girls from prison"
> "I hope your girls will enjoy visiting you behind bars"

"I'm not mad at you for being truthful, I'm mad at you for being an idiot"
"You could've been rich and now you'll have nothing"
"Your family better get used to sleeping outside"
"I'm the one person in this whole world you don't fuck"
"You're a fucking pussy. You tried to play Geneva and I'm going to fuck you as a result"
"Being nice doesn't get you anywhere"
"[Telling the truth] doesn't get you anywhere either, you're fucked"

52.     I understand the names and/or initials used by Mr. Maass on these telephone calls refer to the following:

- "Frank" refers to Mr. Wilson.

- "CU" refers to Clayton Utz.

- "Jol" refers to Lucerne's attorney, Jol Rogers, a partner at Gadens.

53.     I believe Mr. Maass was threatening me, my firm, my firm's clients and my family because I provided honest and accurate testimony in my November 18 Declaration.  After being on the receiving end of these and other statements and threats from Mr. Maass, I have become fearful for my and my family's personal safety.

54.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: March 13, 2017

/s/ Anthony Murphy
ANTHONY MURPHY