UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| DOMENICA NOMINEES PTY. LTD.; FRANK WILSON; and LUCERNE AUSTRALIA PTY. LTD.,<br><br>    Plaintiffs,<br><br> -against-<br><br>EMERGING MARKETS INTRINSIC CAYMAN, LTD.; EMERGING MARKETS INTRINSIC, LTD.; SRT CAPITAL SEGREGATED PORTFOLIO COMPANY TFC; CGO V, LLC; SRT CAPITAL SPC, LTD.; ERIC MAASS; and BULENT TOROS,<br><br>    Defendants. | Case No. 16-cv-09016 (VEC)<br><br>**DECLARATION OF JEREMY JOHN LAWRENCE WADE IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

## DECLARATION OF JEREMY JOHN LAWRENCE WADE

I, Jeremy John Lawrence Wade, pursuant to 28 U.S.C. § 1746, do state under penalty of perjury under the laws of the United States of America as follows:

1. My name is Jeremy John Lawrence Wade. I am over twenty-one years old and competent to make this declaration. The facts stated in this declaration are within my personal knowledge and they are true and correct.

2. I am an attorney licensed to practice in Western Australia. I am currently a Partner at the law firm Iffla Wade in Perth, Western Australia where I specialize in corporate transactional work.

3. I have represented Mr. Frank Wilson and several of his related business interests since 2011.

4. I am personally familiar with Mr. Wilson's positon, relationship, and direct and indirect ownership in TFS Corporation Ltd. ("TFS"). Based in Western Australia, TFS is the world's largest owner and manager of commercial Indian sandalwood plantations. From my interactions with Mr. Wilson over the last six years, I know that Mr. Wilson co-founded, is the Managing Director of and, through Domenica, is the largest shareholder of TFS.

5. From my interactions with Mr. Wilson over the last six years, I am also familiar with the voting practice at TFS annual general shareholders' meetings. From my interactions with Mr. Wilson over the last six years, I know that the right to continue control and vote his TFS Shares is critical for Mr. Wilson to maintain his substantial role in management of TFS.

6. On October 17, 2016, I was requested by Mr. Wilson to provide advice to him concerning a loan transaction being proposed by Emerging Markets Intrinsic Cayman Ltd. ("EMI").

7. On approximately October 18, 2016, I received a draft term sheet relating to the proposed transaction and participated in a teleconference call with Mr. Anthony Murphy and other

representatives of EMI, including Eric Maass, regarding the structuring of a proposed margin lending transaction. During the call, I expressed, among other issues, Mr. Wilson's position concerning his maintaining control over the buying and selling of any collateral securities acquired using funds drawn down under the facility.

8. On or about October 19, 2016, I received an e-mail from Mr. Murphy containing some proposed changes to the draft term sheet to address the issues raised in our call the previous day. The amendments did not address Mr. Wilson's concern that I had expressed in the call the previous day about Mr. Wilson wishing to control the trading in TFS shares acquired using facility.

9. On October 28, 2016, I had an extensive telephone conversation with Mr. Murphy, regarding important changes Mr. Wilson required to the terms of the 2016 Term Sheet. I understood that Mr. Murphy had introduced Mr. Wilson to EMI and, from my discussions with Mr. Murphy, was aware that Mr. Murphy and his company Lucerne Investment Partners had other pending business relationships with EMI unrelated to Mr. Wilson. Mr. Murphy indicated to me that he was looking at a proposed Indonesian transaction. Amongst other matters we discussed was the amount of the proposed loan as it appeared from my calculations that the figures in the proposed term sheet were not correct. At no stage during this conversation did Mr. Murphy indicated that the Term Sheet was in final form, although he did indicate that he considered it likely that EMI would only agree to limited changes. We did not discuss any document other than the term sheet.

10. The next day, on October 31, I e-mailed Mr. Wilson and Mr. Murphy and advised them that I would revise the draft term sheet to reflect the changes agreed to during an October 30 phone call that I understand took place between Mr. Maass, Mr. Murphy, and Mr. Wilson. A true and correct copy of my e-mail is attached hereto as **Exhibit 1**.

11. No one informed Mr. Wilson or me that any term sheet had already been signed nor to my knowledge had any authority—express or implied—been given to bind Mr. Wilson to any

2

transaction. As Mr. Wilson's counsel for this transaction, I would have been aware if such authority had been given, as it was Mr. Wilson's practice to inform me of such matters during the six years that I had been representing him.

12. I was copied on an e-mail from Mr. Wilson to Mr. Murphy stating Mr. Wilson's **conditional** acceptance of the commercial terms—requiring the terms agreed to during the October 30 teleconference and upon Mr. Wilson's receiving confirmation that EMI had voted the TFS shares as Mr. Wilson directed. In a follow-up e-mail, I then requested the term sheet in Word format so I could revise them accordingly. True and correct copies of these e-mails are attached hereto as **Exhibit 2** and **Exhibit 3**.

13. On October 31, 2016, I received a response from Mr. Murphy who stated that the Word documents were not available at that time, and suggested that an additional document be drafted to reflect the terms of the parties' agreement reached during the October 30 phone call. I replied that "Frank has made it clear that he wants to see a revised terms sheet which incorporates what has been discussed." I again asked for Word versions of the deal documents. A true and correct copy of this e-mail is attached hereto as **Exhibit 4**.

14. The next day, November 1, 2016, Mr. Murphy e-mailed me and Mr. Wilson and confirmed that he "submitted the discussed/agreed changes with the other docs and instructed EM to incorporate them into the final TS [term sheet]." A true and correct copy of this e-mail is attached hereto as **Exhibit 5**.

15. The e-mails contained in **Exhibits 1, 2, 3, 4 and 5** were either sent by me from my e-mail address (jeremy.wade@ifflawade.com) or received by me at that same e-mail address. All of these e-mails were from or to Mr. Murphy (Anthony.Murphy@lucernepartners.com) and/or Mr. Wilson (frank@tfsltd.com.au). I know these to be Mr. Murphy's and Mr. Wilson's e-mail addresses because I have had consistent and successful communications with them at these e-mail addresses.

3

16.     On November 2, 2016, I was still asking for the transaction documents in Word format to memorialize the parties' agreement. Shortly thereafter, I was advised that EMI had declared a "default" based on documents that neither I or Mr. Wilson had never approved, and that Mr. Wilson did not execute, much less authorize. These documents did not contain the terms agreed to during the October 30 call, nor did EMI ever confirm the TFS shares had been voted pursuant to Mr. Wilson's instructions.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 13, 2017.

_____
Mr. Jeremy John Lawrence Wade